IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: _____

DIEGO AGNELLI,

    Plaintiff,

v.

LENNOX MIAMI CORP.,

    Defendant.

_____/

## COMPLAINT FOR DAMAGES

Plaintiff Diego Agnelli ("Agnelli"), by and through his undersigned counsel, hereby sues Lennox Miami Corp. ("Lennox" or the "Company"), and states:

## PARTIES, JURISDICTION AND VENUE

1. This is an action for damages in excess of Seventy Five Thousand and 00/100 Dollars ($75,000.00), exclusive of interest, attorneys' fees and costs.

2. Agnelli is an individual, *sui juris*, who is a citizen of Argentina. While Agnelli presently resides in Florida, he is not lawfully admitted for permanent residence in the United States. As such, he is a citizen of a foreign state for diversity jurisdiction purposes.

3. Lennox is a Florida corporation authorized to do business in the State of Florida.

4. Jurisdiction is proper before this Court pursuant to 28 U.S.C. § 1332(a), as Agnelli is a citizen of a foreign state and Lennox is a citizen of Florida, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. Venue is proper before this Court because, among other things, (1) the contract breached by Lennox contains an exclusive venue provision for Miami-Dade County; and (2) the events giving rise to this cause of action accrued in Miami-Dade County.

## GENERAL ALLEGATIONS

6. At all material times, Lennox has operated the hotel located at 1900 Collins Avenue, Miami, Florida 33139 (the "Hotel").

7. Agnelli served as the President of Lennox from November 2010 until July 2020.

8. In December 2017, Agnelli and Lennox entered into an Employment Agreement for the term of January 1, 2018 through January 1, 2023 (the "Employment Term"). A true and correct copy of the Employment Agreement is attached as Exhibit A.

9. The Employment Agreement was executed by Juan Castellanos Bonillo ("Castellanos"), as Vice President of Lennox. Castellanos was Agnelli's father-in-law, and provided investment capital for Lennox while Agnelli put in the sweat equity for Lennox.

10. Pursuant to the Employment Agreement, during the Employment Term, Agnelli was to have "sole supervision, management, direction and control" over the management of Lennox. Employment Agreement ¶ 3.

11. During Agnelli's tenure as President, Agnelli had the lead role in the day-to-day development and operations of the Hotel in Miami Beach and cultivating the "Lennox" brand, which is now known for its upscale, sophisticated, and uniquely modern boutique hotels.[1]

12. The Hotel, for example, is a modern reinterpretation of an iconic 1930's Art Deco revival building. The Hotel is renowned for being one of the best modern remodels of a historic building in Miami Beach. It is stylish, artistic, and meticulously designed and decorated. These were all details planned and executed by Agnelli, whose passion and tireless work for the hotels is the moving force behind the Lennox brand's success. Under Agnelli's leadership, in less than 8 months, the Hotel became #1 out of 222 hotels on TripAdvisor.

---

[1] Agnelli has also helped successfully build up two (2) Lennox-branded hotels in Argentina.

13. Agnelli's labor and unique skillset were crucial to Lennox's success. Agnelli was the mastermind behind the Hotel and the development of the brand. He built the Hotel from the ground up, personally involving himself in all aspects of the project, including big picture development, construction, design, marketing, and sales. Agnelli oversaw employee training, the creation of operating manuals and controls, and all aspects of administration and management of the Hotel.

14. Agnelli put together an audit and inventory control system that helps the Hotel run efficiently, keeping costs low and exceeding the industry average for hotel profits.

15. Agnelli was also indispensable in establishing Lennox's elite position in the hotel market. He secured high-end events and affiliations that generated a significant amount of revenue for the Hotel, such as Paraiso, Cabana, Chopard, and Porsche. Agnelli made Lennox the headquarters for the Paraiso Miami Beach Swim Week show because of his involvement with the Miami fashion industry.

16. Agnelli also partnered with several high-end South American influencers to showcase the Hotel and expand the brand to the South American market.

