IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:20-cv-22800-RNS

DIEGO AGNELLI,

     Plaintiff,

v.

LENNOX MIAMI CORP.,

     Defendant.

_____

## <u>PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

Plaintiff Diego Agnelli ("Agnelli") hereby submits his proposed findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

Respectfully submitted,

HOLLAND & KNIGHT LLP
***Attorneys for Plaintiff***
701 Brickell Avenue, Suite 3300
Miami, Florida 33131

*/s/ Jesus E. Cuza*
Jesus E. Cuza
Florida Bar No. 42899
jesus.cuza@hklaw.com
J. Raul Cosio
Florida Bar No. 503630
raul.cosio@hklaw.com
Brian H. Koch
Florida Bar No. 637335
brian.koch@hklaw.com
Annelise Del Rivero
Florida Bar No. 1003234
annelise.delrivero@hklaw.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:20-cv-22800-RNS

DIEGO AGNELLI,

      Plaintiff,

v.

LENNOX MIAMI CORP.,

      Defendant.

---

### **PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

This is an action brought by Diego Agnelli, an Argentine citizen, against Lennox Miami Corp. ("Lennox"), a Florida corporation, for breach of contract arising out of an Employment Agreement between Agnelli and Lennox (the "Employment Agreement") and judicial dissolution of Lennox. Lennox elected to purchase Agnelli's shares of Lennox in lieu of dissolution and asserted several counterclaims against Agnelli for breach of fiduciary duty, breach of contract, fraudulent inducement, and rescission. *See* [ECF Nos. 10 & 17].

A bench trial was held by the Court in this matter beginning on May __, 2022, and concluding on May ___, 2022. [ECF No. ___]. For the reasons stated herein, and based upon all the evidence adduced at trial, the Court finds in favor of Plaintiff, Diego Agnelli, and against Defendant, Lennox Miami Corp., on all claims. The Court finds that Lennox is liable to Agnelli for breach of contract for $ _____. The Court also directs Lennox to purchase Agnelli's 125 shares in Lennox for the fair value of $____, plus statutory interest since June 30, 2021. As to Lennox's counterclaims, the Court finds in Agnelli's favor.

---

[1] Plaintiff notes that this submission will be supplemented post-trial in light of the evidence and issues presented, as may be necessary.

Having heard the witnesses' testimony and the parties' arguments and reviewed all of the evidence that was admitted at trial, the Court makes the following findings of fact and conclusions of law:

## II. FINDINGS OF FACT

Rule 52(a)(1) of the Federal Rules of Civil Procedure requires this Court to "find the facts specially and state its conclusions of law separately." The Court has carefully reviewed the record in this case, including all pleadings, exhibits, and testimony at the trial. Based on the evidence adduced at trial, the court makes the following findings of fact pursuant to Rule 52(a):

*1)    The Parties*

The Plaintiff, Diego Agnelli ("Agnelli"), is an Argentine citizen who resided in Florida at all material times relevant to the instant dispute. The Defendant is Lennox, a Florida corporation doing business in Florida. On November 29, 2010, Lennox purchased the property located at 1900 Collins Avenue, Miami Beach, Florida 33139, which was the site of the iconic Peter Miller Hotel.

Lennox is and has always been a closely held, family owned corporation. The three original shareholders of Lennox Miami Corp. were (1) Juan Castellanos Bonillo ("Castellanos") who owned 750 shares (75%); (2) his daughter, Analia Castellanos ("Analia"), who owned 125 shares (12.5%); and (3) her husband and Castellanos' son-in-law, Agnelli, who owned 125 shares (12.5%). On or about December 11, 2015, Castellanos' 750 shares in Lennox were transferred to Invernorth Limited, a British Virgin Islands company ("Invernorth"). Castellanos controls and is attorney-in-fact for Invernorth.

Agnelli and Castellanos were the only officers and directors of Lennox until Agnelli was removed as both an officer and director in July 2020. Agnelli was President and Castellanos was Vice President.

Lennox is only one part of the Castellanos family enterprise. The Castellanos family owns two other Lennox branded hotels in Argentina. Castellanos, both directly and indirectly, also owns other entities and businesses in the U.S. and Argentina and has an ownership stake in the largest casino operation in Argentina, from which he derives the majority of his wealth. From the early 2000's, shortly after his marriage to Analia, Agnelli began to oversee the Castellanos family enterprise and was vested with broad authority to make decisions on how to run the overall enterprise for the family's benefit. Over a period of nearly twenty years, the family established a clear course of dealing which changed when Castellanos learned in 2019 that Agnelli and Analia had been having marital problems.

### 2)   *Development of the Lennox Hotel*

Around 2012, Agnelli and Analia moved to Miami with their children. Agnelli immediately began working on development and construction of the Lennox Hotel in Miami Beach. Just as with the other two Lennox branded hotels in Argentina (which opened in 2005 and 2010, respectively) Agnelli devoted himself to the creation and development of the Lennox project. Agnelli oversaw all aspects of development, design, and construction of the hotel in Miami Beach and later oversaw the control of operating manuals and procedures, oversaw employees, and guided day-to-day operations at the hotel. Under Agnelli's leadership, the hotel made it to the No. 1 spot on TripAdvisor shortly after opening.

### 3)   *The Employment Agreement*

In December 2017 Agnelli entered into an Employment Agreement with Lennox Miami Corp. *See* Employment Agreement. Agnelli signed the Employment Agreement in his personal capacity and Castellanos, the sole representative of the company's majority shareholder (in truth, the company's ultimate majority shareholder) and the company's only other director, signed the

employment agreement on behalf of Lennox in his capacity as its Vice President in or about December 2017.

The Employment Agreement contains a provision addressing "Termination of Employment." *See* Employment Agreement § 2. Section 2 is clear that Agnelli's employment "may be terminated . . . at any time and for any reason" but that, "[u]pon termination . . . [Agnelli] shall be entitled to the compensation and benefits described in this Section 2." *Id.* at 1 § 2. Section 2 then breaks into two subparts setting out the compensation Agnelli is entitled to for termination with cause in part (a) and without cause in part (b).

