United States District Court
for the
Southern District of Florida

| | | |
|---|---|---|
| Diego Agnelli, Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-22800-Civ-Scola |
| | ) | |
| Lennox Miami Corp., Defendant. | ) | |

### Verdict and Order Following Non-Jury Trial

#### 1. Introduction

In 2001, Plaintiff Diego Agnelli ("Agnelli") married Analía Castellanos ("Analía"), the daughter of Juan Castellanos ("Castellanos"). Castellanos was a part-owner of several casinos and racetracks in Argentina that produced huge amounts of income. Shortly after the marriage, Agnelli began working with Castellanos and the two used much of the money from the casinos to invest in several businesses and investment opportunities both in Argentina and the United States. For the next 18 years, Agnelli and Castellanos used these closely held businesses with few, if any, corporate formalities and ran many personal expenses through the businesses.

Their families lived extravagant lifestyles and Castellanos treated Agnelli like a son, eventually entrusting Agnelli to run all the businesses and bank accounts with little or no oversight. It appears Agnelli successfully and faithfully ran the finances for Castellanos until approximately 2017, shortly after he had begun an extramarital affair. But, as is often the case, when you trust someone blindly, you end of being robbed blind.

Although Agnelli had been paying some personal expenses for himself and Castellanos with business monies for a number of years, he either became arrogantly greedy and/or was doing some pre-divorce financial planning and around 2017 the number of personal expenses he paid through business entities skyrocketed. When Castellanos learned in mid-2019 that Agnelli and Analía's marriage was headed for divorce due to an affair by Agnelli, the relationship between Agnelli and Castellanos quickly soured, and Castellanos started learning that Agnelli's betrayal extended beyond his marriage.

One of the businesses in which Agnelli and Castellanos held a joint interest was the Miami Lennox hotel, a luxury boutique hotel in Miami Beach. On paper, Defendant Lennox Miami Corporation ("Lennox") owned the hotel. Agnelli was Lennox's President and Castellanos was its Vice President. Castellanos, through a trust, owned 75% of the shares of Lennox and Agnelli

and Analía each owned 12.5%. In December 2017, Lennox and Agnelli formalized Agnelli's role in managing the Lennox hotel through an employment agreement naming him as Lennox's Chief Executive Officer. Agnelli signed the employment agreement in his individual capacity and Castellanos signed it on Lennox's behalf.

Although Agnelli had done a spectacular job overseeing the design and construction of the Miami Lennox hotel, his self-dealing came to the attention of Castellanos and, on July 8, 2020, Agnelli was formally terminated. On August 17, 2020, Agnelli filed the operative amended complaint in this action against Lennox.

In count I, Agnelli alleges that Lennox breached the employment agreement. However, Agnelli dropped this count after the close of evidence. (*See* ECF No. 141.) In his remaining count II, Agnelli asks the Court to judicially dissolve Lennox. (ECF No. 9.) Although Agnelli demanded a jury trial, Magistrate Judge Torres struck that demand on Lennox's motion. (*See* ECF No. 25.)

Lennox, in turn, timely answered the amended complaint and asserted nine counterclaims against Agnelli: count I – emergency injunctive relief as to a Wells Fargo bank account and certain property; count II – breach of fiduciary duty; count III – conversion; count IV – trespass; count V – fraudulent inducement; count VI – rescission of the employment agreement for conflict of interest; count VII – unjust enrichment; count VIII – accounting; count IX – breach of contract. Lennox later dropped its counts I, III and IV such that only counts II, V, VI, VII, VIII and IX remain active, with count IX being pled in the alternative to counts V and VI. (*See* ECF Nos. 10, 72.)

In response to Agnelli's count seeking judicial dissolution, Lennox exercised its right under Florida law to avoid dissolution by buying out Agnelli's shares. The parties were unable to come to an agreement as to the shares' value, though. As such, the Court is tasked with determining the value of Agnelli's 12.5% share in Lennox.

For reasons more fully set forth below, the Court finds that the fair value of Agnelli's shares in Lennox is $8,356,000.

At the same time, the Court finds that Lennox has prevailed on its claim for breach of contract (count IX) and is entitled to damages of $6,073,526. In the alternative, the Court finds that Lennox would be entitled to damages of $6,073,526 on its breach of fiduciary duty claim (count II). Lennox's remaining claims fail. Finally, the Court denies Lennox's request for attorneys' fees made under Fla. Stat. § 607.1431(5) on its finding that this action was not instituted "arbitrarily, frivolously, vexatiously, or not in good faith."

Below are (1) the Court's findings of fact, (2) the Court's conclusions of law, and (3) a summary of the testimony the Court heard.

## 2. Findings of Fact

The Court has carefully reviewed the record in this case, including all pleadings, exhibits, and testimony at the trial. Rule 52(a)(1) of the Federal Rules of Civil Procedure requires this Court to "find the facts specially and state its conclusions of law separately." Based on the credible evidence and testimony adduced at trial, the Court makes the below findings of fact.

### A.    The parties

The Plaintiff Agnelli is an Argentine citizen who resided in Florida at all material times relevant to the instant dispute. The Defendant is Lennox, a Florida corporation doing business in this State. On November 29, 2010, Lennox purchased the property located at 1900 Collins Avenue, Miami Beach, Florida 33139, which was the site of the iconic Peter Miller Hotel.

Lennox is and has always been a closely held, family-owned corporation. The three original shareholders of Lennox were (1) Castellanos who owned 750 shares (75%); (2) his daughter, Analía, who owned 125 shares (12.5%); and (3) Agnelli, who owned 125 shares (12.5%). On or about December 11, 2015, Castellanos's 750 shares in Lennox were transferred to Invernorth Limited ("Invernorth"), a British Virgin Islands company. Castellanos controls and is attorney-in-fact for Invernorth.

Agnelli and Castellanos were the only officers and directors of Lennox until Agnelli was removed as an officer and director on July 8, 2020. Up until then, Agnelli was its President and Castellanos was its Vice President.

Lennox is only one part of the Castellanos family enterprise. The Castellanos family owns two other Lennox branded hotels in Argentina. Castellanos, both directly and indirectly, also owns other entities and businesses in the U.S. and Argentina. Castellanos further has an ownership stake in the largest casino operation in Argentina, from which he derives the majority of his wealth. In the early 2000's, shortly after his marriage to Analía, Agnelli began to oversee the Castellanos family enterprise and was vested with broad authority to make decisions on how to run the overall enterprise for the family's benefit.

### B.    Development of the Miami Lennox hotel

Around 2012, Agnelli and Analía moved to Miami with their children. Agnelli immediately began working on the development and construction of the

3

Lennox hotel in Miami Beach. Just as with the other two Lennox branded hotels in Argentina (which opened in 2005 and 2010, respectively), Agnelli devoted himself to the creation and development of the Lennox project. Agnelli oversaw all aspects of development, design, and construction of the hotel in Miami Beach and later oversaw the control of operating manuals and procedures, oversaw employees, and guided day-to-day operations at the hotel. Under Agnelli's leadership, the hotel obtained the top spot in Miami Beach on TripAdvisor shortly after opening.

Castellanos has advanced more than $68 million to Lennox including the Miami Lennox hotel's purchase, remodeling, and operations. All that money came from "one pocket"—Castellanos's. From the time of his appointment as Lennox's President, Agnelli exercised complete and sole control over Lennox's spending.

Agnelli had sole supervision, management, direction, and control over Lennox. Agnelli was the authorized signer for Lennox's three bank accounts located at City National Bank.

The hotel opened for business to guests in approximately August 2019. On or about November 8, 2017, Lennox retained Driftwood Hospitality Management II LLC ("Driftwood") to manage the hotel's day-to-day operations (including, rates, marketing, guest reservations, guest check-in and check-out, guest billing and payments). Driftwood—not Agnelli—handled those functions.

## C.      The employment agreement

Agnelli controlled Lennox's payment of his own wages. From 2012 through 2016, Lennox paid Agnelli a $90,000 annual salary, as authorized. That salary increased two times in 2017. At the beginning of 2017, Agnelli realized his secretary, Elizabeth Bermudez, was earning more than he was. As he did not want to be out-earned by his secretary, he raised his own salary to about $150,000 per year—still woefully insufficient to satisfy his lifestyle. Regardless, he did not intend on paying himself a salary that met his lifestyle; the increase was only for the purpose of assisting him in obtaining his visa.

At the end of 2017, Agnelli raised his salary again. 2017 was a difficult year for the family and Castellanos. In 2016-2017, there was a difficult situation with the government and press in Argentina. Two of Castellanos's partners in the casino business were being investigated for tax evasion, there were raids, they closed bank accounts in the United States, the cash in Argentina was cut off, one of the partners was arrested, and Castellanos was not in good health. The first thing Agnelli wanted to do was to protect Castellanos and the family.

Starting in the middle of 2016 and through March 2017, Argentina was offering amnesty to people who came forward and paid a fee for past taxes owed. Agnelli wanted to help Castellanos arrange for the amnesty. Agnelli was working with the accountant for the casino, Roberto Suazo. Clara Pizarro and Romero and perhaps the attorney for the casino helped gather information in Argentina to help in this process. In the United States, Bermudez and Shirley Fabal, another assistant that worked with Bermudez, also helped gather information. Agnelli gathered all the information concerning Castellanos's cars, houses, businesses, and bank accounts to present to Suazo so that the fee could be paid, and Castellanos could be at peace. Agnelli made arrangement for his own family to receive amnesty in Argentina since his own family's finances were so intertwined.

Prior to this time, Agnelli had discussions with Castellanos about how much money they were spending every month. When they came to Miami, Agnelli asked Castellanos, "how do you want us to live here?" To live a lifestyle in Miami similar to the Argentina lifestyle would cost a lot of money. Agnelli had Fabal prepare a spreadsheet of his family's expenses including groceries, clothes, schools, tutors, and clubs. Agnelli showed Castellanos the spreadsheet numerous times. Castellanos said that "as long as the business is producing, it's okay."

To avoid a tax problem in the United States, and, knowing that they had a multi-million-dollar home, large boat, horses, cars, and a lifestyle they could not justify, Agnelli wanted to have a contract that would more accurately reflect their lifestyle. In December 2017, Agnelli asked Roberto Macho (one of Castellanos's accountants) for the name of an attorney and Macho recommended an attorney at Fowler White. Agnelli hired the law firm of Fowler White to prepare three service agreements: a personal services agreement between Agnelli and Castellanos, and two professional services contracts, one between Agnelli and Lennox, and one between Agnelli and Sociedad Hotelera del Sur S.A. ("SHS"), the entity which ran the two Lennox hotels in Argentina.

Agnelli chose not to hire any legal counsel for Lennox to review, negotiate, and/or otherwise represent Lennox's interests. After his lawyers prepared the employment agreement, Agnelli never showed the employment agreement (or any draft thereof in either Spanish or English) to Castellanos prior to the time Agnelli presented it to Castellanos for his signature. Castellanos chose not to consult with any legal counsel prior to signing the employment agreement.

Castellanos is a citizen of Argentina. His native language is Spanish. He does not read, write, or speak the English language. Agnelli was fully aware of

these facts. Agnelli also does not read, write, or speak English. The employment agreement increased Agnelli's annual salary from the previously authorized amount of $150,000 to $1.2 million and gave Agnelli nine weeks of annual paid vacation. The employment agreement also contained a $6 million liquidated damages penalty. On February 11, 2022, this Court granted partial summary judgment for Lennox holding that the liquidated damages provision is unenforceable as a matter of law.

The employment agreement contains a provision addressing "Termination of employment." (*See* Employment Agreement § 2.) Section 2 is clear that Agnelli's employment "may be terminated  .  .  .  .  at any time and for any reason" but that, "[u]pon termination  .  .  .  .  [Agnelli] shall be entitled to the compensation and benefits described in this Section 2." (*Id.* at 1 § 2.) Section 2 then breaks into two subparts setting out the compensation Agnelli is entitled to for termination with cause in part (a) and without cause in part (b).

In part (a), the employment agreement enumerates four grounds that constitute "Cause" and states that, if terminated for cause, Agnelli is "entitled to receive *only* accrued compensation through the date of such termination." (*Id.* at 1, § 2(a) (emphasis added).)

Section 2(a) of the employment agreement states in its entirety as follows:

> Termination for Cause. This agreement may be terminated at the Company's option, immediately upon notice to the Employee, upon: (i) material breach by the Employee of any provision of this agreement; (ii) gross negligence or willful misconduct of the Employee in connection with the performance of his duties under this agreement, or his willful refusal to perform any of his duties or responsibilities required pursuant to this agreement; (iii) fraud, criminal conduct including, but not limited to, crimes of moral turpitude, dishonesty or embezzlement by the Employee; or (iv) the Employee's misappropriation for personal use of assets or business opportunities of the Company ("Cause"). If this agreement is terminated by the Company for Cause, then the Employee shall (i) be entitled to receive only accrued compensation through the date of such termination; and (ii) immediately relinquish, forfeit, and surrender any rights to receive any other benefits from the Company following the effective date of such termination for Cause.

(*Id.* at 1, § 2(a).)

In part (b), the employment agreement indicates that if terminated without cause, Agnelli is entitled to liquidated damages equivalent to the salary he would have earned over the full five-year employment Term:

> (b) Termination without Cause. This agreement may be terminated without Cause by the Company or the Employee, at any time upon giving written notice to the other party of such termination. If the Company terminates this agreement without Cause, the Parties acknowledge that the actual damages likely to result from breach of this agreement are difficult to estimate on the date of this agreement, and would be difficult for the Parties to prove. Accordingly, the Parties agree that in the event of any breach of the obligations and responsibilities set forth in this Section 2(b), the Company shall pay the Employee USD $6 Million, which amount reflects five (5) years of Employee's salary, as Liquidated Damages . . . .

(*Id.* at 2, § 2(b) (emphasis added).)

Castellanos testified that he was misled by Agnelli at the time he signed the employment agreement. He claims Agnelli told him this was just a document that needed to be filed with the City of Miami Beach relating to the ongoing construction of the Lennox. Agnelli claims that he told Castellanos the true purpose of the agreement. On this factual dispute, the Court finds the testimony of Agnelli more credible and finds that Castellanos was not misled by Agnelli as to the true nature of the employment agreement. The Court further finds that Castellanos was not denied the opportunity to have the document translated; nor was he prevented from consulting with counsel or anyone else prior to signing the agreement.

### D.   Agnelli's termination

Agnelli was terminated from his position as President and CEO of Lennox on July 8, 2020.

He moved out of the family home around April 2018. Once Castellanos learned of this in the late summer of 2019, Castellanos began to take steps to separate Agnelli from the family businesses, except for Lennox.

In December 2019, while Agnelli was still President, Agnelli opened a new account at Wells Fargo for Lennox. On the application he falsely claimed to be the 100% owner of Lennox. Around the same time, Castellanos, through his attorneys at Shutts & Bowen—and for the first time since Lennox was formed—demanded to review Lennox's books and records.

Agnelli hired Salazar Law, LLP to represent Lennox. Salazar Law indicated Lennox would make documents available for inspection so long as Shutts established it represented a shareholder. Castellanos had placed his shares in an entity, Invernorth, and it was unclear from Shutts's letter whether Shutts represented Castellanos or Invernorth. Neither Shutts nor Castellanos

ever responded to Salazar Law's requests for information.

On June 22, 2020, Castellanos seized control of the hotel with Miami Beach police. A padlock was placed on Agnelli's office, and a 24-hour armed guard was posted in front of the door. That same morning, Castellanos served Agnelli with a letter purporting to fire him and Lennox employees were served with a "Notice of Change of Management," stating Agnelli had been removed, that Castellanos was now Lennox's "sole director and Interim President," and demanding Castellanos's agents be given immediate access to Lennox's records.

The Court finds that Castellanos's first, attempted termination of Agnelli was ineffective and in contravention of Lennox's bylaws.

On July 1, 2020, Agnelli, along with attorney Luis Salazar, a locksmith, police officers, and others, cut the padlock and entered the hotel's management office. Agnelli removed his personal belongings. Agnelli did not remove any Lennox documents but did take a painting that he claimed was personal property even though it had been hanging in the lobby of the hotel.

Castellanos and Analía later called a shareholder's meeting (attended by the two of them) to validate Agnelli's termination and bring their actions into compliance with Lennox's bylaws. Agnelli was officially and lawfully removed from Lennox's board on July 8, 2020.

### E.     This lawsuit

Shortly after his termination, Agnelli filed the instant action bringing two claims: (1) breach of contract, alleging that Lennox breached the employment agreement by terminating him without cause and failing to pay him damages as contractually required under the agreement; and (2) judicial dissolution of Lennox. As noted, Agnelli dropped the former claim and Lennox subsequently elected to purchase Agnelli's 12.5% shares of the company to avoid dissolution. The parties disagree on the fair value amount of Agnelli's 12.5 shares of Lennox, each offering a different valuation date and methodology they argue must govern. Because the latter issue is an issue of law for the Court, it will be addressed in Section 3 on Conclusions of Law *infra*.

For the first few years in which he was associated with Lennox, Agnelli did use Lennox company funds for personal and family expenses. This practice was consistent with the entire Castellanos family's course of dealing for close to twenty years. But the amounts of business funds used for personal expenses was relatively low until Analía found out about Agnelli's affair with Paula Bosch in 2016. For example, the following amounts were paid by Lennox for personal expenses: $39,130 in 2014, $58,162 in 2015, and $26,332 in 2016. But in

2017, the amount increased to $111,271. And, in 2018, the year during which Agnelli separated from Analía, there were $1,380,452 in personal expenses paid by Lennox; in 2019, there were $728,965 in personal expenses paid by Lennox; and, in the first half of 2020, there were $317,723 in personal expenses paid by Lennox.

These huge increases in personal expenses paid by Lennox in the years 2018 through 2020 were in addition to the $1.2 million per year salary Agnelli received during those years pursuant to the employment agreement executed in December 2017.

Lennox also claims that Agnelli violated his fiduciary duties to Lennox by entering into a contract with Mira, a company who was going to operate a restaurant in the Lennox. That contract gave an entity owned by Agnelli and Analía a 25% stake in Mira for this restaurant as well as future franchises of Mira in Lennox hotels.

Lennox additionally claims that Agnelli fraudulently submitted an I-140 visa application to the government and forged Castellanos's signature on that application in April 2020. When asked about the application, Agnelli invoked his Fifth Amendment privilege against self-incrimination. This invocation allows the Court to make an adverse inference concerning this issue. And Castellanos credibly denied signing the application.

The Court finds that Agnelli did violate the terms of his employment contract. Agnelli paid excessive personal expenses with Lennox funds, contravened his fiduciary duties to the company by entering into the contract with Mira and kept the $200,000 key money for himself, forged Castellanos's signatures and submitted a false visa application to the federal government, lied to Wells Fargo about being the 100% owner of Lennox, and used most of the funds transferred from Lennox to that account to pay for his own salary and other personal expenses.

## F.    The Agnelli/Castellanos family's course of dealing for their family businesses

Agnelli began working for his father-in-law, Castellanos, shortly after his marriage to Analía. Agnelli gradually assumed more responsibility and within a few years was in charge of managing and administering all personal and business ventures for Castellanos and the family. By 2003 or so Agnelli had left his prior job and was exclusively dedicated to operating the various family businesses and taking care of the family's needs. Agnelli also became the person in charge of controlling and administering all the Castellanos family's money.

Castellanos's main source of income was funds received from Argentinian casinos. From early on, Castellanos gave Agnelli authority to receive and control the casino funds; determine how to use, distribute, and administer the funds within the family structure; and decide what funds to use from the entities within the family structure and Castellanos's accounts to make purchases for the family and for the various businesses. Among other things, Castellanos gave Agnelli access to bank accounts for each of the entities (as well as his own personal bank accounts), and made him trustee of the trust that held the shares of the casinos in Argentina.

In other words, Agnelli had full autonomy and authority to (1) receive and control all money that came in to the family structure; (2) decide how to move (and to actually move) funds within the family structure; (3) decide what funds to access and use from the family entities and Castellanos's accounts to pay for all expenses for the entities, for Castellanos, and for various family members (including Agnelli, his wife Analía, and their children); and (4) operate and manage all of the family businesses.

Castellanos, who traveled frequently and wanted to live a leisurely life, did not involve himself in the management of the family's money or the operations of any of the properties or businesses Agnelli administered. Castellanos instead gave Agnelli the freedom to manage the family funds without restriction or supervision. Castellanos was comfortable with this way of doing things and allowed Agnelli to run the family enterprise for almost two decades without issue.

Although Castellanos himself was not involved in the day-to-day operations, Agnelli regularly communicated with Castellanos's personal accountants (Miguel Angel Romero, Alberto Suazo, and Roberto Macho) regarding the financial operations of the businesses and family assets. Agnelli and his assistants maintained open and frequent communication with all three accountants over the years and sent information to Castellanos's accountants upon request.

Over the years, Agnelli gradually began to expand the family structure and create new businesses, including the Lennox hotels. The different companies created and acquired through the years were privately-held businesses intended for family use. The family rarely, if ever, observed corporate formalities. At all material times, the only shareholders and directors of the various entities were typically Castellanos, Agnelli, and other family members. The pattern and practice for almost twenty years was that some company funds from of the family businesses and entities could be (and often were) used to cover expenses for the different family members—including

Castellanos, Analía, Agnelli, and their children.

In or about 2002, Castellanos provided investment capital and entrusted development and operation of a hotel project to Agnelli. The first Lennox hotel was opened in Ushuaia in 2005 and the second in Buenos Aires in 2010. The third and final hotel in Miami Beach opened in 2019. Just as with Lennox, Agnelli was the President of SHS, the company that owned the Lennox-branded hotels in Argentina. Castellanos and Analía were directors of SHS in various positions throughout the years. Castellanos was a 95% owner of SHS, and Agnelli a 5% owner. Just as with Lennox, Castellanos transferred his shares of SHS to a British Virgin Islands company, Inversouth Ltd. As with Invernorth, Castellanos controls Inversouth.

Agnelli oversaw the construction, development, and operations of all three hotels. Consistent with the family's course of dealings, Agnelli had personal and family expenses paid by the hotels, as well as the other family businesses, since the early 2000's and up until his termination from Lennox in 2020.

For several years and through 2017, Lennox paid Agnelli a $90,000 annual salary. Just as they had done for years through other family businesses, Analía and Agnelli used Lennox resources to pay for family expenses. This practice was open and consistent with the way the family had operated for nearly twenty years. Those loose practices resulted in some personal expenses being incurred by the businesses and these relatively small amounts of expenditures were ignored or tolerated by Castellanos. But, when his marriage was starting to fall apart, Agnelli took advantage of the blind trust Castellanos had placed in him and started to rob him blind.

The Court finds that Castellanos's testimony on the issue of whether Agnelli had implicit or explicit authority to use business monies to pay for personal expenses is more credible than that of Agnelli's. Although there were small amounts of business funds used to pay for personal expenses, the highly increased amount of expenditures after Agnelli's affair was discovered, Agnelli's transfer of millions of dollars in marital funds to an entity controlled by his mother, Agnelli's use of funds for his own investment property, and, most significantly, his false testimony during the trial that he did not place one of Castellanos's safe deposit boxes at the Banco Colombia in Argentina in his own name, all weigh against Agnelli's testimony on this issue.