17. Agnelli's involvement and aggressive sales approach led to the Hotel's early success. Among other things, Agnelli secured a high-end buyout group for the 2020 Super Bowl in Miami, which generated half a million dollars in revenue for the Hotel in the span of four days.

18. The Employment Agreement includes the following provision:

> <u>Termination without Cause</u>. This Agreement may be terminated without Cause by the Company or the Employee, at any time upon giving written notice to the other party of such termination. If the Company terminates this Agreement without Cause, the Parties acknowledge that the actual damages likely to result from breach of this Agreement are difficult to estimate on the date of this Agreement, and would be difficult for the Parties to prove. Accordingly, the Parties agree that in the event of any breach of the obligations and responsibilities set forth in this Section 2(b), the Company shall pay the Employee USD $6 Million, which amount reflects five (5) years of Employee's salary, as Liquidated Damages (the "Liquidated Damages Amount"). The parties intend that Company's payment of the Liquidated Damages Amount would serve to compensate the Employee for any breach by the Company of its obligations under this Agreement.

Employment Agreement ¶ 2(b).

19. Agnelli and his wife (Castellanos' daughter) separated, and their marriage is irretrievably broken. There are family law proceedings between Agnelli and Castellanos' daughter pending in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. *See Castellanos v. Agnelli*, Case No. 2020-009516-FC-04 (Fla. 11th Cir. Ct.).

20. On June 22, 2020, while Agnelli was on vacation out-of-state with his children, Castellanos unilaterally and unlawfully[2] began attempting to remove Agnelli from Lennox. This included actions that involved locking Agnelli out of the Hotel, denying Agnelli access to his personal property, and seizing control of the premises.

21. To punish, harass and bully his soon to be former son-in-law, Castellanos caused Lennox to unlawfully and constructively terminate Agnelli without Cause as of the filing of this Complaint.

---

[2] Castellanos did not have standing or authority to remove Agnelli from the Hotel and has not taken steps that are consistent with Lennox's Bylaws and other corporate documents. Among other things, Castellanos acted without authority of Lennox's Board of Directors. Agnelli has 12.5% ownership stake in Lennox, his wife another 12.5%, and the remaining 75% is owned by an overseas entity known as Invernorth Limited. Invernorth Limited is, in turn, owned by a Wyoming trust. Additionally, Agnelli was President of Lennox Miami Corp. and Castellanos was Vice-President.

22. As a result, Agnelli is entitled to recover from Lennox at least $6,000,000.

23. All conditions precedent to the prosecution of this action have been performed, satisfied, excused or waived.

24. Agnelli has been required to retain the services of the undersigned counsel to prosecute this action and is obligated to pay counsel an hourly fee for their services.

## COUNT I – BREACH OF CONTRACT

25. Agnelli re-alleges and incorporates Paragraphs 1 through 24 as if fully set forth herein.

26. Lennox has breached the Employment Agreement by, among other things, failing to pay Agnelli the $6,000,000.00 due and owing to Agnelli under the Employment Agreement.

27. As a direct and proximate result of Lennox's breach of the Employment Agreement, Agnelli has been, and will continue to be, damaged.

28. In addition, Agnelli is entitled to attorneys' fees for unpaid wages pursuant to Fla. Stat. § 448.08.

**WHEREFORE**, Diego Agnelli demands judgment in his favor and against Defendant Lennox Miami Corp., together with pre- and post-judgment interest, attorneys' fees and costs under Florida law, and for such other and further relief as this Court deems just and proper.

## JURY DEMAND

Agnelli hereby demands a jury trial on all issues so triable.

Dated:  July 8, 2020.