In part (a), the Employment Agreement enumerates four grounds that constitute "Cause" and states that, if terminated for cause, Agnelli is "entitled to receive *only* accrued compensation through the date of such termination." *Id.* at 1, § 2(a) (emphasis added). In part (b), the Employment Agreement indicates that if terminated without cause, Agnelli is entitled to liquidated damages equivalent to the salary he would have earned over the full five-year Employment Term:

> (b) <u>Termination without Cause</u>. This Agreement may be terminated without Cause by the Company or the Employee, at any time upon giving written notice to the other party of such termination. ***If the Company terminates this Agreement without Cause***, the Parties acknowledge that the actual damages likely to result from breach of this Agreement are difficult to estimate on the date of this Agreement, and would be difficult for the Parties to prove. Accordingly, the Parties agree that in the event of any breach of the obligations and responsibilities set forth in this Section 2(b), ***the Company shall pay the Employee USD $6 Million, which amount reflects five (5) years of Employee's salary, as Liquidated Damages*** . . . .
>
> *Id.* at 2, § 2(b) (emphasis added).

Although this Court ruled that the $6 million liquidated damages amount is unenforceable, it recognized that Agnelli may nonetheless be entitled to an award of actual damages if Lennox breached the Employment Agreement and terminated him without cause before the end of the term of the contract. *See* Order on Summary Judgment, ECF No. 88.

### 4)     *Agnelli's Termination*

Agnelli was terminated from his position as President and CEO of Lennox on July 8, 2020 following a bitter family dispute resulting from Agnelli's separation from Castellanos' daughter, Analia. As construction of the Lennox Miami hotel (the "Hotel") was nearing completion, Agnelli and Analia's marriage became irretrievably broken. Agnelli moved out of the family home around August 2018. Once Castellanos learned of this in 2019, everything changed. In or about September 2019, when Agnelli had finished building the Hotel and it had just began to open for guests, Castellanos began to take steps to separate Agnelli from the family businesses.

For example, in December 2019, while Agnelli was still President, Castellanos caused City National Bank to freeze Lennox's bank accounts, effectively halting the Hotel's operations and forcing Agnelli to open a new account at Wells Fargo so that Lennox could continue to transact business. Around the same time, Castellanos, through his attorneys and for the first time since Lennox was formed, demanded to review Lennox's books and records.[2]

On June 22, 2020, Castellanos seized control of the Hotel with Miami Beach police. A padlock was placed on Agnelli's office and a 24-hour armed guard was posted in front of the door.[3] That same morning, Castellanos served Agnelli with a letter purporting to fire him and Lennox employees were served with a "Notice of Change of Management," stating Agnelli had been removed, that Castellanos was now Lennox's "sole director and Interim President," and demanding Castellanos' agents be given immediate access to Lennox's records. Castellanos'

---

[2] Agnelli hired Salazar Law, LLP to represent Lennox Miami Corp. Salazar Law indicated Lennox would make documents available for inspection so long as Castellanos complied with the applicable statutes and made a legally proper demand. Castellanos failed to respond to Salazar Law's requests for information.

[3] Lennox sued Castellanos in the Southern District of Florida for the unauthorized takeover of the Hotel. *See Lennox Miami Corp. v. Castellanos Bonillo*, Case No. 1:20-cv-22609-KMW.

attempted termination of Agnelli was ineffective and in contravention of Lennox's Bylaws. Castellanos and Analia later called a shareholder's meeting (attended by the two of them) to validate Agnelli's termination and bring their actions into compliance with Lennox's Bylaws. Agnelli was officially removed from Lennox's board on July 8, 2020.

### 5)   *This Lawsuit*

Shortly after his termination, Agnelli filed the instant action bringing two claims: (1) breach of contract, alleging that Lennox breached the Employment Agreement by terminating him without cause and failing to pay him damages as contractually required under the Agreement; and (2) judicial dissolution of Lennox. Lennox subsequently elected to purchase Agnelli's 12.5% shares of the company. The parties disagree on the fair value amount of Agnelli's 12.5 shares of Lennox, each offering a different valuation date and methodology they argue must govern. Because the latter issue is an issue of law for the Court, it will be addressed in Section III on Conclusions of Law *infra*.

As to Agnelli's breach of contract claim, Lennox's principal argument in response is that Agnelli was terminated for cause because he misappropriated corporate funds for personal use. Agnelli did use Lennox company funds for personal and family expenses — however, this practice was consistent with the entire Castellanos family's course of dealing for close to twenty years.

### 6)   *The Agnelli/Castellanos Family's Course of Dealing for their Family Businesses*

### (i)  **Agnelli's Work for Castellanos and Authority to Control the Family Funds**

Agnelli began working for his father-in-law, Castellanos, shortly after his marriage to Analia. Agnelli gradually assumed more responsibility and within a few years was in charge of managing and administering all personal and business ventures for Castellanos and the family. By 2003 or so Agnelli had left his prior job and was exclusively dedicated to operating the various

family businesses and taking care of the family's needs. Agnelli also became the person in charge of controlling and administering all of the Castellanos family's money.

Castellanos' main source of income was funds received from Argentinian casinos. From early on, Castellanos gave Agnelli authority to receive and control the casino funds; determine how to use, distribute and administer the funds within the family structure; and decide what funds to use from the entities within the family structure and Castellanos's accounts to make purchases for the family and for the various businesses. Among other things, Castellanos gave Agnelli access to bank accounts for each of the entities (as well as his own personal bank accounts), and made him Trustee of the Trust that held the shares of the casinos in Argentina.

In other words, Agnelli had full autonomy and authority to (1) receive and control all money that came in to the family structure; (2) decide how to move (and to actually move) funds within the family structure; (3) decide what funds to access and use from the family entities and Castellanos' accounts to pay for all expenses for the entities, for Castellanos, and for various family members (including Agnelli, his wife Analia, and their children); and (4) operate and manage all of the family businesses.