### G.     Agnelli's misappropriations from Lennox

After he moved out of his marital home in 2018, Agnelli used Lennox monies to pay for a condominium unit that he rented on Key Biscayne for use

as his personal residence. The monthly rent was $11,500, and in total, Agnelli used $207,000 of Lennox's monies to pay to his landlord for rental of this condominium. He also used $29,010 of Lennox monies to pay for housekeeping services for this rental unit.

Agnelli used in excess of $800,000 of Lennox funds to pay for several of his other personal living expenses, including but not limited to personal trips for himself, trips for his personal athletic trainer, trips with his mistress, meals, entertainment, purchases from Apple and Amazon, groceries, clothing, sports gear, and supplements.

Agnelli took substantial salaries in excess of that provided for in the employment agreement. The employment agreement provided for an annual salary of $1.2 million. In 2018, therefore, he took $160,000 more than that provided for in the employment agreement, in 2019, $489,615 more, and for the partial 2020 year, $117,780 more.

Agnelli had Lennox pay $62,401 for the construction and design work performed on his personal real estate investment property at Paraiso Bay Condominium. Lennox never had any interest in this property.

Agnelli also had Lennox reimburse him for $179,889 in expenses he never incurred. Although the expenses were not paid for by Agnelli (but rather by Castellanos or others), Agnelli submitted and received reimbursement for those expenses. Agnelli never returned to Lennox the improper so-called reimbursements he had wrongfully received.

Agnelli converted Lennox assets for his own personal benefit. Agnelli took from Lennox, for his personal benefit, a golf cart purchased for $17,249.99 by, and belonging to Lennox. Agnelli also took, for his personal benefit, a piece of artwork painted by Rogelio Polesello which was hanging in the lobby of the Miami Lennox hotel and which was purchased for $10,000 by Lennox.

Agnelli usurped for himself at least one corporate opportunity of Lennox. In 2019, Agnelli on behalf of Lennox negotiated a written lease with Mira South Beach LLC ("Mira") to lease space inside of Lennox from which Mira would operate a restaurant. Unbeknownst to Lennox, Agnelli negotiated with the tenant, Mira, for Agnelli personally, through an entity he owned known as Spark Design, which is unrelated to Lennox, to acquire a 25% ownership interest in the Mira entity before Mira signed a lease with Lennox. Along with that ownership interest, Agnelli negotiated for and acquired the right to participate personally in other Mira restaurants opened in the future at other Lennox hotels. Agnelli did not negotiate for Lennox to become a member in Mira or the right for Lennox to participate in future Mira ventures.

Additionally, Agnelli demanded a $425,000 payment from Mira as a

condition for Mira to operate its restaurant at the hotel. Mira paid Agnelli $200,000 through his entity, Spark Design. Agnelli did not remit or otherwise account to Lennox for that payment.

Neither Lennox nor Castellanos was advised of or aware of these unauthorized material financial transactions designed to benefit solely Agnelli.

Agnelli, in breach of Subsection 2(a) of the employment agreement, caused Lennox to file inaccurate tax returns with the Internal Revenue Services. Agnelli did not report the monies spent by Lennox for his personal expenses as income. Instead, he recorded them in Lennox's books and records as Lennox business expenses. As a result, Agnelli caused Lennox to improperly classify and report those personal expenditures of Agnelli on Lennox's federal income tax returns, which were signed by Agnelli under penalty of perjury. Lennox has incurred accountant expenses to re-state its financial statements and amend its tax returns.

Contrary to the terms of the employment agreement (Subsection 2(a)), Agnelli made false statements to Wells Fargo bank in order to surreptitiously open a new a bank account for Lennox. Two days after receiving the Demand for Documents from Castellanos, and without informing either Castellanos or Invernorth, Agnelli applied to Wells Fargo to open a new Lennox bank account ("WF Account"). In order to open the WF Account, Agnelli falsely certified that he was the sole owner of Lennox.

Agnelli caused Lennox to submit to the U.S. government a forged application in Lennox's name for a work visa for Agnelli. Specifically, on or about April 15, 2020, Agnelli submitted to the U.S. Citizenship and Immigration Services ("USCIS") (i) a Form I-140, Petition for Alien Workers, purportedly signed by Castellanos under penalty of perjury on April 14, 2020, (ii) a Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, purportedly signed by Castellanos under penalty of perjury on April 14, 2020, and (iii) a support letter on Lennox letterhead, purportedly signed by Castellanos on March 27, 2020.

Castellanos's signatures on the Form I-140, the Form G-28, and the support letter each of which Agnelli submitted to the USCIS in support of his immigrant visa petition are forgeries. As Agnelli acknowledged, Agnelli and Castellanos were no longer speaking by the dates of the documents that include Castellanos's forged signatures. Castellanos did not sign these documents and his signatures contained therein were forged and unauthorized.

Agnelli did not disclose to Castellanos or Invernorth any of his misdeeds set forth above. Because Agnelli withheld documents from Castellanos and

13

Invernorth, some of the misdeeds were only discovered after Agnelli was terminated. Agnelli would have been terminated for cause for these reasons had they occurred and been known prior to the time of termination. Any one of the grounds above standing alone constitute sufficient grounds to support Lennox's termination of Agnelli for cause.

Agnelli attempts to justify his misappropriations from Lennox on the basis of an alleged course of dealing with Castellanos. Agnelli claims that he was authorized to spend any Lennox monies on himself or his family. In weighing the testimony of Agnelli and Castellanos as to whether such authorization existed, the Court concludes that it is implausible that Castellanos authorized Agnelli to spend Castellanos's monies without limits at Agnelli's sole discretion. The Court finds Castellanos's testimony that no such arrangement, course of conduct, or agreement existed to be more credible.

### 3. Conclusions of Law

On the basis of these factual findings, the Court now proceeds to its conclusions of law on both sides' remaining claims, beginning with Agnelli's sole count for dissolution.

### A. Dissolution of Lennox (Agnelli's Count II)

At Count II of his amended complaint, Agnelli sought Lennox's dissolution. However, Lennox exercised its right to purchase Agnelli's 12.5% ownership interest in Lennox pursuant to Fla. Stat. § 607.1436. (ECF No. 17.) The parties were unable to reach an agreement, leaving the Court to determine the "fair value of the petitioner's shares as of the day before the petition under s. 607.1430 was filed or as of such other date as the court deems appropriate under the circumstances." Fla. Stat. § 607.1436(4). Crucial to that determination is the shares' valuation date because Lennox's primary asset is the Lennox hotel in Miami Beach, which went directly affected by the COVID restrictions in place at the time of Agnelli's dissolution petition.

Agnelli presented expert testimony from Kathy Conroy that the value of the Lennox hotel was $71,500,000 as of June 30, 2021. Ms. Conroy testified that the June 30, 2021 date would be an appropriate date to conduct a valuation of Lennox because there were few hotel transactions in the summer and fall of 2020 and a mid-2021 valuation would capture operations of the Lennox hotel after initial COVID restrictions eased, thereby offering a truer picture of the hotel as a going concern.

Agnelli also presented expert testimony from Sheri Fiske Schultz that Lennox's adjusted net asset value of was $66,847,165, which would place

Agnellis 12.5% share of that amount at roughly $8,356,000. Fiske Schultz relied upon Conroy's valuation of the hotel in her evaluation of the case. Fiske Schultz reviewed, among others, Lennox's balance sheet through June 30, 2021 to conduct her valuation. She did not use any discounts due to Agnelli being a minority shareholder because it is the custom and practice in Florida to not apply discounts.

On the other hand, Lennox presented expert testimony from Charlotte Kang that the value of the Lennox hotel was $45,000,000 as of August 16, 2020. That date represents the date contemplated by Section 607.1436(4)—the day before Agnelli filed his amended complaint with the dissolution count. (ECF No. 9.) Lennox also presented expert testimony from Cameron Cook who suggested that Lennox's adjusted value was $38,262,827 as of that date, but Mr. Cook's estimate was based off Ms. Kang's August 16, 2020 valuation of the hotel, which was not representative of an active market. Cook also classified COVID-era Paycheck Protection Program ("PPP") loans as liabilities in his calculations despite the fact such loans were to be forgiven by the government. And Lennox's calculations aggressively overshot future marketing expenses, projecting them to be more than $1,000,000, which was not at all in line with its spending.

Although the Court finds both sides' experts to be qualified in respect of Federal Rule of Evidence 702, the Court found Agnelli's to be more convincing and accordingly values Agnelli's shares at $8,355,875 as of June 30, 2021.

## (1) *June 30, 2021 as an appropriate valuation date*

Due to COVID and the limited marketplace for hotel transactions during the third quarter of 2020, this matter represents a unique circumstance where it would be more appropriate to measure the value of the hotel—and Agnelli's shares in Lennox—after the initial ease of COVID restrictions.

To be sure, a true valuation of the hotel would require a market where there was a willing buyer and a willing seller not under duress. *See Cox Enterprises, Inc. v. News Journal Corp.*, 510 F.3d 1350, 1357 (11th Cir. 2007). The limited number of hotel transactions in the third quarter of 2020, and the absence of any such transactions in the Miami Beach market until the summer of 2021, persuade the Court that mid-2021 presents an appropriate timeframe in which a reliable going concern valuation can be formed.

Ms. Conroy's evaluation based on a June 30, 2021 date is based on actual data following the ease of COVID restrictions and reflects the fact that the Miami Beach hotel market was uniquely situated to be among the fastest recovering tourist areas after initial COVID restrictions were lifted.

### (2) *No discount for lack of control or marketability*

The Court declines Lennox's request to apply any discounts for lack of control or lack of marketability. Those discounts are normally applied in the context of "fair market value" determinations, but the specific judicial dissolution statute requires a determination of "fair value."

The term "fair value" is not defined in Florida's judicial dissolution statute but is defined in the analogous appraisal rights statute to expressly disallow discounts for lack of control and lack of marketability. In each place where the Florida legislature has defined the term "fair value," the definition expressly precludes application of such discounts. *See* Fla. Stat. §§ 605.1061(5)(c), 607.1301(5)(c) and 620.2113(4)(c). It is also well recognized that the terms "fair value" and "fair market value" are not synonymous and "[m]ost courts have rejected the notion of such synonymity." *Cox Enterprises, Inc. v. News Journal Corp.*, 510 F.3d 1350, 1357 (11th Cir. 2007).

Additionally, a minority discount need not always be applied as urged by Lennox. *See Cox Enterprises, Inc. v. News Journal Corp.*, 469 F. Supp. 2d 1094, 1108 (M.D. Fla. 2006) ("courts *may* apply a lack-of-marketability discount when valuing shares in a closely-held corporation  .  .  . .") (emphasis added).

As legislative policy does not suggest the application of minority discounts for lack of control or marketability in determining "fair value," the Court declines to apply any discount to Lennox's purchase of Agnelli's shares under Section 607.1436.

On this issue the Court finds that testimony of the Plaintiff's expert is more convincing than the testimony of the Defendant's expert.

### (3) *Valuation determination*

The Court applies June 30, 2021 as Lennox's valuation date and uses the Conroy valuation of $71,500,000 as a starting point for the value of the Lennox hotel, plus cash on hand, net account receivables and prepaid expenses on Lennox's June 30, 2021 balance sheet. Before determining the value of the shares, the Court will subtract the listed liabilities of Lennox as of June 30, 2021. The Court declines Lennox's request to decrease the valuation amount by asserted excess paid-in capital of Castellanos. Such amount was not reported on Lennox's books as a loan to or other liability of Lennox notwithstanding Castellanos had control and otherwise had Lennox financial documents amended when he took over day to day control of Lennox in July 2020.

The Court therefore finds Lennox had an approximate adjusted net asset value of $66,847,165, which represents a fair value for Agnelli's 12.5% interest

in Lennox to be $8,355,875 as of June 30, 2021. Pursuant to Fla. Stat. § 607.1436(5), Agnelli shall also receive interest at the statutory rate of interest set under Fla. Stat. § 55.03 since June 30, 2021.

Having determined the fair value of Agnelli's shares, the Court hereby directs the purchase of those shares pursuant to Fla. Stat. § 607.1436(5), which purchase the Court determines complies with Fla. Stat. § 607.06401 based on the evidence before it. In accordance with the Court's fair value determination, Lennox must file a notice of compliance concerning the purchase of Agnelli's shares within **ten days** of the date this order becomes final.

### B. Lennox's Counterclaims

Having decided Agnelli's sole remaining claim, the Court now turns to Lennox's surviving counterclaims. To recall, those are: count II – breach of fiduciary duty; count V – fraudulent inducement; count VI – rescission of the employment agreement for conflict of interest; count VII – unjust enrichment; count VIII – accounting; and count IX – breach of contract, in the alternative to counts V and VI.

#### (1) *Breach of Contract (Lennox's Count IX)*

Because the Court finds that Lennox prevails on its breach of contract claim, it need not address Lennox's alternative claims for rescission and fraudulent inducement. And indeed, the Court upholds the employment agreement's validity even though Castellanos signed the employment agreement on Lennox's behalf without being able to read English.

As this Court has previously noted, "Florida law has long held that a party to a contract is conclusively presumed to know and understand the contents, terms, and conditions of the contract." *Gustave v. SBE ENT Holdings, LLC*, No. 19-23961, 2020 WL 5819847, at *8 (S.D. Fla. Sep. 30, 2020) (Scola, J.) (cleaned up). "A party has a duty to learn and know the contents of an agreement before signing it," and an inability to read the language the contract is written in does not excuse a party's lack of diligence. *See id.*; *see also Allied Van Lines, Inc. v. Bratton*, 351 So.2d 344, 348 (Fla. 1977) ("No party to a written contract [in Florida] can defend against its enforcement on the sole ground that he signed it without reading it."). While ignorance of the contents of a document could affect the contract's bindingness if Lennox was misled as to those contents, the Court does not find that such misrepresentations were made. The Court further finds that Castellanos was not deprived of an opportunity to review the agreement with counsel of his choice. And in any

event, the Court's assessment of Castellanos's testimony is that he would have idly signed the employment agreement on Lennox's behalf regardless of any representations concerning its contents.

The Court finds that Agnelli breached the employment agreement by misappropriating Lennox's assets since the agreement's inception. Agnelli attempts to justify his misappropriations from Lennox on the basis of an alleged course of dealing with Castellanos by which he was authorized to spend corporate funds for personal purposes. The Court, however, finds that there was no viable agreement or course of conduct that authorized Agnelli to spend Lennox's money in the manner in which he did.

Even if Castellanos's hands-off approach could be said to amount to a course of dealing prior to the employment agreement's effectiveness, the ratification of that agreement—which was drafted by Agnelli's attorneys—would necessarily mark a departure from that course of dealing. In fact, the express provisions of the agreement required Agnelli to: (i) "Direct and coordinate the Company's financial and budget activities to fund operations, maximize investments, and increase efficiencies" (Agreement § 3(a), ECF No. 9-1), and (ii) "Analyze operations  .  .  .  .  to determine areas of potential cost reduction" (Agreement § 3(c).) The employment agreement also limited Agnelli's reimbursement to *business* expenses and disallowed Agnelli's commission of fraud or criminal conduct. (*See* Agreement §§ 2(a)(iii), 9.)

Accordingly, the parol evidence rule precludes Agnelli from relying upon evidence of prior or contemporaneous oral statements or agreements to vary, contradict, or affect the unambiguous language of the agreement. *See Ungerleider v. Gordon*, 214 F.3d 1279, 1282 (11th Cir. 2000). Even more, the employment agreement contained a merger and integration clause that expressly precluded Agnelli's reliance on any prior agreements or understandings that conflicted with it. (*See* Agreement § 22.) As such, no level of prior course of dealing could be said to override the terms of the agreement upon its effectiveness.

Agnelli also breached his fiduciary duty to Lennox by negotiating for a 25% ownership interest in Mira and receiving a $200,000 key payment which should have been paid to Lennox.

Beyond this, Agnelli independently breached the agreement by causing Lennox to submit false tax returns, lying to a federal insured financial institution about his ownership interest in Lennox, and forging an immigration application. Those acts directly contravened its Section 4, which required him to "comply with all relevant federal, state and local laws" in the execution of his

responsibilities. To the extent Agnelli purports to excuse this conduct by a course of dealing defense, it is quintessential that no one can contractually authorize Agnelli to commit tax or immigration fraud. *E.g.*, *Schaal v. Race*, 135 So. 2d 252, 257 (Fla. 2d DCA 1961) (agreements for illegal purposes will not be enforced by courts).

Nor does the doctrine of acquiescence apply. Under it, "[w]here a party fails to declare a breach of contract, and continues to perform under the contract, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement." (Opp. on Summ. J. 12-13, ECF No. 56.) Agnelli's invocation of the doctrine is entirely self-serving insofar as he controlled Lennox's day-to-day operations. In that sense, Agnelli did not present credible evidence that Lennox itself ever actually acquiesced to the actions described above, particularly in light of Castellanos's hands-off approach. Additionally, the employment agreement contains a modification provision which states: "This agreement may be modified only by agreement in writing signed by both the Company and Employee." (Agreement § 16.) No writing excused Agnelli's violations of the employment agreement. His acquiescence defense fails.

Last, Agnelli's breaches are not excused by the doctrine of unclean hands as he argues. The doctrine "applies to equitable actions, not actions at law," such as a breach of contract claim. *Incarcerated Entertainment, LLC v. Cox*, No. 18-21991, 2019 WL 4738144, at *5 (S.D. Fla. Sep. 27, 2019) (Scola, J.).

Accordingly, Lennox prevails on its breach of contract claim and is entitled to damages in the amount of $6,073,526. Although the amount of expenditures for non-business relate expenses was largely not in dispute, to the extent there is a dispute, the Court accepts the testimony of the Defendant's expert Fechter in establishing this amount of damages.

### (2) *Breach of Fiduciary Duty (Lennox's Count II)*

Next, Agnelli maintains that Lennox's claim for breach of fiduciary duty is barred by the independent tort doctrine, which requires the basis of a tort action to be independent of a claim for breach of contract. *See Island Travel & Tours, Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1240 n.7 (Fla. 3d DCA 2020).

An understanding of Florida's independent tort doctrine requires a discussion of the closely related economic loss rule. In its simplest form, "the economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Tiara Condominium Association, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399, 401 (Fla. 2013). But in *Tiara*, the Florida

Supreme Court held that this rule applied only to products liability cases. *Id.* at 407. Importantly, *Tiara* acknowledged that under the "contractual privity application" of the rule, "courts have held that a tort action is barred where a defendant has not committed a breach of duty apart from a breach of contract." *Id.* at 402. This "contractual privity application" of the economic loss rule is what Florida federal courts have referred to as the "independent tort doctrine." *Inspirations Nevada LLC v. Med Pro Billing, Inc.*, No. 20-CV-60268, 2021 WL 2156677, at *4 n.9 (S.D. Fla. May 26, 2021) (Strauss, Mag. J.). Thus, it would seem clear that the "contractual privity application" of the economic loss rule— alternatively known as the "independent tort doctrine"—would also be limited to the products liability context, but that is not necessarily true.

Along with *Tiara*'s unambiguous limitation of the economic loss rule came Justice Pariente's concurring opinion, which specified that "in order to bring a valid tort claim, a party must still demonstrate that all of the required elements for the cause of action are satisfied, including that the tort is independent of any breach of contract claim." *Tiara*, 110 So.3d at 408. Therefore, the question of whether *Tiara* did away with the "independent tort doctrine" or somehow left it intact has produced confusion. *See Inspirations*, 2021 WL 2156677 at *6 (quoting *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014) ("[w]hile the exact contours of this possible separate limitation, as applied post-*Tiara*, are still unclear, the standard appears to be that where a breach of contract is combined with some other conduct amounting to an independent tort, the breach can be considered negligence.")) (cleaned up); *see also Tiara Condominium Ass'n, Inc. v. Marsh USA, Inc.*, 991 F. Supp. 2d 1271, 1279 (S.D. Fla. 2014) ("the Florida Supreme Court's restriction of the contractual privity economic loss rule . . . necessarily swept with it the corollary concept of the 'independent tort rule.'").

Noting that at least two Florida appellate courts have upheld the independent tort doctrine post-*Tiara*, *see Inspirations*, 2021 WL 2156677 at *5, the Court errs on the side of caution and finds that Lennox can prevail on its breach of fiduciary duty claim only in the alternative to its breach of contract claim because both counts allege the same wrongful conduct. (*Compare Counterclaim* ¶¶ 45-50, ECF No. 10 *with Counterclaim* ¶¶ 102-107.)

In any case, Lennox would have prevailed on its breach of fiduciary duty claim had it pled it alone. In Florida, "[t]he elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Taubenfeld v. Lasko*, 324 So. 3d 529, 537-38 (Fla. 4th DCA 2021) (quoting *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002)).

There are two fundamental fiduciary duties: the duty of care and the duty of loyalty. *See id.* at 538. The former is a requirement to use the care that an ordinarily careful and prudent person would use in similar circumstances. *See id.* The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Id.* It follows that "[f]iduciary obligors may not 'either directly or indirectly, in their dealings on behalf of the fiduciary beneficiary  .  .  .  make any profit or acquire any other personal benefit or advantage, not also enjoyed by the fiduciary beneficiary, and if they do, they may be compelled to account to the beneficiary." *Id.* at 539 (cleaned up).

As an officer and director of Lennox, Agnelli breached his fiduciary duties in at least the following ways:

- using Lennox's assets for his personal benefit;
- engaging in and concealing his self-dealing involving Mira, the restaurant on Lennox's premises. That self-dealing included taking an upfront "key money" payment from Mira; obtaining an ownership interest in the entity that owned Mira; obtaining a commitment from Mira that Agnelli would share in future opportunities; failing to protect Lennox's interest in negotiating and signing an arm's length and commercially reasonable lease with Mira; and failing to enforce Lennox's rights under the lease. Lennox was damaged by Agnelli's actions in regards to Lennox's tenant, Mira, and these damages impact Agnelli's employment claim, Lennox's claims and the determination of fair value;
- submitting a forged visa application for himself on behalf of Lennox to the U.S. government; and
- misleading Lennox's accountants about expenditures made by Lennox for non-business purposes of Lennox, causing Lennox to submit false tax returns.

As a result of Agnelli breaching his fiduciary duties, Lennox suffered damages in the amount of $6,073,526.

To the extent Agnelli would assert the defenses of course of dealing, acquiescence, and unclean hands to the breach of fiduciary duty claim, the Court would deny those defenses for the same grounds previously discussed with respect to the breach of contract claim.

### C. Unjust enrichment and accounting (Lennox's Counts VII & VIII)

Lennox also asserts an unjust enrichment claim on the grounds that Agnelli paid himself an "exorbitant salary and other benefits." (Counterclaim

¶ 91.) However, the Court agrees with Agnelli that this claim fails as a matter of law because the acts complained of under it are the subject of Lennox's breach of contract claim. "Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008). As such, Lennox is not entitled to any damages on its unjust enrichment claim.