Respectfully submitted,

*/s/ Brian H. Koch*
JESUS E. CUZA
Fla. Bar No. 428991(jesus.cuza@hklaw.com)
BRIAN H. KOCH
Fla. Bar No. 637335 (brian.koch@hklaw.com)
REBECCA CANAMERO
Fla. Bar No. 86424 (rebecca.canamero@hklaw.com)
ANNELISE DEL RIVERO
Fla. Bar No. 1003234 (annelise.delrivero@hklaw.com)
HOLLAND & KNIGHT LLP
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Telephone: (305) 374-8500
Fax: (305) 789-7799

## Employment Agreement

This Employment Agreement (the "Agreement") is made and entered into as of December ____, 2017 by and between **Diego Agnelli** (the "Employee") and **Lennox Miami Corp.**, a Florida corporation (the "Company")(collectively the "Parties").

### Recitals

WHEREAS, the Company operates the Lennox hotel located at 1900 Collins Avenue, Miami Beach, FL 33139 (hereinafter the "Hotel"); and

WHEREAS, the Company desires to employ the Employee on the terms and conditions set forth herein; and

WHEREAS, the Employee desires to be employed by the Company on such terms and conditions.

NOW, THEREFORE, in consideration of the mutual covenants, promises and obligations set forth herein, the Parties agree as follows:

1. **Term**. The Employee's employment hereunder shall be effective as of January 1, 2018 (the "Effective Date") and shall remain in full force and effect for five (5) years from the Effective Date. The period during which the Employee is employed by the Company hereunder is hereinafter referred to as the "Employment Term".

2. **Termination of Employment**. The Employment Term and the Employee's employment hereunder may be terminated by either the Company or the Employee at any time and for any reason; provided that, unless otherwise provided herein, either party shall be required to give the other party at least fifteen (15) calendar days advance written notice of any termination of the Employee's employment. Upon termination of the Employee's employment during the Employment Term, the Employee shall be entitled to the compensation and benefits described in this Section 2.

(a) Termination for Cause. This Agreement may be terminated at the Company's option, immediately upon notice to the Employee, upon: (i) material breach by the Employee of any provision of this Agreement; (ii) gross negligence or willful misconduct of the Employee in connection with the performance of his duties under this Agreement, or his willful refusal to perform any of his duties or responsibilities required pursuant to this Agreement; (iii) fraud, criminal conduct including, but not limited to, crimes of moral turpitude, dishonesty or embezzlement by the Employee; or (iv) the Employee's misappropriation for personal use of assets or business opportunities of the Company ("Cause"). If this Agreement is terminated by the Company for Cause, then the Employee shall (i) be entitled to receive only accrued compensation through the date of such termination; and (ii) immediately relinquish, forfeit, and surrender any rights to receive any other benefits from the Company following the effective date of such termination for Cause.

EXHIBIT A

(b) <u>Termination without Cause</u>. This Agreement may be terminated without Cause by the Company or the Employee, at any time upon giving written notice to the other party of such termination. If the Company terminates this Agreement without Cause, the Parties acknowledge that the actual damages likely to result from breach of this Agreement are difficult to estimate on the date of this Agreement, and would be difficult for the Parties to prove. Accordingly, the Parties agree that in the event of any breach of the obligations and responsibilities set forth in this Section 2(b), the Company shall pay the Employee USD $6 Million, which amount reflects five (5) years of Employee's salary, as Liquidated Damages (the "Liquidated Damages Amount"). The parties intend that Company's payment of the Liquidated Damages Amount would serve to compensate the Employee for any breach by the Company of its obligations under this Agreement. If a court finds that this Liquidated Damages provision is overbroad, it may narrow the scope and duration of the provision and enforce it as modified.

3. **Duties and Responsibilities**. During the Employment Term, the Employee shall serve in the position of "*Chief Executive Officer*" of the Company. Except as otherwise expressly provided herein, the management of the Company shall be under the sole supervision, management, direction and control of the Employee. The Company has hired a "General Manager" of the Hotel and the "General Manager" will report directly to the Employee.