### (ii)     Castellanos Was Not Involved

Castellanos, who traveled frequently and wanted to live a leisurely life, did not involve himself in the management of the family's money or the operations of any of the properties or businesses Agnelli administered. Castellanos instead gave Agnelli the freedom to manage the family funds without restriction or supervision. Castellanos was comfortable with this way of doing things and allowed Agnelli to run the family enterprise for almost two decades without issue.

Although Castellanos himself was not involved in the day-to-day operations, Agnelli regularly communicated with Castellanos' personal accountants (Miguel Angel Romero, Alberto

Suazo, and Roberto Macho) regarding the financial operations of the businesses and family assets. Agnelli and his assistants maintained open and frequent communication with all three accountants over the years and sent information to Castellanos' accountants upon request.

### (iii)    Course of Dealing for the Family Businesses

Over the years, Agnelli gradually began to expand the family structure and create new businesses, including the Lennox hotels. The different companies created and acquired through the years were privately-held businesses intended for family use. The family rarely observed corporate formalities. At all material times, the only shareholders and directors of the various entities were typically Castellanos, Agnelli, and other family members. The pattern and practice for almost twenty years was that company funds from of the family businesses and entities could be (and often were) used to cover expenses for the different family members — including Castellanos, Analia, Agnelli, and their children.

In or about 2002, Castellanos provided investment capital and entrusted development and operation of a hotel project to Agnelli. The first Lennox hotel was opened in Ushuaia in 2005 and the second in Buenos Aires in 2010. The third and final hotel in Miami Beach opened in 2019. Just as with Lennox Miami, Agnelli was the President of Sociedad Hotelera del Sur, S.A. ("SHS"), the company that owned the Lennox-branded Argentinian hotels. Castellanos and Analia were directors of SHS in various positions throughout the years. Castellanos was a 95% owner of SHS,[4] and Agnelli a 5% owner.

Agnelli oversaw the construction, development, and operations of all three hotels. Consistent with the family's course of dealings, Agnelli had personal and family expenses paid by

---

[4] Just as with Lennox Miami Corp., Castellanos transferred his shares of Sociedad Hotelera Del Sur, S.A. to a British Virgin Islands company, Inversouth Ltd. As with Invernorth, Castellanos controls Inversouth.

the hotels, as well as the other family businesses, since the early 2000's and up until his termination from Lennox Miami in 2020.

For several years and through 2017, Lennox paid Agnelli a $90,000.00 annual salary. Just as they had done for years through other family businesses, Analia and Agnelli used Lennox resources to pay for family expenses. This practice was open and consistent with the way the family had operated for nearly twenty years. The majority of family expenses paid through Lennox were related to the construction and furnishing of Analia and Agnelli's marital home, known as the "Balada House." *See* Exhibit A, Property Search Landing Page.[5] The use of Lennox funds for family expenses was documented and available for anyone who wanted to review it.

### III. <u>CONCLUSIONS OF LAW</u>

I.    **Agnelli's Count I (Breach of Contract) and Lennox's Count IX (Breach of Contract)**

Agnelli claims Lennox breached the Employment Agreement by terminating him without cause before the end of his employment term and failing to pay him the damages amount owed under the Agreement. *See* Employment Agreement § 2.

In response, Lennox argues that it did not breach the Employment Agreement because it terminated Agnelli for cause for, among other things, misappropriating corporate funds. Lennox separately brought its own affirmative claim for breach of contract in the alternative to its fraudulent inducement and rescission claims, arguing that Agnelli breached the Employment Agreement by misusing Lennox monies, engaging in self-dealing, and breaching his fiduciary duties. Given the interrelation of these claims, the Court addresses them together herein and finds that Lennox breached the Employment Agreement by terminating Agnelli without cause before

---

[5] As noted on the Miami Dade Property Appraiser's page, the "Actual Area" of the home is 11,112 Sq. Ft and the entire "Lot Size" is 22,400 Sq. Ft.

the end of his employment term under the contract.

**(i)      *Lennox Terminated Agnelli Without Cause***

The Court finds that Agnelli's termination was without cause. Although it is undisputed that Agnelli used company funds for family use, the evidence showed Agnelli had authority to use company funds for personal expenses (including for the expenses of Castellanos and the whole family) and that this practice was authorized, agreed to and known by Lennox's other two shareholders, Castellanos and Analia. The evidence also showed that Castellanos turned over authority to run the family businesses to Agnelli and, for nearly twenty years, fostered a course of dealing within the family where use of company funds for personal use was accepted and approved.

This long standing course of dealing precludes Lennox's claim that Agnelli's use of company funds was proper cause for Agnelli's termination under the Employment Agreement. *See, e.g.*, *In Re Shawe and Elting LLC*, No. CV 10449-CB, 2015 WL 4874733, at *37–38 (Del. Ch. Aug. 13, 2015) (barring Shawe's claim that Elting had misappropriated company funds because both parties knew how the funds were used and "[i]t would be inequitable to permit Shawe to renege on the parties' longstanding course of dealing…"). The law in Florida is clear that "[a] written contract can be modified . . . by the parties' course of dealing." *Kiwanis Club of Little Havana, Inc. v. de Kalafe*, 723 So. 2d 838, 840 (Fla. 3d DCA 1999); *see Pan American Eng'g Co., Inc. v. Poncho's Const. Co*., 387 So. 2d 1052, 1053 (Fla. 5th DCA 1980) (noting subsequent modification of a contract can result from the conduct of the parties).

> (1) A course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
>
> (2) Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.

Restatement (Second) of Contracts § 223 (1981).

Under the circumstances of this case, Agnelli's conduct was consistent with the way the entire Castellanos family operated for close to twenty years. The parties' course of conduct or performance clearly gave certain terms in the Employment Agreement, particularly those related to "cause," their own particular "meaning" in the context of this family's way of doing business. It is clear this long-established course of conduct became objectionable only after Agnelli and Analia's marriage broke down. Accordingly, the Court finds Agnelli's termination based on these grounds was pretextual and not supported by cause.