Last, Lennox demands an accounting of its finances "including but not limited to all funds received by Agnelli and/or used by Agnelli for personal purposes  .  .  .  ." (Counterclaim ¶ 100.) However, an "accounting is best understood as a remedy for a cause of action, not as a cause of action in its own right." *Caldwell v. Compass Ent. Grp. LLC*, No. 614CV1701ORL41TBS, 2016 WL 7136181, at *3 (M.D. Fla. Feb. 4, 2016) (quoting *Zaki Klaibee Establishment v. McFliker*, 771 F.3d 1301, 1310 n.21 (11th Cir. 2014)).

As such, the Court construes Lennox's request for an accounting as an alternative request to the damages it seeks in conjunction with its breach of contract and/or breach of fiduciary duty claim(s).

Accountings are equitable remedies meant to "afford relief to principals who were injured by their fiduciaries, yet, due to informational asymmetries and trust inherent in the relationship, were unable to obtain relief via traditional remedies at law." *Zaki Kulaibee Establishment v. McFliker*, 771 F.3d 1301, 1314 n.25 (11th Cir. 2014).

But Lennox has quantified its damages and Lennox did not request an accounting during its closing arguments. Indeed, Lennox left out an accounting in its presentation of a proposed final judgment. Lennox instead requested that the Court award it damages in its final judgment, and the Court has awarded Lennox those damages. As such, Lennox's request for an accounting is moot.

### D. Disposition of Lennox's claims

In sum, the Court's disposition of Lennox's remaining counts is as follows: Lennox prevails on its breach of contract claim in the alternative to its breach of fiduciary duty claim, which it would have prevailed on. Lennox's claim for unjust enrichment fails as duplicative of the breach of contract claim, and the Court need not address Lennox's counts for rescission or fraudulent inducement because they were pled in the alternative to Lennox's contract claim, which the Court has adjudicated. Next, the Court deems Lennox's request for an accounting moot in light of Lennox's request for damages of $6,073,526, which request the Court grants.

Last, the Court denies Lennox's request for attorneys' fees made under Fla. Stat. § 607.1431(5) on a finding that this action was not instituted "arbitrarily, frivolously, vexatiously, or not in good faith."

### 4. Summary of the Testimony

The Court's findings of fact and conclusions of law come from an in-person, non-jury trial in this matter on May 23, 2022 through May 27, 2022, May 31, 2022, June 13, 2022 through June 16, 2022, June 20, 2022, and June 21, 2022, during which the Court heard the testimony of several witnesses. Closing arguments were presented to the Court on July 5, 2022. Below is a summary of the testimony in this action, organized by witness and listed in the order of presentation.

The summaries contained in this section are not findings of fact or conclusions of law made by the Court. Any assertions of fact or law contained in a summary should be understood to be respective witness's only.

### A. Kathy Conroy

Kathy Conroy is an experienced hotel evaluator. She has been in the real estate consulting and valuation business for 44 years and specializes in hotel and hospitality-driven properties. She is a lifetime member of the Appraisal Institute.

Conroy has been involved in 4,000 to 5,000 assignments and has expertise in the Miami market. Conroy has testified as an expert in court and has been found to be an expert by other courts.

Conroy was engaged by Agnelli's counsel to prepare a current market value appraisal of the hotel. She prepared three reports based upon her work in the case, and one of the things she needed to consider was the effective date of the valuation. Conroy opined that the value of the hotel as of July 2021 was $71.5 million.

As part of her appraisal, Conroy noted that the hotel was previously a Peter Miller, art deco hotel built in the 1930's, but significant renovations and improvements were made prior to its re-opening as the Lennox hotel. Conroy believed the renovations were done as well as she has seen. She noted that there was attention to detail and included high-end furnishings, finishes, linen, and toilets. Conroy also pointed out that the hotel includes unique amenities such as a Moët & Chandon champagne vending machine.

Conroy also considered the hotel's reputation. For example, Tripadvisor is an internet-based platform that allows hotel guests to rate hotels. The Lennox hotel obtained the highest rating of Miami Beach hotels prior to the

COVID pandemic. Small Luxury Hotels is another internet-based platform for luxury boutique hotels and the Miami Lennox made its list. The hotel also received a four-diamond rating from AAA. She notes that luxury hotels like the Lennox do not come on the market very frequently and when they are on the market, they do so with a premium.

There are three methods of valuing hotels: the income capitalization approach, the cost approach, and the sales comparison approach. Conroy used the income capitalization method. Neither Conroy nor Jones Lang Lasalle ("JLL") (Lennox's expert) used the cost approach. Conroy inspected the property, looked at the competitive market, and trends relative to that market. She also looked at the projected budget and income going forward.

In the hotel industry, the primary approach to determine value is the income approach. Under it, one looks at the budgets for future projections, the market within which the subject competes for business, the average rate of occupancy, and rate of renting the rooms over a ten-year period. One then conducts a discounted cash flow analysis.

When Conroy did her analysis, she had historical data for part of 2019 (the hotel opened in 2019), all of 2020, and the first six months of 2021. The starting point for Conroy's financial forecast was July 2021. Typically, the date of value will correlate to the date of the expert's inspection. Conroy used July 1, 2021 as the starting point even though she did her inspection on July 13, 2021. Conroy preferred not to use the summer of 2020 to value the property because of disruptive hotel market the pandemic produced. Hotels were closed or opened on a very limited basis and people were not traveling. Using the summer of 2021, she opined, gave a more realistic view of the actual data that would be relevant for a future-looking analysis.

In turn, market value is generally determined through a willing seller and willing buyer who are not under duress. During the second and third quarters of 2020, there were virtually no sales of hotels because the market was so negatively affected by COVID that buyers and sellers could not reach a meeting of the minds of how much values should be discounted. Meanwhile, Miami was one of the fastest recovering markets post-COVID.

This reality also played into Conroy's consideration of the hotel's occupancy. The first step in forecasting occupancy is a market wide occupancy—looking at other hotels in the area with which it would compete for business. Conroy used the Betsy, the Hotel Victor, Kimpton Angler, Dream South Beach, and Redbury—local boutique hotels—as comparatives for occupancy rates. The occupancy rates for those hotels were very low during the 2020 year due to COVID but bounced back strongly in 2021. Thus, to forecast

the balance of 2021, Conroy used the numbers from 2019 to forecast higher numbers for 2022 based upon the increasing, post-COVID occupancy rates. Conroy predicted that the 2022 market-wide occupancy rate would be 72.6%. The actual rates for the 2022 market-wide occupancy rate for the period of July 2021 through March 2022 were just slightly higher than Conroy's forecast. Conroy also predicted the market-wide occupancy rate would stabilize[1] at 78% after three years and the actual numbers for the past year have trended toward that number.

Once Conroy determined the market-wide occupancy rate, she then determined the Lennox occupancy forecast. Conroy determined that the Lennox would get its fair share of the market's occupancy so it would eventually reach the same 78% stabilized occupancy after three years.

Conroy next considered the average daily rate ("ADR") for the Lennox. She used the forecast figures calculated by the hotel's managing company, Driftwood, for the last six months of 2021. For the first six months of 2022, Conroy estimated the average daily rates would be approximately 6% more than the 2019 rates. These two forecasts came to an ADR of $275.00. The data from Lennox through March 2022 showed the average daily rates were actually 7% higher than in 2019.

The next step in Conroy's analysis was to review the historical financials of the hotel which was from 2019 through mid-2021. This review allowed her to determine the earnings before interest, taxes, depreciation, and amortization ("EBITDA") or what is commonly referred to as the "net income." This information would have come from Driftwood. In arriving at the EBITDA, Conroy considered profit and loss statements which would include the salaries of employees. Conroy was not aware that Agnelli was being paid $100,000 per month and that salary information was not provided to her. In her 44 years of experience, Conroy has never heard of an employee being paid over $1 million for a 119-room boutique hotel. Even if she had known about the salary, it would not have affected her opinion as to the value because the purchaser of the hotel would not be paying someone that kind of a salary.

The financial records show that the Lennox exceeded its expected budget in 2021. The ten-year revenue and expense forecast shows once the Lennox reaches its stabilized occupancy rate its EBITBA will also be fairly stable throughout the rest of the ten-year period. The terminal capitalization rate is

---

[1] A stabilized occupancy is the average annual occupancy a hotel would have over the remaining economic life. Lennox had not achieved stabilized occupancy at the time of Conroy's valuation.

applied to the forecasted 11th year to determine the income to be used in a model for a sale during that year. Conroy determined the terminal capitalization rate to be 7%.

Conroy chose an 8.5% discount rate because of the lower risk market and the fact the Lennox is a new hotel. The higher the discount rate, the lower the value of the hotel. The Defendant's expert used a 10% discount rate which Conroy believes is too high. In her decades of experience, Conroy has never seen a 10% discount rate for a property of the quality of the Lennox.

Another method for valuing a hotel is to do a sale comparison approach that looks at actual hotel sales transactions and then look at the total sale of the hotel, divided by the number of rooms to get a price per room. One would then apply the price per room to the hotel one is trying to value. This approach is difficult to use because some sales are very complex, and others do not make all the details of the sale available for review. Conroy sometimes uses this approach to check out the validity of her income-based valuation just to make sure her final number is somewhere in the ballpark with other sales.

For her sales analysis approach, Conroy looked at sales of the South Seas Hotel, the One Hotel on South Beach, the Raleigh, the Redbury, Boulan, and the Celino Hotel. Five of these transactions took place at least a year before Agnelli filed his dissolution action. The Celino Hotel transaction took place a month after the dissolution action was filed. The Celino Hotel sold for $150,000 per room less than Conroy believed it had been sold for. The Boulan was listed as a 52-room property in one part of her report and 58 rooms in another. Conroy later corrected those errors to indicate the hotel had 30 rooms. The sales price Conroy had for the Boulan was also inaccurate. There was also retail space included as part of the sale as well as a parking garage.

Conroy also looked at sales of other hotels that JLL used in its analysis. Those sales took place from 2017 through 2021. These sales showed adjusted per-room rates between $500,000 and $764,000. The Lennox is a higher quality hotel than some of these other hotels so Conroy's per-room number of approximately $600,000 is in the range of these other hotels.

As concerns JLL's report, Conroy believes that they did not consider all the data available to them. They had the year-end profit and loss statement for 2020 and the budget for 2021. They did not issue their report until August 2021, and they could have looked at 2021 data up to that point but did not do so. JLL's forecast begins in August 2020. There was an EBITDA of $611,000 in 2020 and a projected EBITDA for 2021 of $2.6 million. JLL starts with an ADR of $207 when the hotel had never had rates that low. Before JLL prepared its

report, Lennox predicted an average rate of $260 but JLL did not use that
number.

Another big difference between Conroy's valuation and JLL's is the
marketing expense. Conroy forecasted a cost of $500,000 on marketing once
the hotel reached its stabilized occupancy rate. JLL forecasted $1,000,000 for
marketing, which is much more than a boutique hotel on Miami Beach would
ever need to spend for marketing according to her.

### B. Sherry Fiske Schultz

Sherry Fiske Schultz is a CPA in Plantation and has been involved in
valuation and forensic accounting since 1990. She has been active on
committees and at conferences involving business valuation. Fiske Schultz has
received several awards in her industry. She has testified in court a couple of
dozens of times and in the last five years she has testified fifty percent for
plaintiffs and fifty percent for defendants. She has also been appointed by
courts as a neutral evaluator on several occasions.

Fiske Schultz was hired to give an opinion on the value of Agnelli's
shares. She decided to use June 30, 2021 as the valuation date. Valuation is a
forward-looking concept. During COVID, there were very few transactions and
thus, there was no market to use or rely upon. Using the June 30, 2021 date,
she determined that the value of Agnelli's shares in Lennox was $8,356,000.

Fiske Schultz relied upon Conroy's valuation of the hotel in her
evaluation of the case. Although Conroy used a valuation date of July 13,
2021, the effective date of that valuation is July 1, 2021—only one day after the
day Fiske Schultz used.

Fiske Schultz reviewed the balance sheet of Lennox through June 30,
2021 to conduct her valuation. The value of the property itself and the
mortgage are not on the balance sheet. The balance sheet sets forth the value
of the assets at cost, but Fiske Schultz needed to determine the value of the
assets on the date of valuation. Some items, like cash on hand, have the same
value. For other assets she needed to determine the appraised valued. She
determined the assets had an adjusted value of $73,313,883.

Fiske Schultz left the value of the mortgage at $5.6 million even though
the last date she had information for the mortgage was 10 months earlier.
Because she did not know the amortization rate of the mortgage, Fiske Schultz
did not reduce the amount of the mortgage—even though there were 10
months of mortgage payments made.

Fiske Schultz also did not include a $243,000 PPP loan as a liability
because there was a virtual certainty the loan would be forgiven. Indeed, that

loan was not on Lennox's books as of June 30, 2021, meaning the loan had been forgiven. As of August 2021, when the defense expert prepared his report, it was known to that expert that the loan had been forgiven.

Excess paid-in capital is extra money a shareholder puts into a company. That money should not be treated as a liability. If it were a loan, it would be recorded on the books and would either be accrued or paid. Fiske Schultz never saw any adjusted books to report this as a liability.

In all, Fiske Schultz determined that the adjusted net asset value was $66,847,165. Thus, Agnelli's 12.5% share of that is $8,356,000. She did not use any discounts due to Agnelli being a minority shareholder because it is the custom and practice in Florida to not apply discounts.

The Florida judicial dissolution statute is found at Florida Statutes § 607.1430. There is no definition of fair value in that section, so Fiske Schultz used the definition set forth in Florida Statutes § 607.1301 found within the Florida Business Corporation Act. The definition of "fair value" in section 607.1301(5) states that "fair value means the value of the corporation's share determined: (a) Immediately before the effectiveness of the corporate action to which the shareholder objects." That date would have been the day before Agnelli filed this action, or August 16, 2020. Nonetheless, Fiske Schultz used a valuation date of June 30, 2021 because there was no market of hotel sales due to COVID in August 2020.

Section 607.1301(5)(b) goes on to say to determine "fair value" of the corporation shares one should use "customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable to the corporation and its remaining shareholders."

Section 607.1301(c) further provides the "fair value" should be determined "without discounting for lack of marketability or minority status."

Section 607.1436 relates to the election to purchase corporate shares instead of a judicial dissolution. Subsection (4) provides that if the parties cannot agree on the fair value of the shares, the court shall determine the fair value on the day before the date on which the petition was filed or "as of such other date as the court deems appropriate under the circumstances."

## C. Fernando Marconi

Fernando Marconi works in the area of hospitality and hotels in Argentina. Marconi graduated from high school in 2000 and then received a college degree in hotel and restaurant management in 2005. He worked at

Crystal Palace Hotel and then worked for Sofitel for seven years first as a bell boy and when he left, he was the front office manager. He left Sofitel in 2010 and began working at the Lennox hotels in Argentina. After interviewing with Agnelli, Marconi began working at the Lennox hotel in Buenos Aires and was there for one and one-half years. He then worked as the manager at the Ushuaia Lennox hotel in Patagonia until 2013 when he returned to manage the Buenos Aires Lennox. He remained in charge of the hotel in Ushuaia as well and he would spend about one week per month in Ushuaia. Marconi remained with the hotels until 2021.

Moving from the Sofitel to the Lennox hotels, he noticed the structure was different and decisions were made more quickly at the Lennox hotels. At Sofitel, decisions were made by owners who were sometimes in other countries, thousands of miles away. The Lennox hotels were part of a family business and operated much differently.

Initially, Marconi reported to a manager but when Marconi became a manager, he reported directly to Agnelli. When Agnelli lived in Argentina, Marconi saw him at the hotel on a daily basis. Once Agnelli moved to Miami, he would speak to him once per week.

Marconi knows that Castellanos is Agnelli's father-in-law and the owner of the hotels, but Marconi never reported to Castellanos. Marconi never saw Castellanos at the hotel in Ushuaia and saw Castellanos at the hotel in Buenos Aires four to five times at its restaurant. Castellanos did not have an active role in the operations.

By 2010, the hotel in Ushuaia had been operating for five years, the Buenos Aires hotel was just opening, and the Miami hotel had just been purchased. Marconi worked on the construction and development of the Buenos Aires hotel.

In 2016, Marconi started traveling to Miami and started working on the operations and control side. In 2017, Marconi traveled more frequently to acquire products for the hotel and then started looking for a management company. In 2018, after deciding on a management company, Driftwood, Marconi traveled to other properties to see how they managed those hotels. Marconi wanted to incorporate some of the ideas the Driftwood used in managing and wanted Driftwood to incorporate the vision of the Argentinean Lennox hotels in its management of the Miami Lennox.

Marconi never received extra monies beyond his salary for helping out with the Miami Lennox. He was responsible for reviewing all the financial records along with the finance person of the two Lennox hotels in Argentina and would forward the bills and invoices to Agnelli for payment. Invoices and

back-up documents were always kept for the hotels. Agnelli needed to approve of any expense before it was paid and only Agnelli had signatory authority for the bank account. Marconi did not speak to Castellanos about any expenses and did not ever obtain permission from Castellanos for payment of any expenses.

Agnelli was the sole director for the entity which owned the two Lennox hotels in Argentina and as such was entitled to a director's fee. Marconi is not aware that Agnelli had a personal expense account. Indeed, Marconi is not familiar with the term "personal expense account."

Analía and Agnelli used resources from the hotels for the personal use. They took mattresses and lamps, and used the hotel's air conditioning company for work at their home. The hotel also paid for their gardening and fuel. For a while, the tags for the vehicles of the entire family were paid for by the hotel. The hotel paid for a corporate credit card for Agnelli and Analía and Marconi is familiar with the majority of the charges. Some of the charges were for personal use such as utilities, DirecTv, a boat, airline flights. The hotel paid these personal expenses from 2010 through 2020.

The Lennox hotels in Argentina also paid expenses for Castellanos. Marconi recalls Agnelli asked him to send a mattress paid for by the business to Castellanos's home in December 2015. Castellanos has a family vacation home in Argentina in San Martín de los Andes. A Lennox hotel paid for one of its employees to be driven to the home to clean the home.

The hotel also paid for expenses of the other family businesses including salaries of employees, cleaning, rent, fumigation, supplies, repairs, and utilities. There were six to seven employees in the offices from 2010 up to 2017. Two to three were dedicated to hotel sales but the others worked for other family businesses.

Clara Pizarro is a friend of Analía and was paid by a Lennox hotel from July 2012 through November 2017 but during those five-plus years, she never performed work for the hotel. Pizarro now works for the Castellanos family. On July 9, 2020, the day after Agnelli's termination from Lennox, Marconi purchased a plane ticket to travel to Miami using Agnelli's corporate credit card.

In total, the Lennox hotels paid over $500,000 in payments for expenses related to the other Castellanos family businesses. The managers for the hotels had their phones and monthly phone bills and parking paid for by the hotel and any meals they had at the hotels were paid for and the manager of the Ushuaia hotel was provided with housing. In approximately 2017, Agnelli was

supposed to be paid $50,000 per month from the Lennox hotels but generally received $12,000 to $13,000 per month.

Agnelli stopped working at the Lennox hotels in Argentina in June or July 2020. Marconi kept working at the hotels, but things changed a lot after Agnelli left. There was no feedback from the owners and not much communication between Marconi and the owners. Many of the employees left for other jobs, some of whom had been there from the very beginning of the hotel's opening. Marconi left in April 2021. When Agnelli left, he took the essence and value of Lennox with him. The employees had direct access to him and he was someone who was very knowledgeable, was a good teacher and had a broad vision of business overall.

Marconi denies that he, Agnelli, Shirley Fabal, and Elizabeth Bermudez formed Sense Hospitality in Mexico. Agnelli was going to go into business with Marconi at Sense but he changed his mind. Fabal, Bermudez and Marconi are the principals of Sense.

Marconi purchased his own plane ticket to testify before the Court. He does not expect to be reimbursed.

### D. Elizabeth Bermudez

Elizabeth Bermudez has lived in Miami since 1995 except for 10 months in 1999-2000. She was born in Colombia but was raised in Venezuela. She has a Venezuelan law degree and practiced law in Venezuela.

Bermudez came to the United States because her husband was a diplomat. She began working in the mortgage business in 2000. In 2013, she began working in the Castellanos family business and remained working there until 2020. Bermudez was familiar with the family from working with them on one of the homes they were buying in Miami and from working on the financing of the hotel. Bermudez worked on numerous matters for the family and their business and personal needs for seven years. Agnelli conducted her interview and explained he was looking for an assistant to work here in Miami. At the time, the family had an office in Buenos Aires with two hotels in Argentina, but they were working on developing a Lennox hotel in Miami Beach. Agnelli was very excited about creating a legacy for his family.

When Bermudez started working for the family business, they were still in the demolition phase while awaiting building permits from the City of Miami Beach. Bermudez had no experience in construction and was intimidated at the beginning. But Agnelli encouraged her to get involved and he took the time to teach her.

Agnelli had a clear vision for the project and for the kind of hotel the Miami Lennox would become. He wanted to highlight the historic aspects of the hotel but to also design it in a way that guests would want to stay there. The hotel was not on the water, so it needed a pleasing environment for its guests. Agnelli picked out finishes and wallpaper for the hotel and was very hands-on in the design of the hotel. He wanted people to walk into the hotel and feel well without knowing why. The smell was important, and he picked out nice artwork and placed moss-covered walls so people would feel pleasure when they were there.

Castellanos was very rarely in Miami during the construction. Even when Castellanos was there, Agnelli ran everything. Agnelli was also very involved in helping the management company prepare its training manuals.

The construction of the hotel was financed by capital contributions from Castellanos. The funds came from either a Castellanos personal bank account or a Castellanos trust account. As noted above, Castellanos's wealth came from casinos in Argentina. However, Agnelli had signatory authority on many of Castellanos's bank accounts. The Lennox hotel in Miami Beach opened in August of 2019. A few months after its opening, the hotel began generating its own money.

Bermudez always reported to Agnelli, not Castellanos. Agnelli handled all the business for the family; not just the businesses but personal matters as well. Agnelli and Castellanos had a close relationship akin to a father-son relationship. Castellanos spent long periods of time in Spain and seemed to her to be retired. He came to Miami about twice a year. When he came to the office, he might attend a meeting for a few minutes but then would leave. He mostly sat around and told stories or looked at his iPad. Castellanos always said that he was okay with whatever Agnelli decided.

During the time she worked for the family businesses, Bermudez never saw Castellanos or Agnelli or Analía call a formal shareholder meeting and did not observe them observing typical corporate formalities. Bermudez once saw Castellanos sign a document for his wife; Agnelli sometimes asked Bermudez to sign his name; Analía once signed something for her mother. They were very informal in how the family businesses were conducted.

Bermudez would do a lot of day-to-day administrative matters along with Shirley Fabal. They made sure all the entities were up to date, cars were insured, and all the services for the family houses were taken care of. Bermudez also did work for Agnelli, Analía and their kids. She bought "slow down, children playing" signs; she made sure repairs for the yacht were paid; she attended teacher/parent conferences; she coordinated photo shoots for

Analía. Bermudez also did several personal chores for Castellanos. She and Castellanos had WhatsApp conversations. Toward the end, he started sending her instructions by email. But Castellanos did not like discussing business with her; he wanted Agnelli to take care of that. Bermudez also rendered services to some of the businesses in Argentina but was always paid through Defendant Lennox.