The Employee shall have full authority to operate the business of the Company and supervise management of the Hotel, specifically:

(a) Direct and coordinate the Company's financial and budget activities to fund operations, maximize investments, and increase efficiencies;

(b) Appoint and supervise employees and managers within the Company and assign and delegate responsibilities to them;

(c) Analyze operations to evaluate performance of the Company and its staff in meeting objectives or to determine areas of potential cost reduction, improvement and policy change;

(d) Supervise the General Manager of the Hotel to guarantee that all of the Hotel's facilities and activities are handled in the same manner as is customary and usual in the operation of other similarly situated hotels and ensure that all services offered by the Hotel are acceptable;

(e) Supervise the General Manager of the Hotel to guarantee that the Hotel's standard administrative, accounting, budgeting, and operational policies and practices are in place and operational;

(f) Prepare an annual budget for operations of the Hotel;

(g) Employ, pay, supervise and discharge on behalf of the Company, all Employees and personnel necessary for the operation of the Hotel;

(h) Supervise the General Manager of the Hotel to guarantee that all of the Hotel's appurtenances and grounds are maintained according to the standards applicable within the Hotel industry in the United States;

    (i) Negotiate and enter into service contracts required in the ordinary course of business in operating the Hotel;

    (j) Supervise and purchase or arrange for the purchase of all inventories, provisions and supplies which in the normal course of business are necessary and proper to maintain and operate the Hotel;

    (k) Establish labor policies at the Hotel, including the hiring and discharging of all employees, supervision and training of the same and entering into employment contracts;

    (l) Establish credit policies (including entering into agreements with credit card organizations), terms of business, charges for rooms and other services, food and beverage policies;

    (m) Lease to tenants commercial space at the Hotel and grant food and beverage concessions;

    (n) Institute and coordinate all phases of promotion, publicity and marketing relating to the hotel; and

    (o) Confirm with legal counsel that all necessary permits and licenses required for operation of the Hotel in the name of the Company.

4. **Legal Compliance**. Employee shall comply with all relevant federal, state and local laws and other regulations applicable to the Hotel and business of the Company, including but not limited to legal requirements pertaining to the health, safety, occupancy and use of the Hotel premises.

5. **Confidentiality**. The Employee understands and acknowledges that during the Employment Term, he will have access to and learn about Confidential Information. For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: practices, policies, plans, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, vendor information, financial information, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, security procedures, market studies, revenue, and costs of the Company or its businesses. The Employee understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to the Employee; provided that, such disclosure is through no direct or indirect fault of the Employee or person(s) acting on the Employee's behalf.

6. **Compensation**. The Company shall pay the Employee a monthly salary of USD $100,000.00 in periodic installments in accordance with the Company's customary payroll practices, but no less frequently than monthly. The Employee's annual salary shall be reviewed at least annually by the Company.

7. **Employee Benefits**. During the Employment Term, the Employee shall be entitled to participate in all employee benefit plans, practices and programs maintained by the Company, as in effect from time to time (collectively, "Employee Benefit Plans"), on a basis which is no less favorable than is provided to other similarly situated executives of the Company, to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or cancel any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

8. **Vacation; Paid Time-off**. During the Employment Term, the Employee shall be entitled to 45 days of paid vacation days per calendar year (prorated for partial years) in accordance with the Company's vacation policies, as in effect from time to time. The Employee shall receive other paid time-off in accordance with the Company's policies for executive officers as such policies may exist from time to time.

9. **Business Expenses**. The Employee shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment and travel expenses incurred by the Employee in connection with the performance of the Employee's duties hereunder in accordance with the Company's expense reimbursement policies and procedures.

10. **Indemnification.** In the event that the Employee is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative or investigative (a "Proceeding"), other than any Proceeding initiated by the Employee or the Company related to any contest or dispute between the Employee and the Company or any of its affiliates with respect to this Agreement or the Employee's employment hereunder, by reason of the fact that the Employee is or was a director or officer of the Company, or any affiliate of the Company, or is or was serving at the request of the Company as a director, officer, member, employee or agent of another corporation or a partnership, joint venture, trust or other enterprise, the Employee shall be indemnified and held harmless by the Company to the fullest extent applicable to any other officer or director of the Company from and against any liabilities, costs, claims and expenses, including all costs and expenses incurred in defense of any Proceeding, including attorneys' fees.