Moreover, a finding that Agnelli engaged in wrongdoing is precluded under the doctrine of acquiescence. "Where a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement." *Acosta v. Dist. Bd. of Trustees of Miami-Dade Cmty. Coll.*, 905 So. 2d 226, 229 (Fla. 3d DCA 2005). Lennox, through its shareholders Castellanos and Analia, knew and accepted the very same conduct asserted as grounds for Agnelli's termination for many years. Indeed, Castellanos and Analia's actions went beyond mere acquiescence — Castellanos and Analia facilitated and participated in the use of company funds for personal use.

The Court finds that Lennox breached the Employment Agreement by terminating Agnelli without cause before the end of his term and that Agnelli is entitled to recover $ 3,000,000.00 in damages, which accounts for the salary he would have been paid had he been permitted to remain at Lennox for the entirety of his term. The Court also finds that Agnelli did not breach the Employment Agreement and Lennox is not entitled to any recovery under Count IX.

## II.     Agnelli's Count II (Valuation)

Count II of the Amended Complaint sought dissolution of Lennox. In lieu of dissolution,

Lennox exercised its right to purchase Agnelli's 12.5% ownership interest in Lennox pursuant to Fla. Stat. § 607.1436. The parties were unable to reach an agreement as to the valuation of Lennox, leaving for the Court to determine the "fair value of the petitioner's shares as of the day before the petition under s. 607.1430 was filed **or** as of such other date as the court deems appropriate under the circumstances." Fla. Stat. § 607.1436(4) (emphasis added).

The primary asset of Lennox is the Lennox Hotel in Miami Beach, Florida. Agnelli presented expert testimony from Kathy Conroy that the value of the Lennox Hotel was $71,500,000 as of June 30, 2021. Agnelli also presented expert testimony from Sheri Fiske that the adjusted net asset value of Lennox was $66,847,165 as of June 30, 2021. Ms. Conroy testified that the June 30, 2021 date would be a more appropriate date to conduct a valuation of Lennox because there were few hotel transactions in the summer and fall of 2020[6] and a June 30, 2021 valuation would capture operations of the Lennox Hotel after initial COVID restrictions eased, thereby offering a truer picture of the hotel as a going concern.

Lennox presented expert testimony from Charlotte Kang that the value of the Lennox Hotel was $45,000,000 as of August 16, 2020. Despite authoring her report in August 2021, Ms. Kang did not consider real data during the interim period between August 16, 2020 and the date of her report. While Ms. Kang may have applied retrospective valuation standards from an academic perspective, her estimates are so far off from actual data figures achieved by Lennox in the first year that her opinions are just not reliable. Lennox also presented expert testimony from Cameron

---

[6] Nationals trends showed a steep decline in the number of hotel transactions exceeding $10,000,000 in Q3 of 2020, although a major study during the time period demonstrated actual price per key for hotel valuations in Q3 of 2020 were 8% greater than price per key for hotel valuations in Q3 of 2019. *See COVID-19's Impact on U.S. Hotel Sale Transaction Market*, Daniel H. Lesser, MAI, published by Boston Hospitality Review, available at https://www.bu.edu/bhr/2021/03/25/covid-19s-impact-on-the-u-s-hotel-sale-transaction-market/.

Cook that the adjusted value of equity of Lennox was $38,262,827 as of August 16, 2020, but Mr. Cook's estimate was based off Ms. Kang's August 16, 2020 unreliable valuation of the hotel.

### A.     June 30, 2021 is an Appropriate Valuation Date

Lennox relies on the "day before the petition" language under Section 607.1436 as its basis for the August 16, 2020 date of valuation. However, due to issues of COVID and the limited marketplace for hotel transactions during the third quarter of 2020, this matter represents a unique circumstance where it would be more appropriate to measure the value of the hotel (and Agnelli's shares in Lennox) after the initial ease of COVID restrictions. First, a true valuation of the hotel would require a market where there was a willing buyer and a willing seller not under duress. The limited number of hotel transactions in Q3 2020, and the absence of any such transactions in the Miami Beach market until the summer of 2021, demonstrates mid-2021 as the first time after COVID shutdowns where a true picture of going concern valuation can be formed. Second, an evaluation based on a June 30, 2021 date is less speculative since it is based on actual data following the ease of COVID restrictions. Third, such an evaluation represents the fact that the Miami Beach hotel market was uniquely situated to be amongst the fastest recovering tourist areas after initial COVID restrictions were lifted. Fourth, the intent of the dissolution statute is to be equitable to the shareholder that is being bought out. A valuation date of June 30, 2021 is equitable to all parties.

### B.     No Discounts Are Applied for Lack of Control or Lack of Marketability

The Court declines Lennox's request to apply any discounts for lack of control or lack of marketability. Those discounts are normally applied in the context of "fair market value" determinations, but the specific judicial dissolution statute requires a determination of "fair value." The term "fair value" is not defined in Florida's judicial dissolution statute, but is defined in the

analogous appraisal rights statute to expressly disallow discounts for lack of control and lack of marketability. In each place where the Florida Legislature has defined the term "fair value," the definition expressly precludes application of such discounts. *See* Fla. Stat. §§ 605.1061, 607.1301 and 620.2113. It is also well recognized that the terms "fair value" and "fair market value" are not synonymous and "[m]ost courts have rejected the notion of such synonymity." *Cox Enterprises, Inc. v. News Journal Corp.*, 510 F.3d 1350, 1357 (11th Cir. 2007) (affirming district court's refusal to apply requested discounts); *Boettcher v. IMC Mortg. Co.*, 871 So. 2d 1047, 1052 (Fla. 2d DCA 2004). Had the Florida Legislature intended to allow for discounts in the judicial dissolution context, the term "fair market value" would have been used instead of "fair value" as the Legislature has used in other contexts.[7]