Bermudez also traveled to Canada with Agnelli and the Miami hotel manager, El Chantiry, to visit the establishments of a restaurant management group that would end up running the Miami Lennox's on-property restaurant, Mira. On behalf of Lennox, Agnelli signed a deal with Mira to lease space in the Miami Lennox and also signed a separate deal with his company Spark Design and Mira, in which Spark Design obtained a 25% ownership in Mira. Mira also agreed to pay key money of $425,000 to Agnelli. Agnelli received $200,000 personally from Mira but did not pay the balance. Spark Design belongs to Agnelli and Analía.

When Bermudez started, there were three Castellanos entities in Florida but by the end there were nine or ten. These entities owned Castellanos's home, cars, commercial properties, several investment residential properties, a yacht, and the Lennox hotel in Miami. Invernorth was a BVI company that was created to allow Castellanos to transfer his shares in Lennox so they could later be transferred to a trustee. Invernorth never held any meetings of the board of directors; nor did it hold any shareholder meetings.

An entity referred to as Centro had the primary purpose of paying for Agnelli and Analía's personal expenses and this information was provided to Castellanos's accountant in Argentina, Roberto Macho. The bank statements and an excel spreadsheet with all the expenditures were sent to the accountant of Castellanos. Items as small as a $3.99 Apple iTunes purchase were included in the spreadsheet. Macho handled matters for Castellanos, Agnelli, Analía and for Lennox until 2014. Macho has not done accounting for Lennox since 2014 but in 2019, Lennox paid Macho over $5,000 for services Macho provided to Castellanos in 2018 for establishment of his trust and other services unrelated to Lennox.

Lennox also hired a painter to paint two murals and other paintings for the hotel. One mural was for the bar and one for the restaurant. Castellanos liked the work of the artist and ordered three paintings for his personal use. Those paintings were paid for by the hotel. Castellanos never questioned any expenditures made by Agnelli.

At some point, Castellanos told Bermudez that Agnelli would no longer take care of his other businesses in Argentina, but that Agnelli would still be

handling the Miami Lennox. Soon thereafter, though, things deteriorated. Bermudez witnessed an argument between Castellanos and Agnelli in approximately December 2019. It was dramatic and public. Castellanos got out of his car in front of the hotel and start screaming at Agnelli. Castellanos and Bermudez left in a car together. Castellanos told her the Agnelli could not go back to Argentina because Agnelli would end up in a wheelchair.

Shortly thereafter, Lennox received letters from attorneys on behalf of Castellanos, Invernorth, and Analía demanding to review Lennox's corporate documents. Agnelli hired an attorney, Luis Salazar, on behalf of Lennox. Bermudez met with Salazar and an associate in a conference room where Salazar told her that they needed to have corporate documents ready and organized. There were boxes of documents which included construction documents, bank statements and invoices. There was an apartment close by, known as the Sherita apartment, that they used as an office or sometimes for staff to stay at if the hotel was full and some of the documents were placed there for safekeeping.

On June 22, 2020, Bermudez received a call from the manager of the Miami Lennox hotel who told her he believed that there was a takeover of the hotel because attorneys were at the hotel. Shortly thereafter, Bermudez received an email from an attorney explaining that Agnelli was no longer in charge of Lennox. Bermudez kept working for Lennox, but she thinks she was still mostly working remotely due to COVID. The new management reached out to her for information, and she provided whatever information she had or could access from her house. She resigned toward the end of July.

But on July 1, 2020, Bermudez, Agnelli and others returned to the hotel. Their attorney, Salazar, told them that public records still showed Agnelli as the President, so he had the right to be there. A lock had been placed on Agnelli's office and an armed security guard was placed in front of Bermudez's office. They called for a locksmith to come to the hotel and remove the lock on Agnelli's office so he could access the office and remove some of his papers. Bermudez denies that they took a painting from the hotel lobby that day.

Near the end of Agnelli's time at Lennox, Bermudez accompanied him to open a Lennox bank account at Wells Fargo. Agnelli asked Driftwood to transfer $1,000,000 into that account. Driftwood did transfer money, but Bermudez does not know the amount. The money in the Wells Fargo account was not used to pay contractors. Agnelli had stopped all payments to the contractors because of COVID.

After he separated from his wife, Agnelli moved in the Oceana building on Key Biscayne and Lennox paid his $11,000 monthly rent for about 18 months.

Bermudez does not know if Castellanos was aware that Agnelli's rent was being paid by Lennox. Bermudez hired an attorney relating to this litigation and Agnelli paid for her attorney. Agnelli paid her $138,000 after her resignation from his own personal funds. He also paid Shirley Fabal $88,000.

Since leaving Lennox, Bermudez has formed a company, Sense Hospitality, with Marconi and Fabal. They asked Agnelli to be part of the company, but he said he had too many things on his plate. Instead, he said he would be happy to give advice. Marconi, Fabal, and Bermudez invested a total of $5,000 to start the business. Agnelli paid rent for some months for Sense while it had an office.

### E. Ziad El Chantiry

El Chantiry worked for Driftwood from January 2018 through 2021. He started as the opening general manager at the Miami Lennox hotel and was there until August of 2020. El Chantiry was interviewed by Agnelli in the fall of 2017 and started in January 2018, prior to the opening of the hotel. He started by working on a budget and the management operating systems. When the opening was delayed, El Chantiry started helping out with the furnishing and design and helping get the hotel ready for opening. Angelli had the last word 99.99% of the time and was very detail-oriented.

El Chantiry visited the Lennox hotels in Argentina and knew the Miami hotel would be an extension of the hotels in Argentina. There was a grand opening for the hotel in July 2019. El Chantiry felt the Lennox was the finest luxury boutique hotel on Miami Beach and could expand to other cities in the United States.

The Miami Lennox hotel turned a profit within a few months which is unusual since most hotels do not turn a profit for six months to a year. Driftwood would provide a statement of operations to Lennox every month on the 20th day which included a detailed presentation of the previous month's performance. Agnelli was paid $10,000 per month according to the profit and loss statements Driftwood prepared. El Chantiry was part of the budgeting process for 2019 and 2020. Driftwood's budgeting projections were usually very close to the actual numbers except during the pandemic.

During his tenure, the Miami Lennox received a TripAdvisor rating of 5.0 which was the highest rating out of over 200 hotels. El Chantiry lived in Coral Springs at the time and could have found work at a hotel closer to his home, but the vision of Agnelli and the way he treated his employees made the long drive well worth it. He was an unusual owner because he cared so deeply about his hotel and treated everyone with respect regardless of their position.

The hotel closed down in March, April and May of 2020 due to COVID. When the City of Miami Beach allowed the hotels to reopen, the Lennox was scheduled to be full on the July 4, 2020 weekend. But an increase in the COVID numbers caused the County and City to shut down the hotels again.

El Chantiry was present when Agnelli came to the hotel with police officers. El Chantiry only saw Agnelli take his own personal items and did not see him take any items belonging to the hotel. At an earlier date, Agnelli did ask the maintenance engineer to take down a painting that had been in the lobby and Agnelli did take that painting.

El Chantiry knows of Javier, a maintenance engineer at Lennox that spent significant time at Analía's house. Javier was paid exclusively by Lennox. El Chantiry received a letter on June 22, 2020 from Castellanos's attorneys informing him that Castellanos was taking over as Director of Lennox.

El Chantiry left the Lennox when he was offered a position at a full-service Hilton which was 20 miles closer to his home and would give him an opportunity to expand his resume and better promote his career. Analía asked him to stay and offered more money, but El Chantiry had already decided to take the new position.

### F. Shirley Fabal

Shirley Fabal is originally from the Dominican Republic and came to the United States in 2002. She has been married for 21 years to a taxi driver and has two sons. Fabal studied civil engineering in the Dominican Republic and obtained a graduate degree in control and project management. Fabal worked in the public works department in the Dominican Republic. She moved to Rhode Island and worked as a planner for Interplex. When she moved to Miami, she worked as a cashier for a parking garage.

Fabal started working for Lennox and the Castellanos family in October 2013 when the hotel was in the beginning phases of construction. Fabal continued working at Lennox until July 2020. Fabal understood she would be providing services for Lennox, for the entities and family of Castellanos, and for the Agnelli family.

For the family, her initial duties were to keep records concerning purchases, keep records of bank accounts, make purchases, pay for services for the family, and to basically keep records of anything the family asked of her. For Lennox, Fabal had bookkeeping responsibilities, including recording invoices in Quickbooks, keeping track of bank statements, recording expenses, and sharing information with the accountant through Dropbox. Prior to this job, Fabal had no prior experience in accounting. Her salary was always paid

36

through Lennox's payroll. She never received any other remuneration from any other entities or any family members.

Fabal is familiar with multiple entities owned by Castellanos, including an entity by the name of Passion Marine. It is an entity of Castellanos that owns a boat and tender. Fabal performed services for that entity from the date the boat was purchased until the day Agnelli was no longer at Lennox. Fabal made arrangements to pay for the captain, maintenance and repairs, registration, insurance and scuba team to clean the boat. She also prepared a spreadsheet with all the expenses which she sent to Castellanos's accountant. Fabal did all the work related to this entity from her office at Lennox and never received any payment from Passion Marine.

International Midtown is another company of Castellanos that owns two buildings that are rented out as commercial space. Fabal provided services for this entity from the day she started until the day Agnelli left Lennox. Fabal was in charge of reviewing lease agreements, registering the rents, sending letters to tenants, obtaining and paying insurance, paying taxes, preparing spreadsheets of the expenses, and checking on the bank accounts. Fabal did all this work from her office at Lennox and was never paid by this entity.

Centro International is yet another company of Castellanos. Fabal provided services for this company during her entire time at Lennox. The family members had debit cards associated with Centro International's bank account. Sometimes. The entire family and Analia made purchases and had expenses. Fabal kept track of the purchases, the family would call Fabal and tell her to prepare a check to pay for a tutor, or bus service. Sometimes Analia would just sent her an invoice and ask her to mail a check for an expense such as for the horses.

Koral Reef is an entity of Castellanos that owns an apartment in Miami at which Castellanos stays when he is in Miami. Fabal did work for this entity. She paid the HOA fees for the apartment, picked up the mail, paid the property tax, took care of any maintenance or repair issues, coordinated and paid for renovations of the apartment's kitchen, and kept a spreadsheet of all the expenses, including utilities. Fabal did not receive any compensation from Koral Reef for all of this work.

Real Condominium and Chateau 806 are companies of Castellanos, each of which own an apartment. Fabal provided similar services to these entities and was not paid by those entities.

Fabal provided personal services to Castellanos. Fabal kept a spreadsheet of all of Castellanos's personal accounts and expenses to be sent to his accountant. She was also always available for personal errands such as

going to his apartment to meet a technician to fix the internet, taking the cars in for maintenance, purchasing items for his house in Argentina, including kitchen equipment, purchasing shoes or batteries. Fabal did all this from the beginning of her employment at Lennox until Agnelli left Lennox. She was never paid by Castellanos but was only paid by Lennox.

Fabal also provided services to Analía and the children. For anything Analía needed she would call Fabal. Among others, Fabal would register the children at school, pay for the school, fill out forms for the children to play sports or other activities, call their pediatrician to make appointments, coordinate pick-up of the children, and make vacation arrangements. In short, just about anything Analía wanted. Fabal was not paid by Analía but was paid by Lennox.

Lennox funds were used to pay many personal expenses of Analía, Agnelli and the Castellanos family. Fabal kept records of all of the invoices and checks and provided them to Castellanos's accountant on a regular basis. When she started, Lennox used Macho as its accountant and later changed to an accounting firm was called H & Co. When H & Co. came on board, they instructed Fabal on how they wanted her to use Quickbooks. Agnelli never told her what to include or not include in Quickbooks. H & Co. never gave her instructions on how to book personal expenses versus hotel expenses in Quickbooks.

Fabal was also responsible for paying vendors of the hotel. When an invoice came in, she would check it to see if it was a purchase or a service, she would check to make sure the service was completed, she would then prepare a check for the payment, then Agnelli would sign the check or approve the transfer. For every invoice, Fabal would make a copy of the invoice and the check or wire confirmation and then she would input the transaction into Quickbooks which was shared in the cloud with H & Co. Again, she did not differentiate in the entries which expenses were for Lennox and which were for the family. She was not told that that was what she was supposed to do. She now understands those expenses should be designated separately but she worked for a company at which that differentiation did not exist.

Fabal kept notebooks of all the transactions she handled. Neither Castellanos nor anyone from H. & Co. ever asked to see her notebooks or for a copy of the notebooks. On one occasion in April 2019, Fabal had lots of work because they were finishing up the construction of the hotel. She told Agnelli she was two months behind in entering information into Quickbooks. Agnelli told her to call H & Co. and have them send someone over to get the documents and input the information. Karen Lantigua came to the office and

picked up two boxes that contained the two months backlog of invoices. Lantigua entered the information into Quickbooks. Neither Lantigua nor anyone from H & Co. ever asked Fabal any questions about the documents.

Lennox had an account at Citibank, which was switched to City National, and also had a Wells Fargo account. Fabal received all the bank statements for Lennox. Fabal would file the statements in a binder and upload a copy of the statements to the cloud so the H & Co. could review and reconcile the bank accounts with Quickbooks. When the volume of records grew too numerous to fit in the Lennox offices, they placed them in the Sherita apartment which was also used as an office. Among the records were invoices and checks of personal expenses related to Agnelli's house that he instructed her to scan. Bermudez and Fabal went to the Sherita apartment and scanned the documents as directed.

At some point, Fabal received a letter informing her that Agnelli was no longer the CEO of the company. She does not remember the specific date. When she learned that Agnelli had been formally removed as CEO, she went on vacation and when she returned, she decided to resign from Lennox. Fabal did not destroy any records of Lennox.

Fabal is now working on a venture with Marconi and Bermudez. Agnelli did not want to get involved with the company because of his divorce and everything else that was going on in his life. They only invested $5,000 to start the company so they did not need money from Agnelli.

Agnelli paid Fabal $88,000 on July 2, 2020, but since she left Lennox, she has not received any money from Agnelli. Bermudez also received money from Agnelli at the same time. Fabal was not owed money by Lennox when Agnelli paid her the money. She was paid her salary by Lennox until the day she resigned in the second or third week of July 2020.

### G. Luis Salazar

Salazar is an attorney in Miami who graduated from Columbia University School of Law in 1992. After working as a law clerk and attorney in New Jersey for five years, he moved to Miami where he practices complex commercial litigation, corporate reorganization and restructuring and corporate compliance.

In January 2020, Salazar was contacted by attorney Jesus Cuza from Holland & Knight about representing a company related to one of Cuza's clients, Agnelli. Salazar met with Agnelli and agreed to represent Lennox. Salazar also met with Bermudez throughout his representation of Lennox. Salazar received a copy of the corporate bylaws and the Agnelli employment

agreement from Holland & Knight attorney Del Rivero on January 14, 2020. The bylaws included a List of Shareholder Certificates showing Castellanos owned 75% of the shares and that Analía and Agnelli each owned 12.5% of the shares.

At the same time, counsel for Castellanos, Shutts & Bowen, had written a letter to Agnelli on January 7, 2020 demanding to see Lennox's corporate documents. Although the letter referred to Invernorth, which owned 75% of the shares of Lennox, the letter did not specify that Shutts represented Invernorth. Cuza sent an email in response to the letter indicating that Lennox had retained Salazar and intended to fully comply with its legal obligations. Agnelli, as president of Lennox, authorized Salazar to produce the documents in accordance with the applicable statutes.

On January 17, 2020, Salazar wrote to Shutts and informed them Lennox fully intended to comply with the law by making the documents and financial records available for inspection and copying, but it was unclear from the January 7, 2020 whom it was that Shutts represented and whether their client was a shareholder. Salazar asked if Shutts represented Castellanos, or Invernorth or its trustees and indicated that Lennox was ready to comply upon receiving this information.

Salazar received no response from Shutts during the rest of the month of January. On February 2 or February 3, 2020, Salazar sent an email to Shutts to follow up on their January 7, 2020 letter since he had not heard from them. Salazar received no response to the email.

The matter revived on May 19, 2020, when Castellanos sent an email to Agnelli with copies to Shutts and Cuza. Cuza forwarded that email to Salazar with copies to Agnelli. Cuza indicated that Agnelli wanted to comply with the law and Cuza asked to set up a meeting with Salazar to discuss how to proceed.

On May 21, 2020, Cuza responded to Castellanos's email with copies to Shutts and Salazar. Cuza indicated that Agnelli as president of Lennox intended to comply with the law and asked for directions as to whom Lennox should deal with.

On June 2, 2020, with the consent of Agnelli as representative of Lennox, Salazar sent a letter to the attorneys at Shutts. Salazar acknowledged receipt of the email from Castellanos and indicated Lennox needed further information to ensure only shareholders have access to the documents of the corporation. Although the List of Shareholder Certificates listed Castellanos as a 75% owner of the shares, Salazar had seen a stock ledger that showed that in 2016 Castellanos had assigned his shares to Invernorth. Salazar also had

information that Invernorth may have transferred the shares to a trust. Salazar needed to know if Invernorth owned the shares or if the shares were owned by an irrevocable trust. If Invernorth owned the shares, Castellanos would be entitled to inspect and copy the documents; but if the shares were held by a trust, Castellanos would not be entitled to such access to the documents.

No response to the June 2, 2020 letter was received by Salazar so, on June 16, 2020, Salazar sent a follow-up letter to Shutts, indicated that Lennox was in the process of gathering all the records, and again asserted that if Castellanos was an authorized shareholder, Lennox would make the documents available for the inspection and copying of the records and documents. On June 22, 2020, Salazar sent yet another letter to Shutts after Shutts wrote to Cuza—Agnelli's attorney. Salazar reminded Shutts that he, not Cuza, represented Lennox and further reminded Shutts that no one had ever responded to Salazar's three letters offering to show Castellanos the records if he established his authority as a shareholder. The letter indicated that Salazar had received information that two Shutts attorneys and Gladys Duran showed up at Lennox's offices with police and raided the Lennox offices without notice to Salazar, whom they knew was the corporate attorney for Lennox. The Shutts attorneys had told the police that Agnelli had been removed as director and president of Lennox. They changed the lock to the office door and spoke to employees of Lennox without the company's attorney.

Salazar pointed out that no notice of any corporate or shareholder meeting had been sent out or received by Agnelli and therefore Agnelli was still a director and president of Lennox.

Salazar went to the hotel on June 22, 2020. The police officers were sitting in their car outside. Salazar does not know if the police had earlier gone inside the hotel. He was told that Ms. Duran was going to be the new president and that the Shutts attorneys represented her. Salazar was informed by the Shutts attorneys that Agnelli had been terminated. Salazar was at the hotel for about an hour that day.

On June 24, 2020, Salazar filed a declaratory judgment action in federal court on behalf of Lennox against Castellanos.

On June 26, 2020, Agnelli forwarded to Salazar an email he had received which included as attachments a letter from Castellanos as attorney-in-fact for Invernorth; a letter from Analía as shareholder of Lennox, and a notice of shareholder meeting to be held on July 8, 2020.

Salazar wrote to Shutts on July 1, 2020, informing the firm that Lennox had filed a federal declaratory judgment lawsuit to determine who was the legitimate president and to declare Agnelli's termination was improper and

unauthorized. Salazar once again indicated Lennox was ready, willing, and able to comply with its statutory and fiduciary obligations to its shareholders.

On July 1, 2020, Salazar and Agnelli went to the hotel. Salazar was acting on behalf of Lennox. Salazar contacted the Miami Beach Police Department to escort them on that day. As of that date, Salazar believed that Agnelli was still the president as his termination was ineffective pursuant to the bylaws of Lennox. Salazar did not reach out to either the other shareholders or to Shutts to advise them that he was going to the hotel with Agnelli.

At the hotel, there was an armed security guard who was posted outside the corporate offices who would not let them into the offices. After a discussion among the guard, the police and Salazar, they were allowed entry to the office.

Salazar was present when items were removed from the office. Only Agnelli's personal items were removed from the office, and Salazar asked Agnelli to prepare an inventory of the items he had removed. Agnelli was in the office for 10 to 15 minutes.

### H. Diego Agnelli

Agnelli is 46 years old and lives in Miami and Argentina. He grew up in Argentina. He graduated from high school in 1993, attended college in Argentina and obtained a degree in graphic design in 2000. Agnelli married Analía Castellanos in 2001. He has been separated since April 2018. He and Analía have three children, Valentino (19), Francesco (17), and Rafaela (13).

Agnelli and Analía were 25 years old when they married. They initially lived in Argentina from 2001 to 2012 and have been in Florida since 2012.

Analía has been a housewife and has taken care of the children since they married. Agnelli initially worked at a shopping bag factory. Later, his Castellanos asked Agnelli to work for him in 2002 or 2003. In 2004, they started operating the Lennox hotel in Ushuaia. In 2005, Agnelli created a family office. In 2011, Agnelli opened a small loan business in Miami.

### (1) *Agnelli's role in the Castellanos family*

When Agnelli first started working for Castellanos, he did not receive any salary. Any salary would have required payment of 35% in taxes in Argentina. They received lots of cash from Castellanos's casino business and spent it without declaring it as income for tax purposes.

In 2005, when they opened the Lennox hotel in Ushuaia, the accountant, Miguel Angel Romero, told Agnelli that since he was a manager of the hotel and

was living a lifestyle he could not justify, he needed to start receiving a salary. The salary was not sufficient to pay for his lifestyle and Castellanos knew that.

The family aimed to create businesses that would create income. They started by buying three farms. They later were involved in wool production which generated cash flow. They tried their hand at real estate development by buying land and built commercial space and apartments. They sold some and kept others to rent out. They were also involved in the purchase and sale of bonds and the operating of the casinos. The casinos produced much income that would be re-invested. And, of course, they also wanted to create a hotel brand. They started with the one in Ushuaia, then opened the hotel in Buenos Aires, and finally opened the Miami Lennox.

Even before he was married, Agnelli helped Castellanos with some of the financial and business matters because Castellanos lived about 2000 kilometers from the city. By the time Agnelli started working for Castellanos, Castellanos already had the farms, four to five properties, a vacation home, his residential home, storage facilities, and the casinos. Castellanos traveled more than 3 months per year, and he lived far from Buenos Aires, so he was physically absent most of the time.

 Agnelli's role in the family businesses was to maximize income to create an investment flow. Agnelli used all the excess income to constantly seek opportunities to generate the most income. His efforts produced results. In November 2001, Castellanos owned four properties for personal use, one farm, the casino shares, three bank accounts, five cars and two credit cards. By December 2016, the family assets included twenty-four entity bank accounts (Agnelli had signatory authority on all of them), fifteen properties to rent, three farms, seven properties for personal use, five trust bank accounts (Agnelli had signatory authority on all and Castellanos had signatory authority on one), three hotels, three farms, eighteen personal bank accounts, three trusts, one boat, ten cars, the casino shares, and twenty companies formed to hold assets.