11. **Waiver**. The waiver by either party of a breach of any provision of this Agreement shall not operate as a waiver of a breach of any other provision of this Agreement by such party.

12. **Survival**. The provisions of Sections 5 shall survive termination or expiration of this Agreement.

13. **Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the Company, its successors and assigns. Neither this Agreement nor any right or

interest hereunder shall be assignable or transferable by Employee, his beneficiaries or legal representatives, except by will or by the laws of descent and distribution.

14. **Severability**. If any provision or part of a provision of this Agreement shall be determined to be void and unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall remain valid and enforceable.

15. **No Prior Agreements**. Employee hereby represents and warrants to Company that the execution of this Agreement by Employee and Employee's employment by Company and the performance of Employee's duties hereunder shall not violate or be a breach of any agreement with a former employer, client or any other person or entity.

16. **Modification**. This Agreement may be modified only by agreement in writing signed by both the Company and Employee.

17. **Section Headings**. The section headings are included for convenience and are not intended to limit or affect the interpretation of this Agreement.

18. **Notice**. Whenever any notice is required, it shall be given in writing addressed as follows:

> To Company:
> To Employee:

Notice shall be deemed given and effective three (3) days after the deposit in the U.S. mail of a writing addressed as above and sent first class mail, certified, return receipt requested, or when actually received. Either party may change the address for notice by notifying the other party of such change in accordance with this Section.

19. **Governing Law**. The employment contemplated under this Agreement, and this Agreement and all matters between the company and the Employee shall be governed in all aspects by the laws of the State of Florida without regard to its rules governing conflicts of law.

20. **Jurisdiction and Venue**. Any civil action or legal proceeding arising out of or relating to this Agreement shall be exclusively brought in the courts of record of the State of Florida in Miami-Dade County or the United States District Court located in Miami, Florida. Each party consents to the jurisdiction of such Florida court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such Florida court. Service of any court paper may be effected on such party by mail, as provided in this Agreement, or in such other manner as may be provided under applicable laws, rules of procedure or local rules.

21. **Counterparts; Facsimile; Effectiveness**. This Agreement may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures hereto and thereto were upon the same instrument. This Agreement may be executed by facsimile or electronic signatures, and delivered electronically.

22. **Entire Agreement**. This Agreement represents the entire understanding of the parties concerning the subject matter hereof and supersedes all prior communications, agreements and understandings, whether oral or written, relating to the subject matter hereof. The language contained herein shall be deemed to be that negotiated and approved by both parties and no rule of strict construction shall be applied.

23. **JURY WAIVER**. IN ANY CIVIL ACTION, COUNTERCLAIM, OR PROCEEDING, WHETHER AT LAW OR IN EQUITY, WHICH ARISES OUT OF, CONCERNS, OR RELATES TO THIS AGREEMENT, ANY AND ALL TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, THE PERFORMANCE OF THIS AGREEMENT, OR THE RELATIONSHIP CREATED BY THIS AGREEMENT, WHETHER SOUNDING IN CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, TRIAL SHALL BE TO A COURT OF COMPETENT JURISDICTION AND NOT TO A JURY. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT, AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THIS AGREEMENT OF THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. NEITHER PARTY HAS MADE OR RELIED UPON ANY ORAL REPRESENTATIONS TO OR BY ANY OTHER PARTY REGARDING THE ENFORCEABILITY OF THIS PROVISION. EACH PARTY HAS READ AND UNDERSTANDS THE EFFECT OF THIS JURY WAIVER PROVISION. EACH PARTY ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY ITS OWN COUNSEL WITH RESPECT TO THE TRANSACTION GOVERNED BY THIS AGREEMENT AND SPECIFICALLY WITH RESPECT TO THE TERMS OF THIS SECTION.

The Company and the Employee have executed this Agreement as of the ____ day of December, 2017.

LENNOX MIAMI CORP.

By: _____
Juan Castellanos Bonillo, Vice President

_____
Diego Agnelli