Lennox relies on *Munshower v. Kolbenheyer*, 732 So. 2d 385 (Fla. 3d DCA 1999) for the proposition that a discount for lack of marketability can be factored into a fair value determination pursuant to Fla. Stat. § 607.1436. However, there are serious deficiencies with respect to continued reliance on *Munshower*. First, *Munshower* was decided before § 607.1301(4)(c) was amended to prohibit the use of such discounts when conducting an appraisal valuation. Second, *Munshower* is devoid of any useful analysis, giving no reasoning for its decision beyond the statement that the court would rely on New York case law. 732 So. 2d at 386. At the time, New York was in the small minority of jurisdictions that allowed for such discounts, and *Munshower* cited an intermediate appellate decision and trial court decision under New York law. No explanation was provided for why New York law would be followed, nor was any explanation provided for why New York law was chosen instead of Delaware law, which Florida courts routinely rely upon in

---

[7] The Florida Legislature recognizes a distinction between "fair value" and "fair market value," and has defined "fair market value" in numerous statutes. *See, e.g.*, Fla. Stat. §§ 718.117, 607.0901, 497.005, 456.053, 400.462, 738.1041, 738.602, 155.40.

the context of corporate issues. *See Boettcher v. IMC Mortg. Co.,* 871 So. 2d at 1052 n.5 (Florida courts should look to Delaware courts for valuation); *see also Taubenfield v. Lasko*, 324 So. 3d 529, 538 n. 1 (Fla. 4th DCA 2021) (Florida courts may look to Delaware for corporate doctrines); *see also Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1459 n. 22 (11th Cir. 1989) ("We rely with confidence upon Delaware law to construe Florida corporate law. The Florida courts have relied upon Delaware corporate law to establish their own corporate doctrines."). Notably, the Delaware Supreme Court has recognized that discounts should not be used in determining the "fair value" of a minority shareholder's shares when being bought out by the majority shareholder or corporate entity. *See Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137 (Del. 1989).

In 2001, the New York Court of Appeals conclusively determined that "in determining fair value, a minority shareholder's stock should not be further discounted because of its minority status." *In re Dissolution of Penepent Corp., Inc.*, 96 N.Y. 2d 186, 194 (2001). The court reasoned that to "impose upon petitioning minority shareholders a penalty because they lack control would violate two 'central equitable principles of corporate governance.' First, a minority discount would deprive minority shareholders of their proportionate interest in the corporation as a going concern. Second, it would result in shares of the same class being treated unequally." *Id*. Accordingly, if the purported logic of the *Munshower* decision were followed — that New York law should govern — then under *Penepent* there would no longer be any application of any discounts in determining the fair value of a minority shareholder's interest.

Notably, no Florida court has ever held that a minority discount must be applied as urged now by Lennox. *See Cox Enterprises, Inc. v. News Journal Corp.,* 469 F. Supp. 2d 1094, 1108 (M.D. Fla. 2006) ("*Munshower* merely determined, however, that courts *may* apply a lack-of-marketability discount when valuing shares in a closely-held corporation; it did not determine that

they *must* do so.").[8] As this Court is sitting in equity when determining "fair value," and public policy supports no application of minority discounts for lack of control or marketability, the Court declines to apply any discount to Lennox's purchase of Agnelli's shares under Section 607.1436.

### C.    Valuation Determination

The Court applies the June 30, 2021 valuation date for the value of Lennox, and uses the Conroy valuation of $71,500,000 as a starting point for the value of the Lennox Hotel, plus cash on hand, net account receivables and prepaid expenses on Lennox's June 30, 2021 balance sheet. Before determining the value of the shares, the Court will subtract the listed liabilities of Lennox as of June 30, 2021. The Court declines Lennox's request to decrease the valuation amount by asserted excess paid-in capital of Castellanos. Such amount was not reported on Lennox's books as a loan to or other liability of Lennox notwithstanding Castellanos had control and otherwise had Lennox financial documents amended when he took over day to day control of Lennox in July 2020.

The Court therefore finds Lennox had an approximate adjusted net asset value of $66,847,165, which represents a fair value for Agnelli's 12.5% interest in Lennox to be $8,355,875 as of June 30, 2021. Pursuant to Fla. Stat. § 607.1436(5), Agnelli shall also receive interest at the statutory rate of interest set under Fla. Stat. § 55.03 since June 30, 2021.

Having determined the fair value of Agnelli's shares, the Court will enter a separate order directing the purchase of those shares pursuant to Fla. Stat. § 607.1436(5). In accordance with the Court's fair value determination, the parties shall submit an agreed upon payment plan for

---

[8] Notably, the American Law Institute has come to a similar conclusion as the majority of jurisdictions. Section 7.22, Standards for Determining Fair Value, states, "(a) The fair value of shares under §7.21 should be the value of the proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability." A.L.I., Principles of Corporate Governance, §7.22, 314-15.

Lennox's purchase of Agnelli's shares or shall otherwise submit their respective proposed payment

plans within ten (10) days of this Order.

### III.     Lennox's Count II (Breach of Fiduciary Duty)

#### (i)     The Breach of Fiduciary Duty Claim is Barred by the Independent Tort Doctrine

A claim for breach of fiduciary duty that relies solely on the same alleged conduct forming

the basis of a claim for breach of contract is barred by the independent tort doctrine. *See XP Glob.,*

*Inc. v. AVM, L.P.*, 16-CV-80905, 2016 WL 6679427, at *4 (S.D. Fla. Nov. 14, 2016) (dismissing

breach of fiduciary duty claim that was duplicative of breach of contract claim); *Fed. Deposit Ins.*

*Corp. v. Law Office of Rafael Ubieta, P.A.*, 12-21864-CIV, 2012 WL 5307152, at *8 (S.D. Fla.

Oct. 29, 2012) (dismissing claim where alleged breach of fiduciary duty was "almost inseparable"

from the conduct alleged as a breach of contract).