All that money came to Agnelli who would keep track of it and make sure it was put in the correct place. Castellanos gave Agnelli authority to control the personal accounts, the trust accounts, and the entities' bank accounts. When Agnelli and Analía were first married, Agnelli's income was insufficient to support them. Analía used a credit card of Castellanos and Castellanos also gave them cash. Once Agnelli started working for Castellanos, they still had the credit card, and still received cash from Castellanos and Castellanos also gave them blank checks he had signed that they could use if they needed to pay an expense. Every month, Castellanos received cash from the casinos which he would then give to Agnelli. Eventually, Agnelli physically picked up the money

himself from the casinos and would use it for the businesses and family members. The monthly take from the casinos was sometimes $100,000 to $200,000.

### (2) *The family's use of business assets*

When Agnelli and Analía purchased additional properties, they used money from Castellanos's entities. Analía's credit card (given to her by Castellanos) was used to purchase furniture for the properties. They did not ask Castellanos for permission to make these purchases. Castellanos knew they had no other sources of money, and he was aware they were making these purchases. When they were purchasing a home in Buenos Aires during the time of the construction of the Lennox hotel in Buenos Aires, they furnished the home by using the same vendors that provided furnishings to the hotel. They received additional discounts for their home furnishings since they were part of the purchase of the volume that had been ordered for the hotel.

When furnishings, supplies and other expenses were obtained for the hotel in Argentina, the monies came from the Centro account, even though there was a different entity that owned the hotel. All the money came from the casinos of Castellanos and was the money of Castellanos. They used the Centro account to pay for many family businesses and the account was also used to take excess cash out of Argentina by Castellanos.

Agnelli also bought himself a Porsche and a motorcycle with family funds with Castellanos's knowledge. Both the Porsche and motorcycle were to be titled in the name of Castellanos's friend until they were delivered to Argentina and put in Agnelli's name.

Both hotels in Argentina were owned by the same entity, SHS. SHS also paid many of the families' personal expenses in Argentina. Romero, Castellanos's accountant at the time, who was also Castellanos's father's accountant, told Agnelli, "look, this is all Juan's money anyway." Agnelli was taught to transfer the money to the accounts relevant to the expense so if the money was for the hotel, he would transfer it to the hotel account. If it was a personal expense Romero told him to just pick one of Castellanos's companies. For example, the accountant said that if Castellanos purchased flooring for his apartment, Agnelli was to just put down that the flooring was for one of the farms.

Castellanos would use the corporate jet of the casino for family vacations in Argentina and even Agnelli and Analía would use the jet without Castellanos for personal trips. Castellanos paid for a vacation home and renovations of the home using money from one of his Argentinian companies. Many of the

furnishings and decorations for the house were purchased in Miami and sent to Argentina. The children loved going to the vacation home and the family used it often.

When Agnelli and Analía first moved to Miami in 2012, they first lived for a couple of months in a vacation apartment of Castellanos in Surfside. They stayed in the apartment until the house they bought for $5.5 million on Balada Street in Old Cutler Bay was ready to move into. The monies for this house came from the funds in the accounts of Castellanos as well as a mortgage. Agnelli is the person who made the transfer of the funds. Castellanos came with them to look at the house, was aware of the purchase of the house, and was very happy that Agnelli and Analía had purchased the house. A large amount of money was transferred from Castellanos's account to Agnelli's account to pay for the down payments, renovations, and ongoing mortgage payments. The furniture was purchased with some of the transferred funds, Analía's credit card, and monies from the Centro account. Castellanos also went out on the 52 foot yacht that Agnelli owned and docked at the house. Agnelli purchased the boat for over $500,000 using Centro funds and named the boat "Lennox."

In 2015, they bought a larger, 74 foot Pershing boat for $2.8 million and later sold the smaller yacht. Agnelli has always had boats since he has been with Analía. In Argentina, they owned 3 boats. Since the separation, the larger boat has been sold.

They lived in the Balada house until they built and then moved into a house next door. They first bought the lot in 2014 using funds from Centro and the house's construction finished in late 2017. The lot cost $2.85 million and the construction costs were about $3 million. Agnelli took loans from Centro, Lennox, his loan business, and from his personal account to pay construction costs. The house was originally built for investment purposes. The builder of the home was also the builder of the Lennox hotel. Although his plan was to sell the home, he and Analía liked the house. They spoke to the accountant who told them they could take a loss on the old house and sell it and move into the new house. Castellanos visited the house while it was being built and knew they were going to move into the new house. The old house was sold furnished —they only took their clothes—so they had to buy all new furniture for the new one. The credit card, some of Agnelli's funds, and some funds of Lennox were used to purchase the furniture. Castellanos visited the new home after it was built whenever he was in town. Castellanos was very happy with the lifestyle he was able to provide to Agnelli, Analía and the children. The new house had a wine cellar that Castellanos saw, drank wine from, and brought wine for.

Since the Miami Lennox was being built at the time, Agnelli did what Castellanos had taught him to do in Argentina: buy furnishings for the house from the same vendors who provided furnishings to the Lennox and use construction workers from the Lennox construction company for work on the house. The invoices noted that the bills were sent to Lennox, but the items were shipped to "Analía Residence, 9320 Balada St." Some of the invoices contain the email address of Analía within the "bill to" box. The description of the items purchased includes the language "Valentino's room." A 30% discount was also applied to the purchases because it was part of the purchases for the hotel. The family saved significant money by purchasing the furniture through the hotel's account.

Agnelli and Analía also purchased a condominium at Paraiso Bay in 2018. Lennox paid over $60,000 for construction and design expenses for that condo. In addition, Agnelli used Lennox funds to purchase a race car simulator for his children for $24,000.

In addition to the income and use of his credit card, Castellanos also gifted other monies to Agnelli and Analía.

On September 14, 2007, Castellanos and his wife gifted to Agnelli three million pesos pursuant to a gift contract which was the equivalent of approximately $958,000.

On May 13, 2009, a gift contract was executed under the terms of which Castellanos gifted $550,000 to Analía.

On January 15, 2010, another gift contract was executed under the terms of which Castellanos gifted $720,000 to Analía.

On September 7, 2012, pursuant to a written conditional gift contract, Castellanos gifted $2 million each to Agnelli and Analía to be used as a capital contribution to Lennox.

On December 19, 2014, another conditional gift contract provided for Analía and Agnelli to each receive $2 million to be used as another capital contribution to Lennox.

On March 16, 2017, another gift contract provided for Castellanos to gift $3.5 million to Analía. That amount was transferred to a Wells Fargo account of Agnelli because Analía did not have an account in her name. Agnelli denies that the purpose of this account was to help fund the purchase of the second Balada home but claims it was to obtain the first Balada home. Agnelli also used over $1.3 million in funds of Lennox to pay for the construction of the second Balada home. Agnelli recently sold it for $16 million. Those funds are frozen due to litigation over his divorce, but Agnelli has no plans to pay any of those monies to Lennox.

Also on March 16, 2017, Castellanos gifted $2.8 million to each of Analía and Agnelli to be used as another capital contribution to Lennox. A gift contract was executed for this gift. In total, Castellanos gifted over $19 million pursuant to gift contracts to Analía and Agnelli.

Agnelli went through every bill and invoice. He wrote the checks, and his secretary would make a copy of the bills, receipts and checks to keep them in a folder. Every month, they would send records to the accountant of both personal and business expenses. All the records were kept "open book" for anyone to review. The Argentinian accountant would come to the office in Argentina on a regular basis to review the documents. At one point they decided to hire an accountant in-house who could input all the information into Quickbooks to share with the accountant.

At no point since Agnelli started running the family's finances in 2005 did Castellanos ever ask to see any records. Funds from the Lennox funds were also used to pay all of Castellanos's expenses in Miami.

### (3) *Opening and operating the Miami Lennox*

The Miami Lennox opened to the public in July 2019. Prior to that date, Lennox had not generated any revenue. Money was simply being injected into the project. The monies came from the funds generated from the casinos. Once the trust accounts were set up, the fees went into the account and the dividends went into the trusts. Some of the money was used to fund other investments, some was used to buy bonds to earn interest, and some went to fund the construction of the hotel in Miami. Agnelli made the decisions on what monies would be utilized for the construction of the hotel.

Whenever monies were requested to be transferred out of Citibank or City National Bank accounts by Lennox employees, the banks would always require verification from Agnelli.

Agnelli denies misappropriating any funds from any of the companies: "They are measuring with a stick that never existed in this family." There were never any corporate meetings, and no formalities were ever complied with. They kept paperwork for the accountants, but everything was done informally. His relationship with Castellanos was like a father-son relationship. Agnelli and Castellanos enjoyed many of the same things and shared interests. They formed a great team and Agnelli was closer to Castellanos than his own son was. Agnelli is grateful for the way Castellanos helped him, taught him, and helped him grow. And Agnelli helped Castellanos grow his fortune. Castellanos had had a tough life: he had been a truck driver and Agnelli wanted him to

enjoy life and spend time with his grandchildren. Agnelli and Castellanos had an amazing life together without limits.

When Defendant Lennox was formed, Castellanos owned 75% and Agnelli and Analía each owned 12.5%. No shareholders meetings were ever held during the time Agnelli was part of Lennox. Neither Castellanos, Analía nor Agnelli ever called for a shareholders' meeting. Agnelli was the President of Lennox until his removal in July 2020. Castellanos was the Vice President did not ever perform any work on behalf of Lennox. Since Agnelli began working with Castellanos, Castellanos has not been involved in any of the businesses except for running one of the farms. Castellanos is not even involved in the running of the casinos. Castellanos spends most of his time traveling.

According to Castellanos, he learned about Agnelli's separation on August 15, 2019. Prior to that date, Castellanos had never asked to see any documents of any of the corporate entities or any bank statements or trust statements or of any expense reports of Lennox or any other entity or expense reports relating to Castellanos's personal spending. Castellanos had not requested an accounting from Agnelli of any of the cash Agnelli had received from the casinos.

Even more, Castellanos was aware of all the accounts in the United States and was familiar with the accountants here in the United States, both at Macho and H & Co. Prior to August 15, 2019, Castellanos had never requested any report from any of the accountants here in the United States.

Castellanos interacted with Bermudez and Fabal since they started working for Lennox in approximately 2014. Prior to August 15, 2019, Castellanos never requested any documents or reports of expenses from Bermudez or Fabal.

When Agnelli moved and started working on the Miami Lennox project, he was paid a salary because the immigration attorney told Agnelli that would help with Agnelli's visa application. Castellanos was not involved in the determination of the amount of Agnelli's salary since he was never interested in those decisions. Agnelli started paying himself a salary of $90,000 per year. That salary increased two times in 2017. At the beginning of 2017, Agnelli realized Bermudez was earning more than he was. Since he was the CEO, he did not want to be out-earned by his secretary, so he raised his own salary to about $150,000 per year—still woefully insufficient to satisfy his lifestyle. Regardless, the salary increase was only for the purpose of assisting him in obtaining his visa.

Lennox purchased artwork during Agnelli's tenure as Lennox's CEO from an artist named Polesello but it was a small piece of work of approximately 3

feet by 3 feet. Agnelli purchased two Polesello works in Argentina, including a large piece that Agnelli hung in the lobby of the hotel in Miami, which he took when he was terminated and put in his apartment.

As noted earlier, while he was CEO and President of Lennox, Agnelli entered into a lease with an entity named Mira for a restaurant in the hotel in 2019. Mira was owned 75% by a Canadian company and 25% by Spark Design, a company owned by Agnelli and Analía. In May 2020 Agnelli discussed with Bermudez the possibility of removing Analía from Spark Design but it was never done. On May 7, 2020, Bermudez sent an email to someone in Macho's office informing them that they needed a new Operating agreement for Sparks Design in which only Agnelli appears.

In negotiating his deal with Mira, Agnelli was to be paid $425,000 to his VFR account, one in which neither Lennox nor Analía had an interest. Agnelli received over $200,000 from Mira. Agnelli also negotiated on behalf of himself and Analía with Mira to participate in future Mira openings in the United States. Agnelli never told the principals of Mira that Sparks Design was owned by Lennox.

Mira was evicted from Lennox after Agnelli was terminated. Mira was not paying the rent and Lennox was not paying for the meals that had been charged to the rooms.

### (4) *Events prior to Agnelli's employment agreement with Lennox*

At the end of 2017, Agnelli raised his salary again. 2017 was a difficult year for the family and Castellanos. From 2016 to 2017, there was a difficult situation with the government and press in Argentina. Two of Castellanos's partners in the casino business were being investigated for tax evasion, there were raids, they closed bank accounts in the United States, the cash in Argentina was cut off, one of the partners was arrested, and Castellanos was not in good health. The first thing Agnelli wanted to do was to protect Castellanos and the family.

Starting in the middle of 2016 and through March 2017, Argentina was offering amnesty to people who came forward and paid a fee for past taxes owed. Agnelli wanted to help Castellanos arrange for the amnesty. Agnelli was working with the accountant for the casino, Alberto Suazo. Agnelli gathered all the information concerning Castellanos's cars, houses, businesses, and bank accounts to present to Suazo so that the fee could be paid, and Castellanos could be at peace. Agnelli made arrangement for his own family to receive amnesty in Argentina since his own family's finances were so intertwined.

In June 2017, there was a raid by the police at a horse racetrack and casino in Argentina, one of the largest in South America. The subject matter of the non-payment of taxes was a topic of discussion among everyone: employees of the hotels in Argentina and all their friends in Argentina. Castellanos was in a very bad state of mind and had many health issues.

### (5) *Agnelli's employment agreement with Lennox*

To avoid a tax problem in the United States, and, knowing that they had a multi-million-dollar home, large boat, horses, cars, and a lifestyle they could not justify, Agnelli wanted to have a contract that would more accurately reflect their lifestyle. In December 2017, Agnelli asked Macho for the name of an attorney and Macho recommended an attorney at Fowler White. Agnelli hired the law firm of Fowler White to prepare three service agreements: a personal services agreement between Agnelli and Castellanos, and two professional services contracts, one between Agnelli and Lennox, and one between Agnelli and SHS. Agnelli does not know if Fowler White was hired as his personal attorney, but the engagement letter indicates that Agnelli was the client. Neither Lennox nor Castellanos were represented by an attorney relating to the employment agreement but the fees for Fowler White were paid by Lennox.

The employment agreement between Lennox and Agnelli is the one related to this suit. It provided Agnelli with a monthly salary of $100,000, and was initialed and signed by both Agnelli and Castellanos. Castellanos initialed and signed the agreement in Agnelli's presence at the Lennox office in Miami Beach. At the same time, another employment agreement was executed under the terms of which Agnelli was to be paid $50,000 per month for his work for the Lennox hotels in Argentina. That agreement was initialed and signed by Castellanos, but not Agnelli.

Castellanos did not say anything at the time the employment agreement was signed but they had previously discussed Agnelli's expenses. Castellanos never asked for a copy of the employment agreement up until the time Agnelli was terminated. Agnelli and Castellanos had had conversations in the times leading up to the signing of the employment agreement during which it was discussed that Agnelli needed to have a more significant salary in the United States as part of their plan to obtain amnesty in Argentina.

Agnelli acknowledges that Castellanos would not have been able to understand what was written in the employment agreement. For eight years, Castellanos signed many documents in English for Lennox, including a mortgage, without having them translated. Castellanos relied upon Agnelli to tell him what information was in documents.

50

Agnelli claims that the employment agreement was prepared to cover the lifestyle of the parties and to help with the amnesty process in Argentina. It is an internal, family document. Agnelli acknowledges that neither he nor Castellanos had a full understanding of all the terms of the agreement but sustains that he explained to Castellanos those terms he did understand. Agnelli denies telling Castellanos that the agreement was needed for the City of Miami Beach permits, as Castellanos says.

The contract between SHS and Agnelli was for a five-year term during which Agnelli would act as president and CEO commencing in January 2018. But according to Agnelli, this was a formality since it was anticipated that Agnelli would always be in those positions, just as he had been since 2005. The shareholders of SHS are Inversouth and Agnelli. Inversouth is a trust that represents the interests of Castellanos. By contrast, the shareholders of Lennox are Invernorth, Agnelli and Analía. Lennox and SHS keep separate books, bank accounts and financial statements. Each uses a different accountant. During the time Agnelli was president and CEO of Lennox, Lennox used either Macho or H & Co. as accountants. Macho did their personal taxes as well. In Argentina, the accountants were Romero and Suazo. The accountants in both countries communicated with each other.

The personal services contract between Agnelli and Castellanos superseded a previous Continuing Services agreement they had executed on October 6, 2015. The contract gave Agnelli 50% of any earnings and Castellanos 50% of the gain upon any sale of any investment or project. The previous agreement had the same provision and properties were sold and Agnelli did receive the 50% and Castellanos knew that Agnelli was receiving the 50%. Agnelli is suing Castellanos in Florida state court for breaching the personal services contract and is seeking more than $35 million.

Castellanos and Agnelli only spent minimal time discussing the three agreements and they did not go over all their terms. Agnelli also did not provide copies of the agreements to Castellanos before asking him to sign the agreements. This was how they conducted business. Castellanos never asked to see documents and never asked to read any documents when they bought properties or took out mortgages.

A few months after the contracts with Lennox and SHS were signed, Agnelli started paying himself pursuant to the contracts. In 2018, Agnelli's W-2 from Lennox reflects that he was paid $1.36 million and in 2019, he was paid $1.63 million. Agnelli claims that from the first of January 2018 until he was terminated, he was not paid more than the contracts called for him to receive. Some of the monies that Lennox paid him came from the monies from the

casinos and hotels in Argentina. He needed to be paid here in dollars and not pesos.

According to Agnelli, he originally was to be paid a minimal salary for purpose of the visa but as the Miami hotel's opening drew near, he would be paid a different salary. This is exactly what they had done in Argentina during the construction and then opening of each of the two hotels. Agnelli is aware that the Defendant is claiming he was paid more than his contract calls for and denies this claim. From the beginning of the contract until he was terminated in July 2020, all the withdrawals from Lennox here and in Argentina were within the amounts set forth in the employment agreements. In fact, after he was terminated from Lennox in Miami, he continued to work for SHS in Argentina until March 2021 but was not paid.

### (6) *Agnelli's separation from Analía and fall out with Castellanos*

Agnelli moved out of his marital home in April 2018, just a few months after the contracts were signed. In 2015 or 2016, Agnelli met a woman at a trekking event. They developed a friendship and competed in races together and he also had an affair that lasted about two years. She lived in Mexico, and he saw her only two to three times per year. Agnelli continued to have contact with her but only as friends.

When he separated from Analía, Agnelli moved to the Oceana building on Key Biscayne. In August 2018, he signed a short-term lease for $11,500 per month from August 7, 2018 through February 16, 2019. He had planned on returning home but things got complicated and he extended the lease. Lennox paid the rent for the Oceana apartment for 18 months at $11,500 per month or a total of $207,000. He also used Lennox's cleaning services to clean his apartment. Agnelli paid approximately $29,000 for those services using Lennox funds.

For the last year and one half prior to his separation, he and his family were spending about $135,000 per month. Agnelli had other sources of income but those totaled $6,000 to 7,000 per month.

In 2017, Agnelli transferred $3.57 million in marital assets to an entity called Path Advisory which is owned by his mother. He filed a federal gift tax return that reflected the $3.57 million cash payment to his mother as giftee. Analía knew that Agnelli was helping out his mother but she did not know the amount.

Castellanos found out about the separation from Agnelli in early 2019, but he was told it was temporary and they were hoping to reconcile. Analía and Agnelli had dinners together, went on the boat together, and even spent

Christmas holiday together. When Agnelli spoke to Castellanos at a polo match after Castellanos learned that Agnelli and Analía had separated, Castellanos told Agnelli, "well, that's between the two of you, but you handle it and keep running my things." In the late summer of 2019, perhaps August, Agnelli told Castellanos that he and Analía were not going to reconcile and the relationship between Castellanos and Agnelli quickly deteriorated.

In September 2019, Castellanos went to a safe deposit box in Argentina at the Banco de Colombia. Castellanos confronted Agnelli and accused him of taking money out of the box. Agnelli vehemently denied ever accessing any of Castellanos's safe deposit boxes. Agnelli claims he had no authority to access the safe deposit box and he only had access when he was with Castellanos. Castellanos went to the family office in Argentina and, according to Clara Pizarro, took monies and other property out of the safe that was in the office.

During the week of September 16, 2019, Agnelli traveled to Argentina. He and Castellanos talked and agreed to meet. On September 20, 2019, Castellanos came to the family office with a file that contained documents Castellanos wanted Agnelli to sign removing Agnelli from his businesses. Agnelli said he had no problem removing himself from Castellanos's businesses. Agnelli signed one document removing him from a trust[2] and another removing him from the casino business. Agnelli was also presented a letter written in Spanish resigning him as Director and President of SHS, but he refused to sign. Agnelli told him that SHS and Lennox were their businesses together—that Agnelli had built those businesses and Agnelli would not sign the documents. At that point, Castellanos closed the folder and left.

Prior to and during this meeting, Castellanos never mentioned anything relating to Castellanos's safe deposit box in Argentina. The first time Castellanos ever mentioned the safe deposit box was when Castellanos came to the Miami Lennox in December 2019. Castellanos and Agnelli had a confrontation. Castellanos was very upset and said he was going to kill Agnelli and that Agnelli should leave the hotel.

Agnelli says he put his heart and soul into the hotels and built a brand and a legacy. He had plans to build other Lennox hotels in New York and Los Angeles. The last time, before this trial, that Agnelli saw or spoke to Castellanos was in December 2019 outside the Lennox hotel.

---

[2] Agnelli was the Protector of two trusts: one relating to the hotels in Argentina and one relating to the Lennox. Agnelli and Castellanos signed a document in English by which Agnelli resigned as Protector of the Teton Trust. He claims he did not understand the implications of signing the document.

Agnelli realizes that his marriage to Analía provided him a life very few could afford. He loved Castellanos like a father and is extremely grateful for everything Castellanos did for him. But Agnelli gave 20 years of his life to the family as well and everything Agnelli did was to make Castellanos proud of him and to allow Castellanos to enjoy his life. He says this case has not been good for anyone in the family.

### (7) *Agnelli's misrepresentations after the fallout with Castellanos*

Castellanos closed Lennox's City National Bank accounts in January 2020, so Agnelli then opened a Wells Fargo account for Lennox on January 9, 2020. On the account application, Agnelli represented he was the owner with control of the entity and was a 100% owner. At the time he made that representation, he knew he was not the 100% owner.

According to Agnelli, in December 2019, Castellanos had spoken to the City National Bank personnel and told them not to allow further transfers from the Lennox account by Agnelli, Fabal or Bermudez. On December 26, 2019, City National Bank refused to transfer money pursuant to an email request from Fabal. The money was in an account of SHS (the account of the Lennox Argentina), not in an account of Lennox. According to Agnelli, even though the documents say the Lennox accounts were not frozen, in reality, Castellanos had spoken to the bank and convinced them not to allow transfers from Lennox without Castellanos's authority. Agnelli was told by a representative of City National Bank that Castellanos had given those instructions to the bank and the bank was not going to transfer monies without Castellanos's authority.