The law is clear that "[t]o bring a tort claim concurrently with a contract claim, plaintiffs

must plead a tortious action committed separate and apart from the breach of contract." *See Perez*

*v. Scottsdale Ins. Co.*, 19-CV-22346, 2020 WL 607145, at *2 (S.D. Fla. Feb. 7, 2020); *Sun Life*

*Assurance Co. of Canada v. Imperial Holdings Inc.*, 13-80385-CIV, 2016 WL 10565034, at *5

(S.D. Fla. Sept. 22, 2016) (party asserting a tort claim must establish conduct "beyond and

independent of breach of contract that amounts to an independent tort."); *Island Travel & Tours,*

*Ltd., Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1239 (Fla. 3d DCA 2020) ("It is a fundamental,

long-standing common law principle that a plaintiff may not recover in tort for a contract dispute

unless the tort is independent of any breach of contract.").

Lennox's breach of fiduciary claim against Agnelli is entirely duplicative of its breach of

contract claim. In its breach of fiduciary duty claim, Lennox alleges Agnelli: "misused Lennox's

monies"; "engag[ed] in self-dealing"; "deliberately and continuously ignor[ed] his

responsibilities"; "failed to fulfill his other duties" and "exposed Lennox to civil and criminal liabilities." (ECF No. 10 at ¶¶ 47(a), (h), (i), (k), (l) (alterations added)).  Then, in its breach of contract claim, Lennox asserts the same allegations, claiming Agnelli breached the Employment Agreement by: "failing to perform his duties"; "misusing Lennox's monies"; "engaging in self-dealing"; "engaging in gross negligence or willful misconduct in connection with the performance of his duties"; "willfully refusing to perform his duties; engaging in fraud and criminal conduct"; and "misappropriating Lennox's assets or business opportunities for personal use." (ECF No. 10 at ¶¶ 105-06).  Significantly, Lennox also claims Agnelli breached the Employment Agreement by "breaching his fiduciary and other duties to Lennox." *Id.* at 105.

The Court finds that Lennox's breach of fiduciary duty and breach of contract claims are based in the same alleged conduct. Lennox does not identify any tortious action committed by Agnelli that is not also subsumed within its breach of contract claim. *See Perez*, 2020 WL 607145, at *2; *see also Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Policy Tr.*, 18-CV-25099, 2021 WL 7368630, at *35 (S.D. Fla. Sept. 24, 2021), *report and recommendation adopted*, 18-25099-CIV, 2022 WL 354241 (S.D. Fla. Feb. 7, 2022) (granting summary judgment to defendant where plaintiff "failed to allege conduct that does not itself constitute breach of the contract at issue" (citing *XP Glob., Inc.*, 2016 WL 6679427, at *4)).  Because Lennox's claim for breach of fiduciary duty is premised on the same alleged conduct that forms the basis of its breach of contract claim, its breach of fiduciary claim is barred by the independent tort doctrine.

### (ii)    The Breach of Fiduciary Duty Claim Fails on the Merits

The Court finds that even if Lennox's fiduciary duty claim were viable, it nonetheless fails on the merits because Lennox's shareholders knew of and authorized the very same conduct asserted as grounds for Agnelli's alleged breach of fiduciary duty for years.

**(a)  Lennox's  Only  Other  Shareholders  Acquiesced  to  Agnelli's Conduct**

Lennox, through its shareholders Castellanos and Analia, knew and accepted the very same conduct asserted as grounds for Agnelli's termination for many years. In a remarkably similar context, a court in Delaware refused to allow owners of a closely held corporation—like Lennox—to change the rules of the game after years of acquiescing to the conduct they later began to complain of. *See In Re Shawe and Elting LLC*, No. CV 10449-CB, 2015 WL 4874733, at *37–38 (Del. Ch. Aug. 13, 2015). The court explained:

> Acquiescence is an equitable defense which is assertable against a party who remains inactive for a considerable period of time, or who recognizes the validity of the complained of act or who acts in a manner inconsistent with the subsequent repudiation and thus leads the other party to believe the act has been approved. Application of the standards underlying the defense of acquiescence is fact intensive, often depending . . . on an evaluation of the knowledge, intention and motivation of the acquiescing party.

*Id.* at *37. *Shawe* concerned a corporation where the only three shareholders were Elting, her former fiancé, Shawe, and his mother. *See id.* at *1. Both Shawe and Elting regularly charged personal expenses to the company for over a decade. *See id.* The partners used company funds to pay salary and benefits to Elting's nanny, legal bills for Elting's lawyers, salary and benefits to Shawe's wife and to his personal assistant, benefits to Shawe's new wife, and rent for Shawe's apartments. *See id.* at *14, 37. The two partners knew and approved of each other's conduct. *See id.* at *37. The court ultimately found Shawe had acquiesced to the payments made by Elting, which precluded him recovering on a breach of fiduciary duty claim against her. *See id.* at *37.

The same reasoning applies here. Castellanos and Analia knew that this was the way the family did things. They acquiesced to Agnelli's conduct—leading Agnelli, for many years, to "believe the act ha[d] been approved." *Id.* at *37. After approving this manner of running Lennox and the other businesses for many years, Castellanos cannot now use it as a basis to claim Agnelli

breached his fiduciary duties.

> **(b)** **Lennox's Claims Are Barred by the Doctrine of Unclean Hands**

Lennox's breach of fiduciary duty claim also fails because Lennox has come to this Court with unclean hands. Lennox's other two ultimate shareholders, Castellanos and Analia, and its only other director at the time (also Castellanos), participated, benefitted, and encouraged the conduct they seek to terminate Agnelli for engaging in.

In *Shawe*, the court applied the doctrine of unclean hands — noting, as a threshold matter, that "[t]he decisional authority is almost universal in its acceptance that courts of equity have extraordinarily broad discretion in application of the doctrine." *See In re Shawe*, 2015 WL 4874733, at *37. The *Shawe* court found that under the circumstances of that case, "it would be inequitable" to permit Shawe to castigate Elting "for conduct that was part and parcel" of their relationship as the Company's only two directors and co-CEO's. *See id.* at *37. Similarly here, a finding of wrongdoing against Agnelli is precluded because of Castellanos and Analia's own unclean hands. *See In re Shawe*, 2015 WL 4874733, at *38 (barring Shawe's breach of fiduciary duty claim against Elting because of Shawe's unclean hands).