On July 9, 2019, Lennox applied for a liquor license. On the application, Agnelli is listed as a 25% owner and Castellanos is listed as a 75% owner. The application is signed by Agnelli.

On April 15, 2020, Lennox submitted an I-140 visa application to the United States for Agnelli, his wife, and his three children. Lennox also submitted a check signed by Agnelli in the amount of $700 for the application. Agnelli admitted he wrote out and signed the check. The check was on a Wells Fargo bank account which Agnelli had opened in the name of Lennox. The application indicated that the authorized signatory is Juan Castellanos, but the email address listed for Castellanos is Bermudez's email address. The visa application also states that Castellanos is the "major shareholder." A box is checked indicating the person signing can read and understand English and has read and understood the entire application. The application is purportedly signed by Castellanos on April 14, 2020.

In response to all questions relating to how the application was completed or whether Castellanos signed the application or whether Agnelli signed Castellanos's signature, Agnelli invoked his Fifth Amendment privilege against self-incrimination and refused to answer the questions.

On March 27, 2020, a letter on Lennox letterhead was sent to United States Citizenship and Immigration Services in support of the Agnelli's visa application. The letter is purportedly signed by Castellanos as majority shareholder of Lennox.

There are email communications between Bermudez and Agnelli in which Bermudez is attaching "only the pages to be signed" relating to the I-140 application, an accompanying form G-28, and the letter supporting the petition, and instructing Agnelli to sign in specific areas of the petition. Twenty minutes later, Agnelli forwarded the email to Christy Rivero and asked her to print out the three pages attached to Bermudez's email. Rivero worked in the management office of the condominium where Agnelli was living at the time.

On April 23, 2020, Agnelli submitted an application to the federal government for a PPP loan and signed the application under penalty of perjury. The applicant must list all owners of 20% or more of the equity of the applicant. Agnelli indicated that he was a 25% owner of Lennox and knew at the time that it was untrue. Agnelli did not list Invernorth's 75% ownership interest.

### (8) *Agnelli's termination from Lennox*

Agnelli received a notice on June 22, 2020, which informed him that he was terminated from Lennox for misconduct, was not allowed to enter the hotel, and his personal items would be delivered to him. The letter was signed by Castellanos as sole director of Lennox. Agnelli was in Colorado with his children when he received the notice.

On July 1, 2020, Agnelli and his attorneys went to the hotel. His office was locked, and an armed security guard was at the office door. Either Agnelli or his attorney told the police that Agnelli was still the president and told the police the termination notice was invalid. The police asked the security guard to step aside and Agnelli entered the office and took his personal items. He later learned that there was a file folder with some Lennox documents in his car and he gave it to his attorney to return to Lennox. He did not take any other Lennox documents.

Once he was back at the apartment in Oceana on July 1, 2020, his Range Rover was stolen. In reviewing the surveillance video, he saw that Analía

had snuck into the garage in a golf cart and stolen the car. Agnelli told the police he did not want Analía to be arrested.

Agnelli found out that the Range Rover was at the Balada house. The car contained documents which included his own attorney/client privileged documents, so Agnelli went to the Balada property and retrieved the documents from the Range Rover. But, he did not take any Lennox documents from the car.

The next day, July 2, 2020, Agnelli filed for divorce. He also made payments to Bermudez and Fabal totaling approximately $200,000. Shortly thereafter, they each resigned from Lennox. Both also helped Agnelli work on this lawsuit. When Bermudez and Fabal were subpoenaed to produce documents and requests for production were made to Agnelli, the three produced the documents jointly.

Despite being terminated from Lennox on July 5, 2020, Agnelli purchased an 82-inch television worth $1,800 for his apartment using Lennox funds. On July 7, 2020, he purchased men's hair growth supplement for $176 and other health supplements for $159 using Lennox funds.

On August 11, 2020, Castellanos wrote a letter to the shareholders of Lennox requesting that each make a capital contribution to Lennox. For his 12.5% interest, Agnelli was supposed to pay approximately $60,000. He was supposed to notify Lennox, by August 17, 2020, whether he was going to make the contribution. Instead, on August 17, 2020, he filed an amended complaint in this case adding a count for judicial dissolution.

### (9) *Agnelli's tax returns and use of Lennox's assets*

Lennox filed tax returns every year. Agnelli understood the importance of filing truthful and complete tax returns. Most of the expenses paid by Lennox for personal expenses were nonetheless listed as business expenses of Lennox for tax purposes.

None of the expenses paid by Lennox on behalf of Agnelli were declared as income to him and Lennox reported all these expenses as its business expenses. Sometimes, Agnelli would submit several invoices of his personal and business expenses to Fabal and she would prepare a spreadsheet and write him a check from Lennox for reimbursement.

On his 2015 federal tax return, Agnelli claimed a total income of $1,143,864. Of that total, $90,000 was his salary from Lennox, $681,000 was from taxable interest from his loan business, $20,000 was from rental income, and $352,000 was from other income (foreign consulting services). The form

also reflects a gift to Analía of $422,000 from Castellanos based upon the charges she made on his American Express card.

Agnelli's 2016 federal tax return shows income of $1,134,464. Of that total, $90,000 was his salary from Lennox, $582,000 was from taxable interest from his loan business, $25,000 was from rental income, and $427,000 was from other income (foreign consulting services).

Agnelli's 2017 federal tax return shows income of $1,343,966. Of that total, $157,000 was his salary from Lennox, $257,000 was from taxable interest from his loan business, $36,000 was from rental income, and $896,000 was from business income (foreign consulting services).

Agnelli's 2018 federal tax return shows income of $2,704,665. Of that total, $1,360,000 was his salary from Lennox and $630,000 was from taxable interest from his loan business.

In 2019, Agnelli filed an individual return. His 2019 federal tax return shows income of $2,248,513. Of that total, $1,689,615 was his salary from Lennox, $408,000 was from taxable interest from his loan business, $25,000 was from rental income, and $168,000 was from other income (foreign consulting services and real estate rentals).

For the years 2015 through 2019, his Lennox income was $3.4 million, and his other income was $5.2 million for a total of approximately $8.6 million. In addition to this income, Analía had access to Castellanos's American Express card, and she was spending about $50,000 per month on that card. Agnelli was responsible for paying the credit card bills but he paid with Castellanos's money. Analía also had a Centurion Black credit card, but she did not have any bank accounts in her own name during the years that they lived in Miami together.

According to Agnelli, through July 8, 2020, he should have received $1.5 million from SHS and $3,026,086.96 from Lennox pursuant to his employment contracts for a total of $4,526,086.96. He actually collected $788,194.04 from SHS and $3,737,892.44 from Lennox for a total of $4,526,086.48. Agnelli's work visa expired on April 6, 2021.

### I.  Juan Castellanos

Castellanos is 78 years old and lives in Argentina. He was born in Spain and moved to Argentina when he was six years old. He has been married to Ana Maria Gutierrez for 52 years and has two living children: Pablo Andres and Analía. His oldest child passed away at the age of 23. Pablo lives in Spain and has a close relationship with Castellanos and Analía lives in Miami. Candelaria is his granddaughter; she is the daughter of Castellanos's daughter who passed

away when Candelaria was two years old. Candelaria was raised by Castellanos and his wife, and he has a very close relationship with her.

Castellanos did not appear at the trial before testifying because he is upset and said he did not want to listen to the lies that the Plaintiff and his witnesses would say. Castellanos considered Agnelli as much or more of a son than Pablo. He gave Castellanos three great grandchildren and Castellanos felt Agnelli was a traitor to him, his daughter and grandchildren.

Since the purchase of the Miami Lennox property, Castellanos came to Miami on a regular basis, every two to three months. When he visited, he would generally stay for about one month.

Castellanos has two siblings: a brother and a sister. When he was growing up, his family was not wealthy. In fact, they were poor and did not even have a bathroom in the house.

**(1)** *Castellanos's background*

In the third year of high school, Castellanos's father bought a farm in Spain. Castellanos went to Spain to help out on the farm which had 5,000 hens. He learned how to vaccinate the hens and help with the land which had fruit trees and olive trees. After spending some time there, Castellanos returned to Argentina. His father later returned to Argentina with the rest of the family after selling the farm. His father had to pay off debts in Argentina with the money from the farm and the only assets they had left were two trucks, one of which did not work. Castellanos started working with one of the trucks hauling oil. He then repaired and started to use the other truck as well. He later bought more trucks and they moved to Ushuaia where he bought two more trucks. Castellanos hired drivers to operate the other trucks. He worked in that business for ten years. In ten years, he had more than 80 trucks.

In 1970, he proposed to and married his wife. Castellanos worked 12 years in Santa Cruz and wanted his children to go to a school that taught English and Spanish. For 22 years, he traveled 900 kilometers every Monday and Friday to and from work and only saw his family on the weekends. Once a pipeline was established and the truck union became difficult to deal with, he started selling the trucks and started buying and selling cars in Miami, France, Spain, and Chile for two years.

Castellanos put money aside to take care of his parents, but Castellanos continued to manage the money for them.

In July 1990, a friend, Ricardo Benedicto, approached him with an opportunity to join him in a casino business in Comodoro Rivadavia called Casino Club. Castellanos invested in Casino Club and still has a 28%

ownership interest. After 20 years, the three partners agreed to give each of the six managers a 1% ownership interest. Casino Club has approximately two thousand eight hundred employees and owns twenty-two or twenty-three gaming establishments in Argentina. Later, they managed 11 companies with over 7,000 employees. They also managed three hotels with four thousand employees.

Casino Club owns a private plane that Castellanos has flown on with his wife for personal trips and Agnelli and Analia have used it many times. When he used the aircraft for personal trips, the cost for the use of the aircraft would be deducted from his earnings. Casino Club distributed profits to Castellanos about once per year. The profits were never paid in cash but were electronically paid to him. Approximately 30% is taken out by the company to pay federal taxes in Argentina.

Castellanos also owns a 30% ownership interest in Inverclub. That entity owns approximately 9 casinos. One of the gaming establishments is in Dania, Florida. Inverclub has 600 employees and another 2,000 indirect employees. Inverclub is also involved in on-line gaming. Castellanos has been a director of Inverclub for years and has received payment for his role as a director every three to four months. His director's fees have never been paid in cash. Inverclub also pays Castellanos fees for being a director but those are also paid electronically. Inverclub also pays his profits electronically.

According to Castellanos, "in our companies, nothing gets paid in cash." But, on cross examination, Castellanos was shown an email from his accountant, Romero, to Agnelli dated April 4, 2016, in which Romero states, "[t]here is also a Casino payment made in cash for $945,000, the observation says that 84,000 euros were received." There is some question as to whether the dollar sign refers to U.S. dollars or Argentine pesos.

### (2) *Castellanos meets Agnelli*

Castellanos first met Agnelli twenty years ago when Agnelli started dating his daughter. Agnelli was working in a factory at the time. In 2002, approximately seven to eight months after Agnelli married his daughter, he asked Agnelli to start working with him. The hotel in Ushuaia was 80% complete when Agnelli started working with him. At first, Agnelli was responsible for purchasing what still needed to be bought to finish the hotel and the hotel opened a few months later.

On cross examination, it was pointed out that the hotel property was actually purchased by SHS in 2004. Castellanos nonetheless testified that the hotel was being built before the actual sale was consummated.

Castellanos made Agnelli the manager of the hotel in Ushuaia. The hotel has 30 rooms. The hotel room rate is between $150 and $200 per night. Agnelli was not doing any other work for Castellanos.

After the hotel in Ushuaia was running, they started looking for a hotel in Bueno Aires. They found a hotel that was 60% built. Agnelli helped with the construction and oversaw the daily work. Agnelli also had a friend who helped with the interior design.

Once the hotel was running Agnelli's role was to manage the two hotels in Argentina. Castellanos created a trust which owned the Argentinian hotels and he never was involved in the hotels again.

Both hotels were owned by SHS. Since he established the trust, Castellanos has not been a director, officer, or shareholder of SHS. Castellanos also never received any distributions from SHS.

At some point in their relationship, Castellanos asked Agnelli to help him doing additional work, but Agnelli never did any work for the casinos.

When Castellanos created JCB-1 Trust, Castellanos appointed Agnelli to be a representative. Castellanos gave Agnelli a power of attorney to administer the monies received, including the distribution of profits, from the casinos and to protect and grow the assets. Agnelli formed some companies but none of the companies made Castellanos even one dollar.

But, Castellanos never authorized Agnelli to take or use any of Castellanos's assets to pay for Agnelli's or his family's living expenses. Castellanos never gave Agnelli or Analía signed, blank checks to use for their own personal expenses. He did give Agnelli signed, blank checks to use to pay expenses for the building such as materials and contractors.

Castellanos denies ever telling Agnelli to disguise personal expenses as business expenses. Nor did his accountant Romero teach Agnelli that.

About five to six years ago, after working with him and his businesses for 40 years, Romero told Castellanos that he could not work with Castellanos anymore because he was getting too big. Castellanos felt it had to do with Agnelli and he asked Romero if that is the real reason he wanted to stop working with him and Romero agreed. After Romero left as his accountant, Castellanos used Suazo as his accountant. Suazo never advised Castellanos to have his companies pay for his personal expenses.

Castellanos does not remember how much he was paying Agnelli when Agnelli first started working with him. Agnelli would submit invoices and Castellanos would pay them. While Agnelli and Analía were living in Argentina, Castellanos gave Analía a credit card which Analía used to pay for her family's living expenses.

60

Castellanos also gave money to Agnelli and Analía and gave them shares in Lennox. Castellanos further loaned Agnelli $3 million to purchase the second Balada home. Castellanos does not have records of the loans, but the accountants would keep track of that.

In total, Castellanos gave Agnelli and Analía $18 million.

### (3) *The purchase of the Miami Lennox*

During the recession of 2010, Castellanos decided to buy the Miami Lennox. The economy in Argentina was doing very poorly and the United States is one of the safest countries in which to invest. Castellanos came to Miami and bought an apartment.

Agnelli was kidnapped in Argentina, and they decided to move to Miami. They obtained two mortgages to purchase and build the Miami Lennox. The hotel was not to fund Agnelli's personal expenses. When Lennox was formed, Agnelli was the President and Castellanos was the Vice President. Castellanos is now President and CEO. He has never received a salary for being an officer or director.

When Castellanos traveled to Miami during the construction, he would visit the office and the construction. There were problems with the construction, but Castellanos was happy with the way it was going. It took from 2010 until July 2019 for the construction to be completed. From the beginning until now, Castellanos has spent $64 million on the Lennox. He has never received any profits or distributions from Lennox and had to sell an apartment on Collins Avenue to pay for the expenses of Lennox.

When Agnelli and Analía first moved to Miami, they lived in Castellanos's apartment and drove Castellanos's car. When Castellanos's financial situation improved, he helped Analía and Agnelli buy a house. In 2012 and again in 2014, Castellanos gave Analía $2 million and in 2017, $2.8 million in shares. He also gave her $3 million for the first Balada home, but Agnelli had always told Analía she could not have a bank account or credit card so Agnelli deposited the check in his bank account.

Agnelli was paid a salary of $90,000 per year. Agnelli also received monies from rental properties in Argentina and Analía kept using Castellanos's credit card to pay for her family's personal expenses.

### (4) *Agnelli's separation from Analía and fall out with Castellanos*

Castellanos first heard of Agnelli and Analía's separation in August 2019 when he was in Spain and overheard his wife say something about it. Castellanos traveled to Miami and Agnelli would show up for dinner at the

house with Analía as if nothing was different. A few days later, Analía talked to him.

On August 20, 2019, Castellanos went to the Lennox office and spoke to Agnelli about the separation. Castellanos told him he had found out about the separation. Castellanos did not know when the couple had first separated.

From April 2018 through August 2019 Castellanos traveled to Miami several times. During those visits, when he visited Analía in the home on Balada for dinner almost every night Agnelli was there. Castellanos still believed that Agnelli and Analía were living together.

Castellanos claims that the fact the couple separated had nothing to do with Agnelli's termination. Agnelli was not terminated until June 2020 and Castellanos had learned of the separation in August 2019.

Castellanos originally told Agnelli that they should set aside the separation and continue with their business, that the separation had nothing to do with the business. Analía never asked him to terminate Agnelli from Lennox due to the separation.

After visiting Miami, Castellanos went to his bank in Buenos Aires, where he had five safe deposit boxes. Castellanos had the keys to the boxes but was told he could not access on of the boxes because Agnelli took Castellanos out and put himself on it. Agnelli had never told Castellanos that he was going to change the name of the person with access to the box.

In that box there were personal documents and approximately $1 million in cash. Agnelli has never returned the documents or money that was in the box to Castellanos.

According to Castellanos, this was the first time he started having any concerns about Agnelli's running of his businesses. Until the discovery of the safe deposit box, Castellanos had an excellent relationship with Agnelli and loved him "more than a son."

The bank confirmed by email that on April 22, 2019, Agnelli had changed the title on the safe deposit box.

When Castellanos learned about the change in the safe deposit box, he lost trust in Agnelli. He returned to Miami in September or October and spoke asked Agnelli why he had changed the safe deposit box and why he had not said anything. Agnelli said they had done it together and Castellanos must have forgotten as if Castellanos was senile.

Castellanos had his attorneys in Argentina prepare documents under the terms of which Agnelli would resign from Castellanos's businesses and trusts. Castellanos and Agnelli agreed to have Agnelli resign as Trustee of the JCB-1

Trust and agreed to change the Trust Protector of other trusts from Agnelli to Iglesias.

Castellanos also presented a document asking Agnelli to resign from SHS but agreed to let him stay on because Castellanos did not know about hotels.

Castellanos demanded to know what had happened with the safe deposit box, but Agnelli did not give him an explanation. Castellanos felt that Agnelli was a thief and left.

When pressed about whether this meeting happened in Miami or Argentina, Castellanos insisted the meeting took place in Miami. According to Castellanos, the documents that he asked Agnelli to sign were prepared by an Argentine attorney named Cacho Herrera. When shown the resignation from the trust which was date-stamped by the postal service in Argentina on September 20, 2019, Castellanos conceded that the meeting relating to the resignations may have taken place in Argentina and not Miami.

Castellanos allowed Agnelli to continue running Lennox because he had no reason to believe that the hotel was being run poorly. Castellanos did ask Agnelli to produce all documents relating to the administration of the hotel, including the by-laws. At the time of Agnelli's termination, Castellanos still did not have copies of the by-laws.

In early December 2019, Castellanos had a confrontation with Agnelli outside the Lennox. Castellanos arrived at the hotel in a good mood. It was 9:00 a.m. Castellanos parked his car and when Bermudez saw him, she blushed and made a phone call. Agnelli walked toward Castellanos with arms open as if to welcome him as a dear father-in-law as if nothing had happened. Castellanos got very angry and told Agnelli not to come close. Castellanos had a nervous crisis and Fabal offered to give him a ride home. Fabal and Bermudez gave him a ride to his home. After the confrontation at the hotel in December 2019 Castellanos did not see or speak to Agnelli until this trial.

Castellanos was upset because of the safe deposit box, and he also had learned Agnelli was living in an apartment for 15 months that was being paid for by Lennox at a time when Lennox was not making money.

A couple of days later, Agnelli traveled to Argentina and went to the bank and emptied four other safe deposit boxes he had.

### (5) *Agnelli's employment agreement with Lennox*

Castellanos is familiar with the tax amnesty program of Argentina in 2016 and 2017. During that time, Agnelli was the person in charge of managing and administering his assets and was responsible for accurately and truthfully reporting all the taxes.

Cristobal Lopez was a partner of Castellanos in the casino businesses and had the same percentage ownership interest, but Lopez had sold his interest before 2016. Lopez's legal issues had nothing to do with the casinos and Castellanos was unconcerned about his legal problems. Castellanos acknowledges that a racetrack and two casinos in which he held an ownership interest were raided by the government of Argentina, but Castellanos claims the raids were based upon a false claim by a customer that large winning bets were paid out in cash.

Castellanos claims that he never knew about any employment agreement until this lawsuit was filed. He does not speak or read English and could not understand a contract written in English. Castellanos claims that Agnelli never told him that he needed an employment agreement to justify the lifestyle he was living and the assets he owned. In fact, Agnelli never spoke to Castellanos about any employment agreement. Castellanos was having dinner with Agnelli and Analía at the second Balada home and after dinner Agnelli had him sign four documents in English and told him that they were papers for the city government. Castellanos believed Agnelli as to the purpose of the documents and signed the documents. His wife told him later that evening that he should never sign any documents in English from Agnelli.

Castellanos acknowledged that he signed the employment agreement. He is unsure if he was given the whole agreement to look at before he signed it. He also disputed whether the initials on some of the pages were put there by him.

Agnelli did not give Castellanos a copy of the employment agreement and never mentioned an employment agreement up until the time Agnelli was terminated. After Castellanos took control of Lennox, no copy of the employment agreement was found in Lennox records.

Agnelli never mentioned that he was going to receive a salary of $1.2 million per year starting in 2018. The hotel was not even close to opening and had no income to be able to pay that kind of a salary. Castellanos would never have signed the document had he known that. Castellanos only knows that he signed three to four documents. He is not sure if one of the documents was an employment agreement between Agnelli and SHS. Castellanos had no affiliation with SHS in 2017.

### (6) *The use of Lennox's assets*

Castellanos agreed that the Miami Lennox hotel was made for Agnelli to have a job here in Miami and so Agnelli could provide for his family. However, Castellanos never authorized Agnelli to spend Lennox money on personal expenses. Agnelli was supposed to manage the hotel just like any other

business. Castellanos never authorized Agnelli to take Lennox money and use for his own or his family's expenses. And Castellanos never had an agreement with Agnelli to share 50% of the profits of any of Castellanos's assets.

Castellanos never asked Bermudez or Fabal to use Lennox money to pay for his personal expenses. Nor did Macho tell Castellanos that Lennox could pay for Agnelli's personal and familial expenses and record those as business expenses. Macho is Castellanos's personal accountant and was the Lennox accountant until 2014. Castellanos did not realize Macho had been removed as Lennox's accountant until 2017. Castellanos denied that Lennox paid for any of Macho's accounting services on behalf for Castellanos personally. But, in 2018 Macho sent a bill to Lennox for accounting services on behalf of Castellanos and/or his trust. Although the invoice was sent to Lennox and paid by Lennox, Castellanos claimed that he did not authorize Agnelli to pay for Macho through Lennox.

As of the date of this trial, Castellanos has learned that Agnelli had spent monies from Lennox on his home: $1.2 million for a construction company, $250,000 for furniture and restoration, over $200,000 for his apartment on Key Biscayne, over $75,000 for personal purchases from Apple and Amazon, personal trips paid by SHS and then reimbursed to Agnelli by Lennox, trips for an interior designer to and from Argentina, a trip by Agnelli to Argentina which was purchased with Castellanos's credit card but Agnelli reimbursed himself from Lennox, and many sporting and biking goods.