Castellanos and Analia — Lennox's only other shareholders — acquiesced to Agnelli's conduct and never had an issue prior to Agnelli's and Analia's marital problems, and worse yet, participated in and facilitated the very same conduct they now complain of for close to twenty years. Accordingly, the Court finds that Lennox's breach of fiduciary duty claim, even if it were viable, is barred.

## IV.   Lennox's Count V (Fraudulent Inducement)

It is undisputed that in 2017, Castellanos signed the Employment Agreement at issue in his capacity as Vice-President of Lennox. Despite having signed the Employment Agreement and

receiving the benefits of Agnelli's services as President for several years thereafter, Lennox now seeks to rescind the Agreement, claiming Castellanos's signature was procured as a result of fraud. Lennox's claim is premised on the allegation that Agnelli fraudulently induced Castellanos to sign the contract by representing that the document was intended for the City of Miami Beach. *See* ECF No. 10 at ¶ 66. This allegation has no legal significance. At bottom, Lennox's true claim is that Castellanos did not understand the document he signed because it was in English and because he did not read it.

But Castellanos' failure to read the Employment Agreement or understand its terms is not a proper basis to rescind the contract. "A person who executes a written document in ignorance of its contents cannot plead ignorance in order to avoid the effect of the document." *Quality Foods, Inc. v. U.S. Fire Ins. Co.*, 715 F.2d 539, 542 (11th Cir. 1983); *Parham v. E. Bay Raceway,* 442 So. 2d 399, 401 (Fla. 2d DCA 1983)(stating that a party to a written contract cannot defend against its enforcement on the sole ground that he signed it without reading it). Under Florida law, "[o]ne who signs a contract is presumed to know its contents." *Addison v. Carballosa*, 48 So. 3d 951, 954 (Fla. 3rd DCA 2010) (citation omitted). It is the duty of the party who signs a contract to learn and understand its contents before he signs it. *See id.* "**This holds true even when a party is unable to read an English language contract**." *Larach v. Standard Chartered Bank Int'l (Americas) Ltd.*, 2011 WL 13173896, at *10 (S.D. Fla. June 7, 2011), report and recommendation adopted, 2011 WL 13174741 (S.D. Fla. Sept. 15, 2011)(emphasis added); *Kendall Imports, LLC v. Diaz*, 215 So. 3d 95, 100 (Fla. 3d DCA 2017) (finding that the buyers, who did not understand English, were bound to a contract that they "blindly signed," "willfully agreeing to whatever the terms were").

Moreover, the duty to obtain a translation or an explanation of the contractual terms is on

the non-English speaking/reading party. *See Rivero v. Rivero*, 963 So. 2d 934, 938 (Fla. 3d DCA 2007); *see also Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Benton*, 467 So. 2d 311, 313 (Fla. 5th DCA 1985) ("Persons not capable of reading English, as well as those who are, are free to elect to bind themselves to contract terms they sign without reading . . . . The burden is on the person who cannot read to know that he cannot read and if he desires to have an instrument read and explained to him to select a reliable person to do so before he signs it."); *see also Sutton v. Crane*, 101 So. 2d 823, 825 (Fla. 2d DCA 1958) (citing 12 Am. Jr., Contracts § 137) ("If a person cannot read the instrument ... his failure to obtain a reading and explanation of it is such gross negligence as will estop him from avoiding it on the ground that he was ignorant of its contents.").

The fact that the document presented to Castellanos was in a language he could not understand is not a valid basis for rescinding the Employment Agreement as a matter of law. The law is clear on this point. The law is *also* clear that it was *Castellanos*' burden — not Agnelli's — to have the document translated to Spanish or otherwise explained to him. *See Rivero*, 963 So. 2d at 938. Castellanos did not make any effort to learn the contents of what he was signing and cannot now use his failure to make the most minimal effort to understand the document as a way to escape his (i.e., Lennox's) obligations under the contract.

In sum, the fact that Castellanos was presented with an English document he could not understand and that he did not read the Employment Agreement simply has no bearing on its validity or enforceability, and Lennox is bound by the contract as a matter of law.

## V.    Lennox's Count VI (Rescission of Employment Agreement)

Lennox seeks rescission of the Employment Agreement on the grounds that the agreement is a voidable director's conflict of interest transaction. Although Lennox fails to cite to the applicable statute, Lennox appears to be relying on the principles in Fla. Stat. § 607.0832.

Lennox's claim fails for two reasons. **First**, Lennox failed to prove the elements necessary for rescission. A rescission remedy is unworkable in this case, as it is virtually impossible to return the parties to the status quo as it existed in December 2017 when the Employment Agreement was signed. **Second**, even assuming rescission were possible under the facts of this case, the conflict of interest transaction was approved by Castellanos, Lennox's majority shareholder and its only disinterested director and is not voidable under Fla. Stat. § 607.0832.

### (i)        Rescission Is Unavailable In This Case

Common law rescission is an equitable remedy where the goal is to place the parties in the position that each enjoyed before the contract was executed. *See Billian v. Mobil Corp.*, 710 So. 2d 984, 990 (Fla. 4th DCA 1998). This relief is not given as a matter of right; thus, the Court has discretion to allow rescission based on the specifics of each case and in the interest of justice. *See id.* Rescission is a harsh remedy disfavored by the Courts. *See Rood Co. v. Board of Public Instruction of Dade County*, 102 So. 2d 139, 142 (Fla. 1958). "Courts of equity will not grant the remedy unless it clearly appears that the claimant is entitled thereto and has not by his own conduct waived his right to the relief claimed." *Id.*