Lennox's funds were also used when Agnelli invited Castellanos to go to the 2018 World Cup in Russia. Castellanos did not want to go but Agnelli convinced him to go with the grandchildren. Castellanos testified it was the best trip he had ever taken but he had no idea how much the trip would cost and had no idea that Lennox was going to pay for the trip. Castellanos thought that Agnelli was paying for the trip.

Additionally, Castellanos had no idea that Agnelli used Lennox's funds to purchase paintings Castellanos liked. He thought they were a gift from Agnelli.

Castellanos realizes his daughter benefitted from many of these expenses, but she is going to repay Lennox when her home is sold. Analía always had use of Castellanos's personal credit card and he set no limit for her use of the card. She spent approximately $25,000 to $35,000 per month. Castellanos did not review the credit card statements of Analía's use of the card. Suazo, the accountant, reviewed the statements. Agnelli paid the credit card bills out of Castellanos's account. Castellanos had given Agnelli the authority to use his account.

Castellanos was confronted with his deposition testimony in which he claimed that it never mattered to him how much Agnelli was billing or earning. He did not worry about how much Agnelli was making. All he wanted was for Analía and Agnelli to live well; that was his only concern.

Castellanos did not know that Agnelli was living on Key Biscayne and did not authorize him to use Lennox funds to pay for the apartment on Key Biscayne.

### (7) *Agnelli's termination*

When Castellanos learned about the impending divorce, he told Agnelli that they would continue to work together in the hotels, but Agnelli needed to resign from all the other Castellanos entities. Agnelli agreed to resign from the other entities. However, after their relationship went south, Castellanos hired Shutts & Bowen for legal assistance and hired an accounting firm, Schechter and Everett to review Lennox's books. The accounting firm assigned someone to review bank statements for Lennox from City National Bank. Castellanos's attorneys asked for more records from Lennox, but they were never provided.

After Agnelli was terminated on June 22, 2020, the Lennox bank account at City National was almost empty. Castellanos told the bank CEO not to close the account. In June 2020, Castellanos did not know that Lennox had three other bank accounts at Wells Fargo: one account had $800,000, one account had $400,000 and one account had $34,000. Wells Fargo refused to give information to Castellanos claiming that Agnelli was the owner of the accounts. By the time they were able to get control of the accounts, there was only a total of $30,000 in them.

Castellanos has to sell his apartment in Miami to pay for all the debts owed by Lennox and to face all these lawsuits. Castellanos had a $5.4 million loan with TransCapital Bank from 2010 but over the years, only interest had been paid on the loan.

The Hermanos Cuestas Construction Company filed a lawsuit against Lennox for $1.8 million. Agnelli had told Castellanos that he could get the debt reduced to $1.4 million. Castellanos sent Agnelli $1.4 million to pay the debt, but Agnelli did not use the money to pay that debt. Eventually, Castellanos and Cuestos agreed to settle for $1.1 million. There were also other debts to other contractors.

As a result of Lennox's debts, a capital call request was made but neither Agnelli nor Analía came forward to contribute capital. Castellanos made a $3 million capital contribution to Lennox.

Throughout this litigation, Castellanos learned that the hotel had paid $800,000 and then $400,000 to a Wells Fargo account which Castellanos knew nothing about. When the account was turned over to Lennox, there was only $36,000 in the account. Agnelli had withdrawn $650,000 for his salary from that account.

Castellanos also learned that Agnelli had received monies from a PPP loan and Agnelli returned the money when Castellanos took over the hotel.

Separately, Agnelli never told Castellanos that Mira had agreed to pay $425,000 for the opportunity to sign a lease with Lennox. Agnelli merely told him that arrangements had been made with a very good Canadian company to rent space for a restaurant at the Lennox and they had given money to Agnelli as a deposit. But that money did not go to Lennox. Castellanos later learned that a company Spark, which was a partnership with Agnelli and Analía, entered into an agreement wherein Spark would receive 25% of the earnings of the restaurant. Agnelli never offered this investment opportunity to Lennox or Castellanos.

Castellanos further learned that Lennox had submitted a visa application on behalf of Agnelli. Castellanos was shown page six and the I-140 application which purportedly contains Castellanos's signature on April 14, 2020. Castellanos denied signing or dating that page of the application. Castellanos was also shown a Form G-28 and denied signing and dating that form.

Castellanos was also shown a twelve-page letter on Lennox letterhead to USCIS in support of an I-140 visa application for Agnelli. The letter is dated March 27, 2020. The letter is purportedly signed by Castellanos as "Majority Shareholder." Castellanos did not prepare or ask anyone to prepare the letter. Castellanos did not sign the letter; nor did he authorize anyone to sign on his behalf.

Since Agnelli, Bermudez, and Fabal have left Lennox, the hotel is doing well. Castellanos is not receiving any salary and Duran is paid $2,500 or $2,800 per month by Lennox. Castellanos has become President of Lennox and Duran has been Vice President; none of their personal expenses have been paid by Lennox.

### J. Scott Cornelius

Scott Cornelius graduated from college and then went into the hotel business in 1981 at ITT Sheraton. He started as a steward and eventually became a manager of several hotels. He has been with Driftwood for the past 18 years. He started out as the general manager of the Omni in Miami, and

eventually became a regional manager in 2014. He currently oversees 12 properties, including the Lennox.

The Lennox has had a management agreement with Driftwood since November 8, 2017. Driftwood is responsible for operating and managing the hotel from marketing, procurement, training, hiring—basically running everything for the owners. Driftwood provided services to Lennox before the opening of the hotel. They try to anticipate the opening date and bring on board a manager and director of sales, hire staff and have the hotel ready to operate when it opens.

There was a grand opening event at the hotel in July 2019 during swim week. The hotel opened for guests two weeks later. Once the hotel opened, there was extensive marketing. Agnelli was personally involved in some of the marketing and sometimes included Driftwood personnel.

The hotel started out well and had $600,000 in revenue by December 2019. The Miami Lennox reached number one in the rankings by February 2020.

Since the hotel has been open, Driftwood has been responsible for running all aspects of it. Driftwood also developed a business plan for the hotel which includes a setting a budget, setting the room rates, arranging with third parties for bookings and ratings, etc.

Cornelius wanted to build the brand without affiliating with Marriott or Hilton. They decided to partner with Small Luxury Hotels.

Agnelli was very involved in working with the architect and designers and bringing the product to the finish line. He had a vision for the hotel and was involved in the details of the construction. The furniture was custom-made.

After the opening, he was periodically involved in certain aspects of the operation. Agnelli was challenging to the general manager. He had frequent outbursts, yelling at people and belittling people, which hurt the morale of the staff. Cornelius would describe Agnelli as an inconsistent micromanager. Agnelli kept control of some aspects of the hotel which were not cost-effective and made it difficult for Driftwood.

Cornelius is aware of the lease between Lennox and Mira to operate a restaurant at the hotel. Driftwood would normally be responsible for negotiating leases for restaurants in the hotels. Mira agreed to pay rent of $30,000 per month. Cornelius felt that number was too high and would be difficult for a new restaurant to meet. Eventually, Mira fell into arrears for the rent and was eventually evicted. Cornelius learned that Agnelli had an ownership interest in Mira. Cornelius has never seen a deal like that in his career.

Driftwood normally collects all the revenues and pays all the bills. There were some invoices for Lennox that were not paid by Driftwood. Cornelius had no knowledge that monies from Lennox were used to purchase personal items for Agnelli.

At one point, Agnelli asked Driftwood to transfer all the cash assets of the hotel from Driftwood to another Lennox bank account. The amount of cash was approximately $1 million. Driftwood advised Agnelli it needed monies to continue to operate so Agnelli agreed to a transfer of $800,000 in cash. Later, however, Agnelli requested another $400,000, which were transferred.

Driftwood did not handle the invoices from Cuesta Construction so he did not know if any monies were owed to Cuesta or if any monies were paid to Cuesta.

Cornelius is unaware of Agnelli's compensation from Lennox and did not know about any employment agreement during the time Agnelli was at Lennox. Cornelius is unaware of any hotel that pays someone over $1 million when there is management company like Driftwood taking care of all aspects of the operation and management of the hotel.

In June 2019, Agnelli told Cornelius not to provide information relating to the hotel to Castellanos. Lennox's attorney, Salazar, also instructed Cornelius to withhold information from Castellanos.

On July 1, 2019, Agnelli appeared at the hotel with his attorney, police officers, and a locksmith and entered the office and removed some personal items.

Since Agnelli's termination, Duran is now the point person for ownership. During the time Agnelli was there, the atmosphere was not conducive to a positive work environment. Since Agnelli was removed, there has been more of a collaborative effort between management and ownership.

The hotel is continuing to do well. There has been no waste or mismanagement at the hotel since Agnelli was terminated.

Driftwood predicted that the net profits for the hotel would be $2.6 million in 2021. The records of Driftwood indicate that the actual net profit for the hotel was $2.16 million for the first half of 2021. Driftwood predicted net profit for Lennox of $1.55 million for the second half of 2021. That would have resulted in a net profit of $3.7 million for 2021. Cornelius believes that Lennox exceeded the predicted amount in profits for the second half of the year.

South Florida hotels exceeded 2021 projections because Florida removed COVID restrictions faster than other states. STR Trend Reports is an industry publication which gathers data from hotels. It is relied upon by the hotel industry. The STR report for 2021 shows that from May 2021 through March

2022 small luxury hotels in Miami Beach had the highest average daily rate of all time and Lennox outperformed most of those hotels.

In all, Cornelius would not expect the Lennox to spend more than $400,000 to $500,000 for marketing. Lennox's PPP loans were forgiven as were the PPP loans for all the other Driftwood-operated hotels. In the last six months, Lennox has been doing better than ever.

### K. Cameron Cook

Cook works for Gordon Brothers, an asset management and consulting group. Cook is its managing director of asset valuations. He received a bachelor's degree in 1985 and received an MBA in finance, investments and banking. Gordon Brothers is a national firm but Cook works in Wisconsin.

His group has valued several hundred businesses as well as 150 to 200 share valuations, including over 100 minority shareholder valuations. He has testified in court as an expert in valuations. Cook received a certified internal auditor certification, an accredited senior appraiser certification, and a distressed business valuation certification.

Cook has never performed appraisal work under the Florida judicial dissolution statute. Except for this case, he has not valued any company whose main asset is a hotel in the past five years. In March 2021, Cook was engaged to serve as an expert in this case and to value to shares held by Agnelli. Gordon Brothers was referred to Shutts & Bowen by JLL.

Cook determined the value of Agnelli's shares in Lennox was $1.9 million. Cook relied upon an appraisal of the hotel performed by JLL and learned that Castellanos funded the purchase and construction of the hotel.

Cook used an effective date of August 16, 2020 to value the shares. That is the day before the judicial dissolution claim was filed by Agnelli. JLL also used August 16, 2020 as its effective date for valuation of the hotel.

Cook did a fair value determination which is the equivalent of a cash equivalent to what a willing and able party would pay, and a willing and able party would receive by selling the shares on the open and unrestricted market. There was no statutory definition of "fair value." "Fair value" and "fair market value" are different terms.

Per Cook, there is a minority shareholder discount because that shareholder has no control over hiring or firing or borrowing money or distribution of assets. There is also a lack of marketability discount due to the fact Agnelli was a minority shareholder.

One uses information that is known or knowable as of the effective date of the valuation: financial data, market conditions, the fact we were in a

pandemic at the time. However, Cook's report has a disclaimer indicating that due to the COVID pandemic there was a material impact on the economy and created lots of uncertainty. Cook included the liability of the PPP loan in his calculations.

Cook determined that the controlling, marketable value of 125 shares of Lennox shares is $2,975,243. But since Agnelli was a minority shareholder, Cook applied a 20% reduction for lack of control and another 20% discount for lack of marketability and opines that Agnelli's shares have a value of $1,904,156.

Cook acknowledges that if JLL severely undervalued the hotel, his own valuation of the shares would be severely undervalued.

In August 2021, Cook was aware that the actual performance of Lennox was better than JLL had forecast.

## L. Jimena Duran

Jimena Duran lives in South Miami and works for Lennox. She is the corporate representative for the company at this trial. She has worked there for almost two years.

Duran is originally from Argentina she has a degree in public relations and completed one of two years towards an MBA. While in Argentina, she worked at Citibank starting in 1995 in payroll services and eventually moved to CitiGold, which is private banking in Argentina. In private banking, her duties included assisting wealthy clients who had investments in Citibank.

In 2002, Duran was transferred by Citibank to work in private banking in Puerto Rico. There was an economic crisis in Argentina and many clients lost up to 70% of their wealth. After working in Puerto Rico, Duran decided to move to Miami because it is most similar to Argentina of all the American cities.

When she first moved here, she stayed home taking care of her children but in 2015, she started working outside the home again. Her sister-in-law was bringing a franchise to Miami and Duran helped her set up the franchise here.

Duran met Castellanos in mid-February 2020, through a friend in common with whom Duran had worked at Citibank in Argentina and who was working at Citibank in Miami. The friend told Duran that Castellanos was looking for a person to work with and put Duran in contact with Castellanos.

Castellanos said he was looking for a person to manage his affairs in Miami and if Duran was interested, he would find a small office for her. He mentioned that he had assets, commercial establishments, and an apartment.

They were going to meet again soon thereafter but Castellanos became ill, and they did not meet again for a couple of weeks. In the second meeting, Castellanos said he wanted Duran to manage his assets, particularly the commercial establishments, and Castellanos gave her instruction as to whom to contact: Clara Pizarro, Shirley Fabal, and Roberto Macho. Pizarro is Castellanos's secretary in Argentina.

Duran sent Pizarro an email and followed up with a phone call. Duran introduced herself and told her she was going to start working on Castellanos matters here in Miami. Pizarro provided Duran with an organizational chart.

Duran also reached out to Fabal by WhatsApp on February 27, 2020, to introduce herself and Fabal gave Duran her email address. On that same date, Duran sent an email to Fabal requesting all the documentation relating to Castellanos's companies as well as bank account information and whether any bills were set up to be automatically paid by bank or credit card. She also requested a key to Castellanos's apartment.

Fabal never responded to the email so in early March, Duran reached out to Fabal by WhatsApp. In the WhatsApp communications, she again requested all the documentation for the companies of Castellanos. Fabal said she had been sick and asked for an address to which to send the key to the apartment. Fabal said when she recovered, she would go to the office and gather the documents.

On March 5, 2020, Duran reached out again to Fabal because Castellanos was pressuring Duran for the paperwork. Fabal wrote that she was still sick at home and had not gone to the office but that she had sent her husband to return the key. Duran received the key but no documents.

On March 11, 2020, Duran wrote to Fabal on WhatsApp asking her if she had had an opportunity to gather the documents. Fabal never responded to that communication.

Duran never received any bank records or company records from Fabal. Duran also reached out to Macho. Macho agreed to meet with Duran and Duran brought the organizational chart of Castellanos's companies and Macho explained everything to Duran, including how the companies related to each other.

Castellanos also asked Duran to speak to Sandor who was the president of Claro Development, the project manager for the construction of the hotel. On March 5, 2020, Duran wrote to Sandor asking him for an update about the construction as well as any outstanding balances. Sandor wrote back by email and indicated that the attorney for Lennox, Salazar, had instructed him not to release any information and she needed to reach out to Salazar.

International Midtown is a company of Castellanos that owns commercial establishments in the Wynwood area. Duran was responsible for collecting rents from the tenants of International Midtown. During COVID, the tenants were not paying rent.

Duran became familiar with a company Schechter & Everett, a forensic accounting company that was engaged by Castellanos to review the bank statements from Lennox at City National Bank and prepare an analysis. Schechter did not have access to by-laws, invoices, or Quickbooks. It only had the bank statements.

After Schechter finished its review, Lennox learned that Agnelli had used Lennox funds for furniture for the second Balada house, had spent Lennox funds for an apartment on Key Biscayne, and had spent $250,000 for trips. Agnelli also requested reimbursements for expenses that were actually incurred by other entities, not by Agnelli.

When Duran received the Schechter report, she shared the information in the report with Castellanos and the attorneys. Castellanos was in shock. He could not believe that the Lennox monies were used for personal expenses of Agnelli.

On June 17, 2020, there was a meeting to remove all the current directors, including Agnelli, and for Castellanos to be the President and sole director.

A letter was sent to Agnelli regarding his termination. The letter was written in Spanish because Agnelli did not speak English. The letter informed Agnelli that he was not allowed on the hotel property and if he had any personal belongings, they would be sent to him at his address listed on the letter. Agnelli was also told to return his laptop, access cards, keys, automobile, and any other company property.

Fabal and Bermudez were sent notices informing them that Agnelli had been terminated and there was a change in management at Lennox. At that time, neither Fabal nor Bermudez were terminated by Lennox. To assist in the transition, they were asked to gather all the documents they had. Duran spoke with Fabal at the hotel and with Bermudez on the phone. Neither ever provided any documents and neither ever returned to work at Lennox.

Duran was appointed as Vice President of Lennox on June 21, 2020. At that time, there were no corporate books or records, and no bank records. The only records were the ones maintained by Driftwood.

Towards the middle or end of August 2020, Duran found out about the Sherita apartment. She did not have keys, so she hired a locksmith and,

together with the attorneys for Lennox and the attorneys for Agnelli, entered the apartment. Inside the apartment there were many Lennox documents.

As Vice President, she reports to the President and supervises the operations of Driftwood at the hotel. She is at the hotel every day.

In July 2020, Duran met with Cornelius, the regional manager of Driftwood, who told her that due to the pandemic, there was no money to operate the hotel and they needed $300,000 to manage for the next couple of months. Cornelius told Duran that $1.2 million of Lennox funds had been transferred to a Wells Fargo bank account. The account was in the name of Lennox.

Duran went to Wells Fargo on approximately July 11, 2020, to gain access to the Lennox account there but she was denied access because the only owner of the account was Agnelli. She learned the account had been opened in late 2019 or early 2020.

Duran did gain access to the City National Bank accounts and found that there were personal expenses of Agnelli paid from those accounts. On December 3, 2019, there was a payment of over $1,280 to Apple. There was also a payroll payment of over $48,000 which represents Agnelli's twice-monthly salary. On December 17, 2019, a debit card was used to purchase more than $4,000 in merchandise from Apple.

On July 3, 2020, Duran received a call from Analía who told her she went to Oceania to get a car and there were two boxes with files of Lennox in them. Duran went to Analía's house to see what was in the car. There were thick folders full of files. Duran took pictures of some and scanned through some of them. They were Lennox documents including information about the Lennox mortgage, and reimbursement records. It was a Friday so Duran told Analía that they would put them in the trunk of the car, then bring them to the office and look at them Monday.

Among the documents that Duran photographed were Lennox checks to Agnelli in the amounts of $10,300 and $21,173 for various reimbursements. Some of the reimbursements were for expenses incurred by and paid by Castellanos or other entities, including SHS. After taking photos of these documents, Duran never saw the documents again. Agnelli went to the house in the middle of the night and took the boxes and binders.

According to the Lennox bank records, there were 17 checks to Agnelli for reimbursements but to this day, Duran has only found invoices for 12 of the reimbursements.

On July 8, 2020, there was a meeting with Castellanos, Analía,

Shutts & Bowen attorneys, and someone from Invernorth. Agnelli was invited but did not appear. The purpose of the meeting was to ratify the decision to terminate Salazar as the attorney for Lennox and approve Shutts & Bowen as Lennox's attorneys. The Schechter investigation was also discussed, and it was determined that a more in-depth forensic accounting investigation needed to be conducted by Berkowitz Accounting. The meeting also discussed and approved new by-laws since they never received the by-laws from Agnelli or Salazar.

As a result of all the expenses that Lennox paid for Agnelli, Duran asked H & Co. to revise the financial statements of Lennox, which was done. There were also tax implications and amended tax returns were prepared and submitted to the IRS by Lennox.

Before April 2017, Agnelli was paid $90,000 per year. After April 2017, he was paid $15,000 per month until October 2018. Even though the employment agreement was entered into in December 2017, Agnelli did not receive his $100,000 per month salary until October 2018.

In December 2018, Agnelli paid himself two bonuses totaling $755,000. In 2018, he was paid over $1.2 million. In 2019, Agnelli was paid $1.69 million in compensation.

According to Duran, Agnelli was terminated for cause for the following reasons: using $1.3 million in Lennox funds for construction and furnishing of the second Balada home; paying $207,000 of Lennox funds to rent his apartment on Key Biscayne; using $250,000 of Lennox funds for personal travel; using $47,000 of Lennox funds to purchase of Apple products; obtaining reimbursement from Lennox for expenses not incurred by him totaling $179,000; paying himself $3,650,000 in excess salary above his $90,000 salary (if the employment agreement is deemed invalid) or $800,00 even if the Court finds the employment agreement valid; using $62,000 of Lennox funds for the interior design of the Paraiso Bay investment apartment; converting $27,000 in assets of Lennox to his personal use such as the golf cart and Polesello paintings; causing Lennox to incur additional expenses of $11,500 to H & Co. and additional monies to Berkowitz to review documents and file amended tax returns; taking $200,000 in key money for the Mira transaction plus Lennox incurred $18,000 in attorneys' fees relating to that; preparing the fraudulent visa application; withholding corporate documents; and, opening the Wells Fargo bank account in which he claimed to be sole owner of Lennox.

In total, Lennox's position is that Agnelli caused losses to Lennox of $6,352,000, which includes the monies and properties taken wrongfully from Lennox by Agnelli and costs to remedy that misconduct.

When Duran began running Lennox, she became aware of a $4,250 invoice from New Link, a public relations agency, for the production of 800 photographs of Agnelli in various places within the hotel. There was a public relations campaign taking place just before the opening of the hotel and the photos were used in press releases and articles in industry journals.

### M. Maher Murshed

Maher Murshed is affiliated with OHS, which is a Canadian holding company representing a group of businesses based out of Toronto. OHS owns and operates restaurants in Toronto and Miami.

Mira Holdings is a subsidiary of OHS and was established to set up and operate a business at the Lennox hotel. Murshed was introduced to Agnelli and Bermudez and Murshed was under the impression Agnelli was the sole owner of Lennox. It was not until a couple of years later that Murshed learned that Agnelli was not its sole owner.

The opportunity at the Lennox was unique: it was April 2019, and the hotel was about to open up. This was very late in the game for a hotel to try to make arrangements with a new restaurant.

Mira was an existing brand with a Peruvian restaurant in Toronto. Agnelli wanted a 25% interest in Mira in exchange for allowing Mira to lease in the Lennox and in future Lennox hotels. Agnelli also wanted Mira to make an upfront key payment of $425,000. Usually, when one sets up a hospitality operation in a space that has already been built out, the new restaurant would make a payment to the landlord or owner to compensate them for the cost of the build out. Both of those conditions seemed reasonable to Murshed.

The rental agreement was not discussed very much. The commercial terms were very easy to negotiate.

Murshed and Agnelli entered into a letter of intent on June 3, 2019, and created Mira South Beach in which Mira Holdings was 75% owner and Agnelli would own 25%. Their agreement provided for a key payment of $425,000 and Mira Holdings made payments totaling $200,000 to Agnelli's company, Spark Designs.