Rescission is unfeasible in this case given that the dispute involves an employment contract. A prerequisite to rescission is placing the other party in status quo. *See Jackson v. BellSouth Telecomms*, 372 F.3d 1250, 1279 (11th Cir. 2004). This is nearly impossible to do in this case, as returning the parties to the status quo in 2017 would mean unraveling several years of Agnelli's labor and services to Lennox. When confronted with this very issue, the Florida Fourth District Court of Appeal declined to rescind an employment contract, even in the face of allegations of fraud. *See Great Harbour Cay Realty and Inv. Co. Ltd. v. Carnes*, 862 So. 2d 63 (Fla. 4th DCA 2003). There, the appellate court affirmed the trial court's ruling that it was a "legal impossibility"

to rescind the parties' employment contract and place them where they would have been had there been no contract. *See id.* at 68. The court also found it telling that neither party "was able to show the court a case where an employment contract had been rescinded" and were not able to demonstrate that rescission had been applied in an employment contract situation. *See id.*

Additionally, "[a] party's right to rescind is subject to waiver if he retains the benefits of a contract after discovering the grounds for rescission." *Jackson*, 372 F.3d at 1279 (citing *Rood Co.*, 102 So. 2d at 142) (alteration added). Lennox will always retain the benefit of Agnelli's years of labor and service and has waived its right to rescind the Employment Agreement. Agnelli was largely responsible for the creation, development, and initial success of the Lennox hotel. Agnelli led the project, working closely with architects, designers, construction workers, and marketing teams, among others, to build and operate Lennox. The multiple years Agnelli spent working at Lennox and developing the project cannot be returned to him. The benefit he conferred to Lennox, which today is one of the premier boutique hotels in Miami Beach, is simply impossible to unwind.

### (ii)     The Conflict of Interest Transaction Was Approved by Lennox's Majority Shareholder and Only other Director and is Not Voidable

Even assuming rescission were available as a remedy in this case, Lennox has failed to prove that the conflict of interest transaction is voidable. Lennox appears to rely on the principles in Fla. Stat § 607.0832, which outlines when a director conflict of interest transaction may be found void or voidable.[9]

Section 607.0832(1) states that a contract between a corporation (Lennox) and one or more of its directors (Agnelli) is *not* void or voidable if:

(a) The fact of such relationship or interest is disclosed or known to the board of directors or committee which authorizes, approves, or ratifies the contract or

_____

[9] The Court will apply the 2017 version of the statute which was in force at the time the Employment Agreement was entered into.

transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested directors;

(b) The fact of such relationship or interest is disclosed or known to the shareholders entitled to vote and they authorize, approve, or ratify such contract or transaction by vote or written consent; or

(c) The contract or transaction is fair and reasonable as to the corporation at the time it is authorized by the board, a committee, or the shareholders.

The Employment Agreement is not void or voidable because Agnelli's financial interest in the agreement was disclosed, known to and approved by Castellanos, the sole representative of (and Lennox's true) majority shareholder and only other director. Lennox is a closely-held, family owned corporation where the only shareholders were Castellanos (individually and later through an entity he controls), Agnelli, and Agnelli's wife, Analia. At all relevant times, the only two directors of Lennox were Agnelli (its President) and Castellanos (its Vice-President).

The Court finds that Agnelli disclosed or made known to Lennox's true majority shareholder and only other director that Agnelli was entering into this conflict-of-interest transaction with the company as required by section 607.0832 (1). Castellanos was not only aware of the conflict of interest, but indeed approved the transaction and gave his written consent when he signed the Employment Agreement. Castellanos has, at all times, controlled the majority shares (75%) of Lennox Miami Corp. and, therefore, his approval and consent satisfies section 607.0832(1)(b).

Lastly, the Court rejects Lennox's attempt to inject the "fair and reasonable" requirement into the analysis. As long as the transaction was approved by disinterested directors or shareholders, the 2017 version of the statute does not require that the transaction be fair. *See Beary v. ING Life Ins. & Annuity Co.*, 520 F. Supp. 2d 356, 369 (D. Conn. 2007) ("It is apparent from the face of the statute that the 'fair and reasonable' requirement applies only to self-dealing by corporate directors, and then **only when there has *not* been approval of the transaction by a**

26

**majority of disinterested board members or shareholders**." (citing Fla. Stat. § 607.0832) (emphasis added)). Because Castellanos approved the transaction, its fairness need not be addressed.

## VII.   Lennox's Count VII (Unjust Enrichment)

Lennox claims Agnelli accepted an "exorbitant salary and other benefits" from Lennox in excess of $1.2 million per year has been unjustly enriched.

**First,** Lennox's claim is barred because no cause of action in unjust enrichment can exist under Florida law where the parties' relationship is governed by an express contract — here, the Employment Agreement (among others). "[W]here there is an express contract between the parties, claims arising out of the contractual relationship will not support a claim for unjust enrichment." *Reese v. JPMorgan Chase & Co.*, 686 F. Supp. 2d 1291, 1309 (S.D. Fla. 2009); *see also Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008) (per curiam) ("Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.").

**Second,** even assuming a claim for unjust enrichment was viable, Lennox has failed to meet the elements required to prevail. To state a claim for unjust enrichment, a plaintiff must allege "a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022). Lennox has failed to show Agnelli accepted a benefit that, under the circumstances in this case, it is inequitable for him to retain.

## VIII.   Lennox's Count VIII (Accounting)

In Count VIII, Lennox claims it is entitled to have Agnelli provide a full and complete

accounting of his activities while he was in complete control and management of Lennox, arguing that Agnelli has refused to provide Lennox its books, records and financial information. An accounting is a remedy, not a stand-alone cause of action. *See Johnson v. Pullman, Inc.*, 845 F.2d 911, 913 (11th Cir. 1988) (noting that "though plaintiffs' complaint contained a count in which an accounting was sought, that relief would not be available here absent some independent cause of action."). Thus, there is no viable cause of action here for an accounting and, even if there were, any need for an accounting would be moot in light of the Court's findings on the remaining issues in this case.

### CONCLUSION

For the reasons set forth herein, the Court enters judgment in favor of Plaintiff on Count I and Count II in Plaintiff's Amended Complaint and in favor of Plaintiff on Counts II, V, VI, VII, VIII, and IX in Defendant's Answer, Affirmative Defenses, and Counterclaims. Final judgment will be entered by a separate document as required by Rule 58(a) of the Federal Rules of Civil Procedure.

Robert N. Scola
United States District Judge