Later, an operating agreement and a lease agreement were signed. A budget and operating plan was set up which anticipated that Mira and Spark would split anticipated expenses of over $800,000 at a ratio of 75% and 25%. Under this arrangement Spark was required to pay about $217,000. Spark ended up paying approximately that amount, but the actual expenses were a lot more than $800,000 so Mira paid in excess of what was anticipated.

Murshed eventually felt that the design of the restaurant— its chairs, lighting, paintings—did not fit the aesthetics of the type of restaurant Murshed wanted to operate. This prompted renovations. The agreement between the parties only required Lennox to pay $30,000 so Mira had to pay for the cost of the renovations beyond the $30,000.

From October 2019 through the pandemic in March 2020, there was no name associated with the restaurant, but the restaurant did provide meals to the guests. Often, the guest will sign for meals and charge the meals to the room. Usually, the billing between the food and beverage and the hotel is resolved within one day. With the Lennox, there were often 30 to 60-day delays in receiving the sales monies from the hotel and sometimes, the balance owed was over $100,000. Murshed spoke to Agnelli and Agnelli always agreed to resolve this issue but never did. Mira decided to slow down on the key money payments.

Mira paid rent up through the beginning of the pandemic. When the pandemic hit, Agnelli agreed to resolve the issue of rent and told Murshed not to worry about it. While Agnelli controlled Lennox, he never took adverse action against Mira.

In June 2020, Murshed learned that Agnelli was no longer the President of Lennox. Murshed was surprised. Murshed reached out to Agnelli. Agnelli said he was removed due to concerns around an impending divorce.

Murshed spoke to Duran, and she said she had no idea what the agreement was with Mira, had no idea what the concept of the restaurant was, and no idea what was happening between Lennox and Mira. Murshed spent two months talking to her and educating her but, eventually, Mira was sued and Mira and OHS agreed to a judgment of over $813,000. Mira paid $50,000 but has not made any other payments towards the judgment and Lennox has not taken any steps to enforce the judgment even though OHS has sufficient assets to pay the balance of the judgment.

The settlement agreement required Murshed to cooperate in the lawsuit between Lennox and Agnelli. But Murshed claims that his company lost $1.2 million in this venture. By entering into this agreement, Mira agreed to not litigate any further which could have tied up use of the restaurant space for a long time. This agreement allowed Lennox to quickly move ahead and find another restaurant for the hotel.

Mira South Beach has filed an arbitration proceeding against Agnelli and Spark Designs to recoup its key money and to resolve other disputes.

### N. Analía Castellanos

Analía is the daughter of Castellanos and Ana Maria. She has a brother, Pablo, and a niece, Candelaria, the daughter of her sister who passed away.

Analía first met Agnelli in 1999 or 2000 and they were married in November 2001. They have three children: Valentino, 19, Francesco, 17, and Rafaela, 13. Valentino has competed in several triathlons around the world. On a trip to Switzerland for a triathlon, Analía traveled with him and Agnelli and used her father's American Express card to pay for the hotel stay. Agnelli continued on to France to compete in his own triathlon.

Analía's daughter Rafaela competes in horse riding competitions. She has traveled to North Carolina and Kentucky for competition.

Analía's son, Francesco, played soccer and traveled to Orlando, Naples, and other places in Florida. Francesco also went with Agnelli to go skiing, including Vail.

Analía and her children and parents as well as Candelaria and Pablo have used many different Apple products in the past five years including laptops and iPhones and iPads. The children also download apps and music for the Apple devices.

Francesco, his friends, and Agnelli's girlfriend use a golf cart, which Analía believes is owned by Lennox.

#### (1) *Analía and Agnelli move to Miami*

On June 20, 2012, Analía and Agnelli moved to Miami, and she has lived here continuously since then. During the marriage, Analía was a housewife and took care of the children. Agnelli was responsible for financially supporting the family. Agnelli did not discuss finances with Analía.

When they were first married, Agnelli was working at a factory that made shopping bags. He did not tell her how much money he was making but he did not make a lot of money.

Later, Agnelli worked for the Lennox hotels in Ushuaia and Buenos Aires and eventually Miami. He never told Analía how much money he was making.

Agnelli made income from properties he owned in Argentina and the United States, but he never told her how much rental income was received.

During her marriage, she knew he and another partner, Baine Leon, but she did not know much about it and had not heard of the name of the loan business, VFR. She learned about it through the divorce.

While they were married, Agnelli paid all of the bills. Analía was never involved in paying the bills and she had no idea from which accounts Agnelli was paying the family bills.

78

Analía never had a checking account during the marriage and never had a bank debit card or ATM card. Agnelli told her that there were tax risks if she opened her own bank account.

Analía did have her father's American Express card that was linked to his account. He allowed her to use it to pay for family expenses like groceries, pharmacies, gasoline, uniforms for children, doctors, clothes, and hairdressing.

Analía very rarely used cash and if she needed a small amount of cash Agnelli would give it to her. She recently learned how to take cashbacks using her credit card.

Agnelli gave her an American Express card but Agnelli would get upset if she spent more than a few hundred dollars on that card.

When she used her father's American Express card she did not receive the billing statements and she never paid the bills for that American Express card.

Analía was completely uninvolved with the preparation of her tax returns both here and in Argentina.

While they were living in Argentina, her father helped them purchase three properties which are held in the name of an entity, Vadiat. Originally, Vadiat was owned 10% by her mother and 90% by Analía. When Analía moved to Miami, Agnelli took her mother out of the company and made himself a 10% owner.

Analía attended the grand opening of the Miami Lennox hotel. She thought it was going to be a small event but there were so many people there. At one point, she bumped into Macho who introduced her to a journalist who asked to interview her. The journalist asked her who owned and built the hotel. She did not want to say her ex-husband, so she said her husband was involved in the construction and decoration, but her father was the investor for the project. Apparently, Agnelli found out what Analía had said to the journalist and grabbed her arm forcefully and told her: "the hotel is mine and you need to tell that woman not to publish anything." Analía quickly left the event.

Castellanos gifted $3.5 million to Analía to purchase the first Balada home and $2.7 million to buy the second Balada home.

When they bought the second Balada home, they first bought some furniture from Agnelli's friend Dio. Analía would go to the store and pick out the items she wanted, and they would be shipped to the house. The invoices were sent to Agnelli. Sometimes, Analía would pick out things she liked and Agnelli told her to run them through the hotel because the hotel gets a discount. She thought that even though the furniture was run through the

hotel to get the discount, the monies to pay the bill would come from their personal monies.

Analía was shown an invoice from Casa Dio which states the shipping address is the Balada house but the "bill to" portion indicates "Lennox Miami Corp." Analía did not even look at the invoices and it remains her belief that Agnelli was paying for the furniture with his own money or assets.

Analía was not aware that Lennox monies were used for the construction of the Balada home and she will pay back whatever she is required to pay.

Castellanos never told her that Agnelli was authorized to use Lennox monies to pay for items purchased for their home.

The second Balada home was sold in August 2021 for $16.1 million. The furniture was included in the purchase price of the home. Many of those furnishings were purchased from Casa Dio.

Analía was also unaware that Lennox monies was used to pay for family expenses such as trips, purchases from Amazon, Apple products, or groceries.

Analía did see Agnelli with cash, but she does not know how much, and he never told her he submitted reimbursements to Lennox to get cash.

The Paraiso Bay apartment was purchased by Agnelli during the marriage without her knowledge. Analía is claiming in her divorce that the apartment is a marital asset. Analía was unaware that in this case, Lennox's position is that Paraiso Bay is the property of Lennox.

### (2) *Agnelli's affair*

Paula Bosch is Agnelli's lover. Analía learned about their relationship on Mother's Day 2016. Agnelli was away at a triathlon, and he said he was not able to make it back in time for Mother's Day. When he returned, she looked at his phone and found evidence of the relationship. Analía called Bosch's husband to advise him of the affair between Agnelli and Bosch and the husband told her that he had known about the relationship for one year.

Analía confronted Agnelli about the relationship and he denied it. They had arguments about this, and Analía said that if he was in another relationship they should separate. Eventually he admitted to the relationship but said it was transitory and a mistake. They went to therapy but Analía put a recording device in Agnelli's car and recorded conversations between Agnelli and Bosch and she heard Agnelli laugh and tell Bosch that he had to go to therapy.

In August 2017, Analía and Agnelli went on a trip to California. While there, Agnelli told her he had to travel to New York to meet with Baine for work. Analía offered to go with him and Agnelli told her she could not go because he

would be working the whole time. Analía hired an investigator and learned that Agnelli actually met Bosch in New York.

During the divorce, Analía learned that in 2017, Agnelli started sending money, eventually $5 million, to Path Advisors, a company owned by Agnelli's mother. Agnelli did not have a good relationship with his mother and Analía was always pushing him to have a relationship. His mother does not work. Analía had no idea Agnelli was sending the money to Path Advisors and did not authorize him to send the money. Analía is making a claim for those monies in her divorce.

In 2018, Agnelli was still in a relationship with Bosch. Agnelli threatened Analía, telling her she could not tell her father because it would cause problems and her father would have a heart attack. Agnelli told her: "if I press a red button, all of us will go to jail."

On April 2, 2018, Analía asked Agnelli to leave the house. It was very difficult for the children. Analía did not tell her father about the separation. She still had a hope of getting her family back together and Agnelli was pressuring her not to tell her father. During the separation, when her father was in town and came to her house for dinner, Agnelli would come to dinner and make it seem everything was normal.

When Analía finally told her father about the separation in August 2019, he was very sad because he considered Agnelli to be a son of his. Her father told her that if Agnelli had been living apart for a year, he was not coming back. However, Castellanos never said he intended to remove Agnelli from Lennox because of the separation.

### (3) *Agnelli's fallout with Analía and Castellanos*

Analía is aware of a confrontation between her father and Agnelli in December 2019. Her mother called to say that Castellanos had come home on the edge of a heart attack because of an argument with Agnelli. All Analía knows is that her father was upset, and they argued but Agnelli laughed at her father and disrespected him.

After this argument, Agnelli called her crying. He said he wanted to see her and she agreed to meet Agnelli. Agnelli told her she was the only one who could fix things with her dad. She told Agnelli that her father was mad at her also and she had no idea why.

During the first part of 2020 her relationship with Agnelli was getting worse. Once Agnelli was terminated from Lennox, he filed for divorce.

After he filed for divorce, Agnelli stopped paying for any of her family's expenses. Initially, she asked her father for help because she didn't have

anything. Her father loaned her money at first and after that the divorce court judge ordered some of the marital monies to be distributed so she was able to pay for the expenses of her and her children.

In June 2020, Analía drove a Range Rover that was given to her by Agnelli for her birthday in 2019. She had let Valentino use the car to visit Agnelli and Agnelli told him to leave the car there at this apartment at the end of the visit. Agnelli told her the car was in the repair shop. A friend of hers who lives in the apartment building called her and told her that her car was at the apartment. Analía thought the car had been fixed so she went to the apartment and picked up the car. She sent Agnelli a message letting him know that she was picking up the car.

Once she arrived at her home, she saw a box and binders in the back of the car, and she was not sure if they belonged to the hotel. Analía called Duran and Duran came to her home and they looked at the binders. They took some pictures of the papers and Duran told her to bring the papers to the hotel during the week.

The next day, the box and files were missing from the car. She checked the security cameras and saw Agnelli using the extra key to the car and removing the paperwork from the car.

Analía saw three Polesello paintings hanging in Agnelli's apartment when she went there with her attorney to do an inspection as part of the divorce.

Up until the time she told her father that she and Agnelli were having marital problems she had never heard her father say anything negative about Agnelli. The only comment her father made in passing was joking that Agnelli spent a lot of money and lived better than he did.

In her divorce case, Analía is claiming that Agnelli's 12.5% share of Lennox is a marital asset because he received the shares as remuneration for his work on the project but her 12.5% share of Lennox is a non-marital asset because she received her shares as a gift. The written gift document confirms Analía's understanding.

Analía is currently living in a house in Coconut Grove owned by a partnership of her father. She is paying $12,500 per month in rent which comes from the marital funds distributed to her. She is not planning on staying there so she bought inexpensive furniture for the house.

### O. Charlotte Kang

Charlotte Kang is the managing director of the valuation advisory services for hotels and hospitals division at JLL which is a Fortune 500

company and is involved in property management and brokerage. She was previously an executive vice president for the company.

Kang has a BS with honors from the University of Greenwich concentrating on real estate. She is a designated member of the Appraisal Institute and a fellow of the Royal Surveyors organization. She is a certified real estate appraiser in 40 states.

Kang was engaged to render an expert opinion on the fair market value of the Lennox hotel. At JLL she has performed 20 to 40 hotel valuations per year for six-and-one half years. She has performed other valuations of hotels in Florida and in the Miami area. Prior to working with JLL, she worked in the real estate appraisal industry for more than a decade and performed valuations of hotels during that time as well. This was her first time testifying in court; she has never been previously qualified as an expert in court.

The Miami Lennox was built in the 1930's as the Peter Miller Hotel. The Miami Lennox is a charming hotel with 119 rooms on Collins Avenue. There is a lobby bar and restaurant, pool, meeting rooms, fitness center and parking garage for 25 cars. The hotel was managed by Driftwood. Kang initially did a virtual inspection of the hotel in September 2020 due to COVID and did an in-person inspection in June 2021.

Kang's report must comply with the Uniform Standard of Professional Appraisal Practices.

Kang did not determine the effective date of value. She used the effective date of value of August 16, 2020—the day before this lawsuit was filed.

Kang's is a retrospective appraisal report. It is not a current market report but one valid as of a previous, effective date of value. Kang has only performed two other retrospective appraisals in her career.

There are different approaches to valuing real estate: cost, income, and sales comparison. Kang used the income approach as well as a sales comparison approach and then tried to reconcile the two approaches.

Kang used a discounted cash flow analysis approach to the income valuation method. First, she calculated the multi-year revenue and operating expenses to come up with net profits. She then used a discount rate to calculate the present-day value of the net profits. Room revenue is the made source of income for a hotel. One needs to determine the room occupancy rate and the average daily rate for the rooms. Hotels also have income from food and beverage and parking.

Kang reviewed the average daily rates of other competitive hotels in the area and compared those to the Lennox hotel. She then used a penetration

analysis to determine market share that the Lennox would have from among the other competitive hotels.

Kang considered Driftwood's forecasts for the balance of 2020.

Kang calculated the other revenue sources from food and beverage, resort fee, and parking. There was no room service at the hotel so that somewhat limited the amount of revenue from food and beverage. There was a $25 resort fee which was charged to most guests. There was also revenue from valet parking for the 25 parking spaces in the basement.

Kang has never been as far off in her prediction of the average daily rate of a hotel in the first fiscal year forecast by percentage as she was in this case.

### P. Jessie de Cardenas

Jessie de Cardenas works at H & Co., which provides accounting and tax services. H & Co. has three offices in Miami and over 500 employees world-wide. De Cardenas is a senior tax manager.

Lennox is a client of H & Co. and, starting in January 2019, De Cardenas worked on Lennox's account. She continued to work on the Lennox account after Agnelli was terminated. De Cardenas prepared the tax returns for Lennox. Karen Lantigua was the staff person assigned to work on the Lennox account. If Lantigua had seen an entry that was a red flag, she would be responsible for making further inquiry with Lennox.

If there were payments for an apartment on Key Biscayne, Lantigua should have seen that as a red flag since the hotel was on Miami Beach.

H & Co. had access to the general ledger of Lennox, but De Cardenas does not personally review the general ledger. De Cardenas relies upon Lantigua to prepare a profit and loss balance sheet.

The general ledger contains payments to "Oceana 304-N" and "Apt. Oceana" and "clean Apt. Oceana" one of which was for $18,000 which should have raised a red flag for Lantigua in her review.

Lantigua also reviewed documents provided to her by Fabal which detailed that a Lennox employee was paid a salary for cleaning the hotel and apartment.

The general ledger also shows four payments of $11,500 each to Tres Hermanos, which is a material amount of money. De Cardenas has no idea what the payments to Tres Hermanos were for.

The ledger of Lennox also shows a number of payments, some in excess of $10,000 to Macho and Associates, the personal accountant of Castellanos. De Cardenas does not know who Macho and Associates is.

De Cardenas does not know if Lantigua made inquiries of Lennox as to any of these red flags.

Lantigua did not bring any of these red flags to the attention of De Cardenas.

H & Co. provided accounting reconciliation and tax work for Lennox. For the accounting reconciliation, all H & Co. does is take Lennox's bookkeeping records and reconcile them with the bank records. H & Co. used the Quickbooks software but the entries into Quickbooks were made by the Lennox bookkeepers. The description of the nature of the purchase and whether the expense was personal or business-related was entered by the bookkeepers. H & Co. never prepared an audit of the Lennox records and never saw the underlying documents to verify if the expenses were personal or business-related.

As part of the tax preparation process, H & Co. did not generate financial statements based upon the Quickbooks. If there was an inaccuracy or untruthful classification of expenses in the Quickbooks, those inaccuracies or untruths would carry over into the tax returns prepared by H & Co.

Castellanos never told H & Co. that Agnelli was authorized to use Lennox funds to pay for personal expenses. Nor did Agnelli ever tell H & Co. that he was using Lennox funds to pay for personal expenses.

Had Lennox reported Agnelli's personal expenses as business expenses to the IRS, that would have been improper and would have erroneously inflated the tax basis of the Lennox property.

If H & Co. had known that it was preparing financial statements or tax returns based upon classification of personal expenses as business expenses, it would have filed amended returns.

During its review of the financial records if H & Co. had seen expenses that seemed to be personal, it would have inquired further. One example is when H & Co. saw expenses for a PlayStation, it inquired of Lennox and determined it to be personal, so it was re-classified.

If H & Co. saw an expenditure for "furniture" that would not have raised a red flag since it could have been furniture for the hotel.

After Agnelli was fired, H & Co. learned that many of Agnelli's personal expenses were classified as business expenses and H & Co. is in the process of filing amended returns on behalf of Lennox.

### Q. Richard Fechter

Richard Fechter works for Berkowitz Pollock & Brant, an accounting firm that does tax and audit work. He is a forensic accountant and an associate

director. Fechter obtained a finance degree in 1987 and then graduated from University of Miami School of Law in 1990. He is a certified fraud examiner and certified anti-money laundering specialist.

He has been engaged as a forensic accountant about 250 times and has testified in court as a forensic accountant four times.

In this case, he was engaged to look at all the disbursements by Lennox during Agnelli's tenure; determine the nature and purpose of the disbursement; determine whether Lennox benefitted from the disbursement or whether Agnelli benefitted personally; look at the running of the hotel by Agnelli to determine if there was self-dealing or mismanagement or malfeasance or criminal conduct.

Fechter was guided by the standards of the American Institute of Certified Public Accountants and the IRS rules and regulations.

Agnelli caused Lennox to disburse over $6.3 million of Lennox funds from January 1, 2014 through August 31, 2020. Some of those disbursements inappropriately increased the book value of the hotel. There were improper accounting records prepared and inaccurate tax returns filed by Lennox as a result.

After he was engaged, Fechter went to the hotel on July 10, 2020. A locksmith was utilized to gain access to the office at the hotel. There were two rooms in the office but there were no business records in either digital form or hard copies. There were no computers, no invoices, no Quickbooks in the offices.

In late August 2020, Fechter was informed that there were records at the Sherita apartment. Fechter went to the apartment and there were many boxes of documents as well as a laundry cart with binders and documents. Fechter was at the apartment for a couple of hours conducting a cursory review of the documents. There appeared to be many documents relating to the construction of the hotel. The materials were in disarray. There was no organization. Some of the documents were water damaged.

Fechter then made arrangements to have the documents returned to the office in the hotel for safekeeping and further review.

Fechter and his team went to the hotel office and performed an inventory of the records. There was no employment contract, no bank statements, and no Quickbooks. There were some random, incomplete reports, listing of vendors but they were sporadic.

Fechter opines that the records were incomplete. There were no accounting records, no vendor files, no accounts payable files. There were some

documents related to the construction of the hotel but none relating to the operation of the hotel.

Fechter attempted to gather records. Some of the vendors voluntarily produced some records but other records needed to be subpoenaed.

When there are no accounting records and no invoices available, those are red flags and are suspicious. It was concerning to him that records needed to support tax filings were not available. If there were an audit, Lennox would not be able to respond properly.

Eventually, Fechter received bank statements from City National Bank and Wells Fargo, and Quickbooks from H & Co.

Fechter went through the bank statements and tried to reconcile all the transactions with the accounting records of the company. Once an expense was located, he had to determine whether the expense was personal or for business purposes. Upon review, there were many purchases that on their face appeared to be personal and not business expenses such as hair products or bicycle equipment. He also looked at the location of the delivery of the products or provision of services to see if the purchases were related to the hotel.

Fechter also interviewed Analía, Duran, Castellanos (through his counsel), Karen Lantigua, Alex Castillo and Jessie De Cardenas from H & Co., Frank Perez from Entek. He also reviewed the depositions of Fabal, Bermudez, Agnelli and Castellanos, and affidavits from Murshed and Castellanos.

Castellanos contributed approximately $68 million in capital to the hotel through deeds of gift. Another $54,000,000 were contributed through deeds of trust and $14,000,00 was contributed by Castellanos outside the deeds of trust. The deeds of trust placed 75% ownership in Castellanos and 12.5% to each of Analía and Agnelli.

Fechter is unaware if amended tax returns have been returned but his company did prepare amended financial records to be used by H & Co. to prepare the amended returns.

Fechter's investigation into the management of the hotel by Agnelli revealed acts of self-dealing and malfeasance. Agnelli did not maintain proper accounting while at Lennox. He caused inaccurate financial statements to be prepared which caused inaccurate tax returns to be filed with the IRS.

Berkowitz has been paid just under $300,000 for its work in this case.

### 5. Conclusion

In light of the foregoing, the Court finds that Lennox prevails on its breach of contract claim and/or in the alternative, prevails on its breach of fiduciary duty claim, and as such is entitled to damages in the amount of

$6,073,526.

Pursuant to Fla. Stat. § 607.1436(5), the Court hereby directs the purchase of Agnelli's shares in Lennox for $8,356,000, which represents their fair value. Pursuant to Fla. Stat. § 607.1436(5), Agnelli shall also receive interest at the statutory rate of interest set under Fla. Stat. § 55.03 since June 30, 2021. The Court determines this purchase complies with Fla. Stat. § 607.06401 based on the evidence before it. Accordingly, the Court hereby dismisses Agnelli's petition to dissolve Lennox pursuant to Fla. Stat. § 607.1436(6).

In accordance with the Court's fair value determination, Lennox must file a notice of compliance concerning the purchase of Agnelli's shares within **ten days** of this order becoming final.

Additionally, the Court denies Lennox's request for attorney's fees. The Clerk shall **close** this case. Any pending motions are denied as moot.

**Done and ordered**, in chambers in Miami, Florida on July 14, 2022.

Robert N. Scola, Jr.
United States District Judge